372 F.2d 836
 UNITED STATES of America and Linda Stout, by her father and
next friend, Blevin Stout, Appellants,
v.
JEFFERSON COUNTY BOARD OF EDUCATION et al., Appellees.
UNITED STATES of America, Appellant,
v.
The BOARD OF EDUCATION OF the CITY OF FAIRFIELD et al., Appellees.
UNITED STATES of America, Appellant,
v.
The BOARD OF EDUCATION OF the CITY OF BESSEMER et al., Appellees.
UNITED STATES of America, Appellant,
v.
CADDO PARISH SCHOOL BOARD et al., Appellees.
UNITED STATES of America, Appellant,
v.
The BOSSIER PARISH SCHOOL BOARD et al., Appellees.
Margaret M. JOHNSON et al., Appellants,
v.
JACKSON PARISH SCHOOL BOARD et al., Appellees.
Yvornia Decarol BANKS et al., Appellants,
v.
CLAIBORNE PARISH SCHOOL BOARD et al., Appellees.
 Nos. 23345, 23331, 23335, 23274, 23365, 23173, 23192.
 United States Court of Appeals Fifth Circuit.
 Dec. 29, 1966.
 
 Macon L. Weaver, U.S. Atty., Birmingham, Ala., Norman C. Amaker, New York City, David L. Norman, Atty., Dept. of Justice, Washington, D.C., for appellants.
 Maurice F. Bishop, Birmingham, Ala., John C. Satterfield, Yazoo City, Miss., George Rogers, Birmingham, Ala., for appellees.
 No. 23331:
 Macon L. Weaver, U.S. Atty., Demetrius C. Newton, Orzell Billingsley, Jr., Birmingham, Ala., David L. Norman, Atty., Dept. of Justice John Doar, Asst. Atty. Gen., St. John Barrett, Joel M. Finkelstein, Brian K. Landsberg, Charles R. Nesson, Attys., Dept. of Justice, Washington, D.C., for appellant.
 Maurice F. Bishop, Birmingham, Ala., John C. Satterfield, Yazoo City, Miss., George Rogers, Birmingham, Ala., for appellees.
 No. 23335:
 Macon L. Weaver, U.S. Atty., Birmingham, Ala., David L. Norman, Atty., Dept. of Justice, Washington, D.C., Oscar W. Adams, Jr., Birmingham, Ala., for appellant.
 Reid B. Barnes, Birmingham, Ala., John C. Satterfield, Yazoo City, Miss., William G. Somerville, Jr., Birmingham, Ala., J. Howard McEniry, Jr., Bessemer, Ala., for appellees.
 
 No. 23274:
 
 1
 David L. Norman, Atty., Dept. of Justice, Washington, D.C., Norman Amaker, Charles H. Jones, Jr., New York City, A. P. Tureaud, New Orleans, La., for appellant.
 
 
 2
 John A. Richardson, Shreveport, La., for appellees.
 
 No. 23365:
 
 3
 David L. Norman, Atty., Dept. of Justice, Washington, D.C., James M. Nabrit, III, New York City, for appellant.
 
 
 4
 J. Bennett Johnston, Jr., Shreveport, La., Jack P. F. Gremillion, Baton Rouge, La., for appellees.
 
 No. 23173:
 
 5
 Alvin J. Bronstein, Jackson, Miss., Harris David, New Orleans, La., Carl Rachlin, New York City, David Norman, Atty., Dept. of Justice, Washington, D.C., for appellants.
 
 
 6
 Fred L. Jackson, Homer, La., William H. Baker, Jonesboro, La., Teddy W. Airhart, Asst. Atty. Gen., Baton Rouge, La., for appellees.
 
 No. 23192:
 
 7
 Alvin J. Bronstein, Jackson, Miss., Carl Rachlin, New York City, Harris David, New Orleans, La., David Norman, Atty., Dept. of Justice, Washington, D.C., Robert F. Collins, New Orleans, La., for appellants.
 
 
 8
 Jack P. F. Gremillion, Atty. Gen., Thomas McFerrin, Sr., Asst. Atty. Gen., Harry Kron, Jr., Asst. Atty. Gen., Baton Rouge, La., Fred L. Jackson, Homer, La., Teddy W. Airhart, Jr., Asst. Atty. Gen., Baton Rouge, La., for appellees.
 
 
 9
 Before WISDOM and THORNBERRY, Circuit Judges, and COX,* District Judge.
 
 WISDOM, Circuit Judge:
 
 10
 Once again the Court is called upon to review school desegregation plans to determine whether the plans meet constitutional standards. The distinctive feature of these cases, consolidated on appeal, is that they also require us to reexamine school desgregation standards in the light of the Civil Rights Act of 1964 and the Guidelines of the United States Office of Education, Department of Health, Education, and Welfare (HEW).
 
 
 11
 When the United States Supreme Court in 1954 decided Brown v. Board of Education[1] the members of the High School Class of 1966 had not entered the first grade. Brown I held that separate schools for Negro children were 'inherently unequal'.[2] Negro children, said the Court, have the 'personal and present' right to equal educational opportunities with white children in a racially nondiscriminatory public school system. For all but a handful of Negro members of the High School Class of '66 this right has been 'of such stuff as dreams are made on'.[3]
 
 
 12
 "The Brown case is misread and misapplied when it is construed simply to confer upon Negro pupils the right to be considered for admission to a white school".[4] The United States Constitution, as construed in Brown, requires public school systems to integrate students, faculties, facilities, and activities.[5] If Brown I left any doubt as to the affirmative duty of states to furnish a fully integrated education to Negroes as a class, Brown II resolved that doubt. A state with a dual attendance system, one for whites and one for Negroes, must 'effectuate a transition to a (unitary) racially nondiscriminatory school system.'[6] The two Brown decisions established equalization of educational opportunities as a high priority goal for all of the states and compelled seventeen states, which by law had segregated public schools, to take affirmative action to reorganize their schools into a unitary, nonracial system.
 
 
 13
 The only school desegregation plan that meets constitutional standards is one that works. By helping public schools to meet that test, by assisting the courts in their independent evaluation of school desegregation plans, and by accelerating the progress but simplifying the process of desegregation the HEW Guidelines offer new hope to Negro school children long denied their constitutional rights. A national effort, bringing together Congress, the executive, and the judiciary may be able to make meaningful the right of Negro children to equal educational opportunities. The courts acting alone have failed.
 
 
 14
 We hold, again, in determining whether school desegregation plans meet the standards of Brown and other decisions of the Supreme Court,[7] that courts in this circuit should give 'great weight' to HEW Guidelines.[8] Such deference is consistent with the exercise of traditional judicial powers and functions. HEW Guidelines are based on decisions of this and other courts, are formulated to stay within the scope of the Civil Rights Act of 1964, are prepared in detail by experts in education and school administration, and are intended by Congress and the executive to be part of a coordinated national program. The Guidelines present the best system available for uniform application, and the best aid to the courts in evaluating the validity of a school desegregation plan and the progress made under that plan.
 
 
 15
 HEW regulations provide that schools applying for financial assistance must comply with certain requirements. However, the requirements for elementary or secondary schools 'shall be deemed to be satisfied if such school or school system is subject t a final order of a court of the United States for the desegregation of such school or school system * * *.'[9] This regulation causes our decisions to have a twofold impact on school desegregation. Our decisions determine not only (1) the standards schools must comply with under Brown but also (2) the standards these schools must comply with to qualify for federal financial assistance. Schools automatically qualify for federal aid whenever a final court order desegregating the school has been entered in the litigation and the school authorities agree to comply with the order. Because of the second consequence of our decisions and because of our duty to cooperate with Congress and with the executive in enforcing Congressional objectives, strong policy considerations support our holding that the standards of court-supervised desegregation should not be lower than the standards of HEW-supervised desegregation. The Guidelines, of course, cannot bind the courts; we are not abdicating any judicial responsibilities.[10] But we hold that HEW's standards are substantially the same as this Court's standards. They are required by the Constitution and, as we construe them, are within the scope of the Civil Rights Act of 1964. In evaluating desegregation plans, district courts should make few exceptions to the Guidelines and should carefully tailor those so as not to defeat the policies of HEW or the holding of this Court.
 
 
 16
 Case by case over the last twelve years, courts have increased their understanding of the desegregation process.[11] Less and less have courts accepted the question-begging distinction between 'desegregation' and 'integration' as a sanctuary for school boards fleeing from their constitutional duty to establish an integrated, non-racial school system.[12] With the benefit of this experience, the Court has restudied the School Segregation Cases. We have reexamined the nature of the Negro's right to equal educational opportunities and the extent of the correlative affirmative duty of the state to furnish equal educational opportunities. We have taken a close look at the background and objectives of the Civil Rights Act of 1964.[13]
 
 
 17
 We approach decision-making here with humility. Many intelligent men of good will who have dedicated their lives to public education are deeply concerned for fear that a doctrinaire approach to desegregating schools may lower educational standards or even destroy public schools in some areas. These educators and school administrators, especially in communities where total segregation has been the way of life from cradle to coffin, may fail to understand all of the legal implications of Brown, but they understand the grim realities of the problems that complicate their task.
 
 
 18
 The Court is aware of the gravity of their problems. (1) Some determined opponents of desegregation would scuttle public education rather than send their children to schools with Negro children. These men flee to the suburbs, reinforcing urban neighborhood school patterns. (2) Private schools, aided by state grants, have mushroomed in some states in this circuit.[14] The flight of white children to these new schools and to established private and parochial schools promotes resegregation. (3) Many white teachers prefer not to teach in integrated public schools. They are tempted to seek employment at white private schools or to retire. (4) Many Negro children, for various reasons, prefer to finish school where they started. These are children who will probably have to settle for unskilled occupations. (5) The gap between white and Negro scholastic achievements causes all sorts of difficulties. There is no consolation in the fact that the gap depends on the socioeconomic status of Negroes at least as much as it depends on inferior Negro schools.
 
 
 19
 No court can have a confident solution for a legal problem so closely interwoven with political, social, and moral threads as the problem of establishing fair, workable standards for undoing de jure school segregation in the South. The Civil Rights Act of 1964 and the HEW Guidelines are belated but invaluable helps in arriving at a neutral, principled decision consistent with the dimensions of the problem, traditional judicial functions, and the United States Constitution. We grasp the nettle.
 
 I.
 
 20
 'No army is stronger than an idea whose time has come.'[15] Ten years after Brown, came the Civil Rights Act of 1964.[16] Congress decided that the time had come for a sweeping civil rights advance, including national legislation to speed up desegregation of public schools and to put teeth into enforcement of desegregation.[17] Titles IV and VI together constitute the congressional alternative to court-supervised desegregation. These sections of the law mobilize in aid of desegregation the United States Office of Education and the Nation's purse.
 
 
 21
 A. Title IV authorizes the Office of Education to give technical and financial assistance to local school systems in the process of desegregation.[18] Title VI requires all federal agencies administering any grant-in-aid program to see to it that there is no racial discrimination by any school or other recipient of federal financial aid.[19] School boards cannot, however, by giving up federal aid, avoid the policy that produced this limitation on federal aid to schools: Title IV authorizes the Attorney General to sue, in the name of the United States, to desegregate a public school or school system.[20] More clearly and effectively than either of the other two coordinate branches of Government, Congress speaks as the Voice of the Nation. The national policy is plain: formerly de jure segregated public school systems based on dual attendance zones must shift to unitary, nonracial systems-- with or without federal funds.
 
 
 22
 The Chief Executive acted promptly to carry into effect the Chief Legislature's mandate. President Lyndon B. Johnson signed the bill into law July 2, 1964, only a few hours after Congress had finally approved it. In the signing ceremony broadcast to the Nation, the President said: 'We believe all men are entitled to the blessings of liberty, yet millions are being deprived of those blessings-- not because of their own failures, but because of the color of their skins. * * * (It) cannot continue.'[21] At the request of President Johnson, Vice President Hubert H. Humphrey submitted a report to the President 'On the Coordination of Civil Rights Activities in the Federal Government' recommending the creation of a Council on Equal Opportunity. The report concludes that 'the very breadth of the Federal Government's effort, involving a multiplicity of programs' necessary to carry out the 1964 Act had created a 'problem of coordination.' The President approved the recommendation that instead of creating a new agency there be a general coordination of effort.[22] Later, the President noted that the federal departments and agencies had 'adopted uniform and consistent regulations implementing Title VI * * * (in) a coordinated program of enforcement.' He directed the Attorney General to 'coordinate' the various federal programs in the adoption of 'consistent and uniform policies, practices, and procedures with respect to the enforcement of Title VI * * *.'[23]
 
 
 23
 In April 1965 Congress for the first time in its history adopted a law providing general federal aid-- a billion dollars a year-- for elementary and secondary schools.[24] It is a fair assumption that Congress would not have taken this step had Title VI not established the principle that schools receiving federal assistance must meet uniform national standards for desegregation.[25]
 
 
 24
 To make Title VI effective, the Department of Health, Education, and Welfare (HEW) adopted the regulation, 'Nondiscrimination in Federally assisted Programs.'[26] This regulation directs the Commissioner of Education to approve applications for financial assistance to public schools only if the school or school system agrees to comply with a court order, if any, outstanding against it, or submits a desegregation plan satisfactory to the Commissioner.[27]
 
 
 25
 To make the regulation effective, by assisting the Office of Education in determining whether a school qualifies for federal financial aid and by informing school boards of HEW requirements, HEW formulated certain standards or guidelines. In April 1965, nearly a year after the Act was signed, HEW published its first Guidelines, 'General Statement of Policies under Title VI of the Civil Rights Act of 1964 Respecting Desegregation of Elementary and Secondary Schools.'[28] These Guidelines fixed the fall of 1967 as the target date for total desegregation of all grades. In March 1966 HEW issued 'Revised Guidelines' to correct most of the major flaws revealed in the first year of operation under Title VI.[29]
 
 
 26
 B. The HEW Guidelines raise the question: To what extent should a court, in determining whether to approve a school desegregation plan, give weight to the HEW Guidelines? We adhere to the answer this Court gave in four earlier cases. The HEW Guidelines are 'minimum standards', representing for the most part standards the Supreme Court and this Court established before the Guidelines were promulgated.[30] Again we hold, 'we attach great weight' to the Guidelines. Singleton v. Jackson Municipal Separate School District, 5 Cir. 1965, 348 F.2d 729 (Singleton I). 'We put these standards to work. * * * (Plans should be) modeled after the Commissioner of Education's requirements * * *. (Exceptions to the guidelines should be) confined to those rare cases presenting justiciable, not operational, questions. * * * The applicable standard is essentially the HEW formulae.' Price v. Denison Independent School District, 5 Cir. 1965, 348 F.2d 1010. 'We consider it to be in the best interest of all concerned that School Boards meet the minimum standards of the Office of Education * * *. In certain school districts and in certain respects, HEW standards may be too low to meet the requirements established by the Supreme Court and by this Court * * *. (But we also) consider it important to make clear that * * * we do not abdicate our judicial responsibility for determining whether a school desegregation plan violates federally guaranteed rights.' Singleton v. Jackson Municipal Separate School District, 5 Cir. 1966, 355 F.2d 865 (Singleton II). In Davis v. Board of School Commissioners of Mobile County, 5 Cir. 1966, 364 F.2d 896, the most recent school case before this Court, we approved Singleton I and II and Price v. Denison and ordered certain changes in the school plan in conformity with the HEW Guidelines.
 
 
 27
 Courts in other circuits are in substantial agreement with this Court. In Kemp v. Beasley, 8 Cir. 1965, 352 F.2d 14, 18-19, the Court said: 'The Court agrees that these (HEW) standards must be heavily relied upon * * *. The courts should endeavor to model their standards after those promulgated by the executive. They are not bound, however, and when circumstances dictate, the courts may require something more, less or different from the H.E.W. guidelines.' Concurring, Judge Larson observed: 'However, that 'something different' should rarely, if ever, be less than what is contemplated by the H.E.W. standards.' 352 F.2d at 23. Smith v. Board of Education of Morrilton, 8 Cir. 1966, 365 F.2d 770 reaffirms that the Guidelines 'are entitled to serious judicial deference'.
 
 
 28
 Although the Court of Appeals for the Fourth Circuit has not yet considered the effect of the HEW standards, district courts in that circuit have relied on the guidelines. See Kier v. County School Board of Augusta County, W.D.Va.1966, 249 F.Supp. 239; Wright v. County School Board of Greenville County, E.D. Va.1966, 252 F.Supp. 378; Miller v. Clarendon County School District No. 2, D.S.C., 253 F.Supp. 552, April 21, 1966. In Miller, one of the most recent of these cases, the court said:
 
 
 29
 The orderly progress of desegregation is best served if school systems desegregating under court order are required to meet the minimum standards promulgated for systems that desegregate voluntarily. Without directing absolute adherence to the 'Revised Statement' guidelines at this juncture, this court will welcome their inclusion in any new, amended, or substitute plan which may be adopted and submitted.
 
 
 30
 In this circuit, the school problem arises from state action. This Court has not had to deal with nonracially motivated de facto segregation, that is, racial imbalance resulting fortuitously in a school system based on a single neighborhood school serving all white and Negro children in a certain attendance area or neighborhood. For this circuit, the HEW Guidelines offer, for the first time, the prospect that the transition from a de jure segregated dual system to a unitary integrated system may be carried out effectively, promptly, and in an orderly manner. See Appendix B, Rate of Change and Status of Desegregation.
 
 II.
 
 31
 We read Title VI as a congressional mandate for change-- change in pace and method of enforcing desegregation. The 1964 Act does not disavow court-supervised desegregation. On the contrary, Congress recognized that to the courts belongs the last word in any case or controversy.[31] But Congress was dissatisfied with the slow progress inherent in the judicial adversary process.[32] Congress therefore fashioned a new method of enforcement to be administered not on a case by case basis as in the courts but generally, by federal agencies operating on a national scale and having a special competence in their respective fields. Congress looked to these agencies to shoulder the additional enforcement burdens resulting from the shift to high gear in school desegregation.
 
 
 32
 A. Congress was well aware that it was time for a change. In the decade following Brown, court-supervised desegregation made qualitative progress: Responsible Southern leaders accepted desegregation as a settled constitutional principle.[33] Quantitively, the results were meagre. The statistics speak eloquently. See Appendix B, Rate of Change and Status of Desegregation. In 1965 the public school districts in the consolidated cases now before this Court had a school population of 155,782 school children, 59,361 of whom were Negro. Yet under the existing court-approved desegregation plans, only 110 Negro children in these districts, .019 per cent of the school population, attend formerly 'white' schools.[34] In 1965 there was no faculty desegregation in any of these school districts; indeed, none of the 30,500 Negro teachers in Alabama, Louisiana, and Mississippi served with any of the 65,400 white teachers in those states.[35] In the 1963-64 school year, the eleven states of the Confederacy had 1.17 per cent of their Negro students in schools with white students.[36] In 1964-65, undoubtedly because of the effect of the 1964 Act, the percentage doubled, reaching 2.25. For the 1965-66 school year, this time because of HEW Guidelines, the percentage reached 6.01 per cent. In 1965-66 the entire region encompassing the Southern and border states had 10.9 per cent of their Negro children in school with white children; 1,555 biracial school districts out of 3,031 in the Southern and border states were still fully segregated; 3,101,043 Negro children in the region attended all-Negro schools. Despite the impetus of the 1964 Act, the states of Alabama, Louisiana, and Mississippi, still had less than one per cent of their Negro enrollment, attending schools with white students.[37]
 
 
 33
 The dead hand of the old past and the closed fist of the recent past account for some of the slow progress. There are other reasons-- as obvious to Congress as to courts. (1) Local loyalties compelled school officials and elected officials to make a public record of their unwillingness to act. But even school authorities willing to act have moved slowly because of uncertainty as to the scope of their duty to act affirmatively. This is attributable to (a) a misplaced reliance on the Briggs dictum that the Constitution 'does not require integration',[38] (b) a misunderstanding of the Brown II mandate, desegregate with 'all deliberate speed',[39] and (c) a mistaken notion that transfers under the Pupil Placement Laws satisfy desegregation requirements.[40] (2) Case by case development of the law is a poor sort of medium for reasonably prompt and uniform desegregation. There are natural limits to effective legal action. Courts cannot give advisory opinion, and the disciplined exercise of the judicial function properly makes courts reluctant to move forward in an area of the law bordering the periphery of the judicial domain. (3) The contempt power is ill-suited to serve as the chief means of enforcing desegregation. Judges naturally shrink from using it against citizens willing to accept the thankless, painful responsibility of serving on a school board.[41] (4) School desegregation plans are often woefully inadequate; they rarely provide necessary detailed instructions and specific answers to administrative problems.[42] And most judges do not have sufficient competence-- they are not educators or school administrators-- to know the right questions, must less the right answers. (5) But one reason more than any other has held back desegregation of public schools on a large scale. This has been the lack, until 1964, of effective congressional statutory recognition of school desegregation as the law of the land.[43]
 
 
 34
 'Considerable progress has been made * * *. Nevertheless, in the last decade it has become increasingly clear that progress has been too slow and that national legislation is required to meet a national need which becomes ever more obvious.'[44] Title VI of the Civil Rights Act of 1964, therefore, was not only appropriate and proper legislation under the Thirteenth and Fourteenth Amendments; it was necessary to rescue school desegregation from the log in which it had been trapped for ten years.[45]
 
 
 35
 The Civil Rights Commission, doubtless better able than any other authority to understand the significance of the Civil Rights, Act of 1964, had this to say about Title VI:
 
 
 36
 'This statute heralded a new era in school desegregation * * *. Most significantly * * * Federal power was to be brought to bear in a manner which promised speedier and more substantial desegregation than had been achieved through the voluntary efforts of school boards and district-by-district litigation. * * * During fiscal year 1964, $176,546,992 was distributed to State and local school agencies in the 17 Southern and border States. The passage of the Elementary and Secondary Education Act of 1965 added an additional appropriation of $589,946,135 for allocation to the 17 Southern and border States for fiscal year 1966. With funds of such magnitude at stake, most school systems would be placed at a serious disadvantage by termination of Federal assistance.'[46]
 
 
 37
 B. The congressional mandate, as embodied in the Act and as carried out in the HEW Guidelines, does not conflict with the proper exercise of the judicial function or with the doctrine of separation of powers. It does however profoundly affect constructive use of the judicial function within the lawful scope of sound judicial discretion. When Congress declares national policy, the duty the two other coordinate branches owe to the Nation requires that, within the law, the judiciary and the executive respect and carry out that policy. Here the Chief Executive acted promptly to bring about uniform standards for desegregation. The judicial branch too should cooperate with Congress and the executive in making administrative agencies effective instruments for supervising and enforcing desegregation of public schools. Justice Harlan F. Stone expressed this well:
 
 
 38
 'Legislatures create administrative agencies with the desire and expectation that they will perform efficiently the tasks committed to them. That, at least, is one of the contemplated social advantages to be weighed in resolving doubtful construction. Its aim is so obvious as to make unavoidable the conclusion that the function which courts are called upon to perform, in carrying into operation such administrative schemes, is constructive, not destructive, to make administrative agencies, whenever reasonably possible, effective instruments for law enforcement, and not to destroy them.'[47]
 
 
 39
 In an analogous situation involving enforcement of the Fair Labor Standards Act, the Supreme Court has said, 'Good administration of the Act and good judicial administration alike require that the standards of public enforcement and those for determining private rights shall be at variance only where justified by very good reasons.' Skidmore v. Swift & Co., 1944, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124. In an appeal from the district court's denial of an injunction to enforce labor standards under the Act this Court has pointed out:
 
 
 40
 '* * * this proceeding is only superficially related to a suit in equity for an injunction to protect interests jeopardized in a private controversy. The public interest is jeopardized here. The injunctive processes are a means of effecting general compliance with national policy as expressed by Congress, a public policy judges too must carry out-- actuated by the spirit of the law and not begrudgingly as if it were a newly imposed fiat of a presidium. * * * Implicit in the defendants' non-compliance, as we read the briefs and the record, is a certain underlying, not unnatural, Actonian distaste for national legislation affecting local activities. But the Fair Labor Standards Law has been on the books for twenty-three years. The Act establishes a policy for all of the country, and for the courts as well as for the agency required to administer the law. Mitchell v. Pidcock, 5 Cir. 1962, 299 F.2d 281, 287, 288.
 
 
 41
 C. We must therefore co-operate with Congress and the Executive in enforcing Title VI. The problem is: Are the HEW Guidelines within the scope of the congressional and executive policies embodied in the Civil Rights Act of 1964. We hold that they are.
 
 
 42
 The Guidelines do not purport to be a rule or regulation or order. They constitute a statement of policy under section 80.4(c) of the HEW Regulations issued after the President approved the regulations December 3, 1964. HEW is under no statutory compulsion to issue such statements. It is, however, of manifest advantage to school boards throughout the country and to the general public to know the criteria the Commissioner uses in determining whether a school meets the requirements for eligibility to receive financial assistance.
 
 
 43
 The Guidelines have the vices of all administrative policies established unilaterally without a hearing. Because of these vices the courts, as the school boards point out, have set limits on administrative regulations, rulings, policies, and practices: an agency construction of a statute cannot make the law; it must conform to the law and be reasonable. To some extent the administrative weight of the declarations depends on the place of such declarations in the hierarchy of agency pronouncements extending from regulations down to general counsel memoranda and inter-office decisions. See Manhattan General Electric Company v. Commissioner, 1936, 297 U.S. 129, 56 S.Ct. 397, 80 L.Ed. 528; United States v. Bennett, 5 Cir. 1951, 186 F.2d 407; United States v. Mississippi Chemical Corporation, 5 Cir., 1964, 326 F.2d 569; Chattanooga Auto Club v. Commissioner of Internal Revenue, 6 Cir. 1950, 182 F.2d 551.
 
 
 44
 These and similar decisions are not inconsistent with the courts' giving great weight to the HEW's policy statements on enforcement of Title VI. In Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, an action was commenced in a federal district court by employees of Swift & Co. to recover wages at the overtime rates prescribed by the Fair Labor Standards Act (52 Stat.1060, et seq.) for certain services which they had performed. At issue was whether these services constituted 'employment' within the meaning of section 7(a) of that act. The district court and this Court, on appeal, decided this issue against the plaintiffs. The Supreme Court reversed. After acknowledging (323 U.S. at 137, 65 S.Ct. at 163) that the statute had granted no rule-making power to the Wage and Hour Administrator with respect to the issue at hand ('instead, it put this responsibility on the courts'), the Court referred to an 'Interpretative Bulletin' issued by the Administrator containing his interpretation of the statutory phrase in question. The Supreme Court said:
 
 
 45
 'We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'[48]
 
 
 46
 The Supreme Court found that the lower courts had misunderstood their function vis-a-vis the Interpretative Bulletin and remanded the case. See also, United States v. American Trucking Association, 1940, 310 U.S. 534, 543, 549, 60 S.Ct. 1059, 84 L.Ed. 134; Goldberg v. Sorvas, 1 Cir. 1961, 294 F.2d 841, 847.
 
 
 47
 It is evident to anyone that the Guideliness were carefully formulated by educational authorities anxious to be faithful to the objectives of the 1964 Act. To the members of this Court, who for years have gone to bed and waked up with school segregation problems on their minds, it is evident that the HEW standards are strikingly similar to the standards the Supreme Court and this Court have established. The Guidelines, therefore, are not run-of-the-mine agency pronouncements low in the hierarchy of administrative declarations. They are not regulations requiring the approval of the President. They may be described as a restatement of the judicial standards applicable to disestablishing de jure segregation in the public schools.
 
 
 48
 Courts therefore should cooperate with the congressional-executive policy in favor of desegregation and against aiding segregated schools.
 
 
 49
 D. Because our approval of a plan establishes eligibility for federal aid, our standards should not be lower than those of HEW. Unless judicial standards are substantially in accord with the Guidelines, school boards previously resistent to desegregation will resort to the courts to avoid complying with the minimum standards HEW promulgates for schools that desegregate voluntarily. As we said in Singleton I:
 
 
 50
 'If in some district courts judicial guides for approval of a school desegregation plan are more acceptable to the community or substantially less burdensome than H.E.W. guides, school boards may turn to the federal courts as a means of circumventing the H.E.W. requirements for financial aid. Instead of a uniform policy relatively easy to administer, both the courts and the Office of Education would have to struggle with individual school systems on ad hoc basis. If judicial standards are lower than H.E.W. standards, recalcitrant school boards in effect will receive a premium for recalcitrance; the more the intransigence, the bigger the bonus.' 348 F.2d at 731.
 
 
 51
 In Kemp v. Beasley, 8 Cir. 1965, 352 F.2d 14, the Court concluded:
 
 
 52
 '(HEW) standards must be heavily relied upon. * * * Therefore, to the end of promoting a degree of uniformity and discouraging reluctant school boards from reaping a benefit from their reluctance the courts should endeavor to model their standards after those promulgated by the executive.' 352 F.2d at 18, 19.
 
 
 53
 Concurring, Judge Larson, speaking from his experience as a district judge, pointed out that school boards which do not act voluntarily retard the desegregation process to the disadvantage of the individual's constitutional rights. 'Judicial criteria', therefore, 'should probably be more stringent' than HEW Guidelines:
 
 
 54
 'A school board which fails to act voluntarily forces Negro students to solicit aid from the courts. This not only shifts the burden of initiating desegregation, but inevitably means delay in taking the first step. As Judge Gibson observes, we are not here concerned with regulating the flow of Federal funds. Our task is to safeguard basic constitutional rights. Thus, our standards should be directed toward full, complete, and final realization of those rights.' 352 F.2d at 23.
 
 
 55
 The announcement in HEW regulations that the Commissioner would accept a final school desegregation order as proof of the school's eligibility for federal aid prompted a number of schools to seek refuge in the federal courts. Many of these had not moved an inch toward desegregation.[49] In Louisiana alone twenty school boards obtained quick decrees providing for desegregation according to plans greatly at variance with the Guidelines.[50]
 
 
 56
 We shall not permit the courts to be used to destroy or dilute the effectiveness of the congressional policy expressed pressed in Title VI. There is no bonus for foot-dragging.
 
 
 57
 E. The experience this Court has had in the last ten years argues strongly for uniform standards in court-supervised desegregation.
 
 
 58
 The first school case to reach this Court after Brown v. Board of Education was Brown v. Rippy, 5 Cir. 1956, 233 F.2d 796. Since then we have reviewed 41 other school cases, many more than once.[51] The district courts in this circuit have considered 128 school cases in the same period. Reviewing these cases imposes a taxing, time-consuming burden on the courts not reflected in statistics. An analysis of the cases shows a wide lack of uniformity in areas where there is no good reason for variations in the schedule and manner of desegregation.[52] In some cases there has been a substantial time-leg between this Court's opinions and their application by the district courts.[53] In certain cases-- cases we consider unnecessary to cite-- there has even been a manifest variance between this Court's decision and a later district court decision. A number of district courts still mistakenly assume that transfers under Pupil Placement Laws superimposed on unconstitutional initial assignment satisfy the requirements of a desegregation plan. The lack of clear and uniform standards to govern school boards has tended to put a premium on delaying actions. In sum, the lack of uniform standards has retarded the development of local responsibility for the administration of schools without regard to race or color. What Cicero said of an earlier Athens and an earlier Rome is equally applicable today: In Georgia, for example, there should not be one law for Athens and another law for Rome.
 
 
 59
 Before HEW published its Guidelines, this Court had already established guidelines for school desegregation: to encourage uniformity at the district court level and to conserve judicial effort at both the district court and appellate levels. We did so by making detailed suggestions to the district courts. Lockett v. Board of Education of Muscogee County, 5 Cir. 1964, 342 F.2d 225; Bivins v. Board of Education for Bibb County, 5 Cir. 1965, 342 F.2d 229; Armstrong v. Board of Education of Birmingham, 5 Cir. 1964, 333 F.2d 47; Davis v. Board of School Commissioners of Mobile County, 5 Cir. 1964, 333 F.2d 53; Stell v. Savannah-Chatham County Board of Education, 5 Cir. 1964, 333 F.2d 55; Gaines v. Dougherty County Board of Education, 5 Cir. 1964, 334 F.2d 983. In other areas of the law involving recurrent problems of regional or national interest, this Court has also found guidelines advantageous. In United States v. Ward, 5 Cir. 1965, 349 F.2d 795, and United States v. Palmer, 5 Cir. 1966, 356 F.2d 951, suits to enjoin registrars of voters from discriminating against Negroes, we attached identical proposed decrees for the guidance of district courts.[54] See also Scott v. Walker, 5 Cir. 1966, 358 F.2d 561, one of a series of cases on the exclusion of Negroes from juries.
 
 
 60
 F. We summarize the Court's policy as one of encouraging the maximum legally permissible correlation between judicial standards for school desegregation and HEW Guidelines. This policy may be applied without federal courts' abdicating their proper judicial function. The policy complies with the Supreme Court's increasing emphasis on more speed and less deliberation in school desegregation.[55] It is consistent with the judiciary's duty to the Nation to cooperate with the two other coordinate branches of government in carrying out the national policy expressed in the Civil Rights Act of 1964.
 
 III.
 
 61
 The defendants contend that the Guidelines require integration, not just desegregation; that school boards have no affirmative duty to integrate. They say that in this respect the Guidelines are contrary to the provisions of the Civil Rights Act of 1964 and to constitutional intent expressed in the Act. This argument rests on nothing that the United States Supreme Court held or said in Brown or in any other case. It rests on two glosses on Brown: the opinions in Briggs v. Elliott, E.D.S.C. 1955, 132 F.Supp. 776 and Bell v. School City of Gary, N.D.Ind.1963, 213 F.Supp. 819, aff'd, 7 Cir. 1963, 324 F.2d 209. Briggs, decided only six weeks after Brown II, is one of the earliest cases in this field of law. The portion of the opinion most quoted is pure dictum. Briggs did not paraphrase the law as the Supreme Court stated it in Brown or as the law must be stated today in the light of Aaron v. Cooper, Rogers v. Paul and Bradley v. School Board. These and other decisions compel states in this circuit to take affirmative action to reorganize their school systems by integrating the students, faculties, facilities, and activities. As for Bell, it is inapplicable to cases in this circuit, none of which involve de facto segregated schools. Although the legislative history of the statute shows that the floor managers for the Act and other members of the Senate and House cited and quoted these two opinions they did so within the context of the problem of de facto segregration. A study of the Guidelines shows that the HEW standards within the rationale of Brown and the congressional objectives of the Act.
 
 
 62
 A. Briggs, an action to desegregate the public schools in Clarendon County, South Carolina, was one of the school cases consolidated with Brown v. Board of Education of Topeka, Kansas. On remand, a distinguished court (Parker and Dobie, Circuit Judges, and Timmerman, District Judge) felt that it was important to 'point out exactly what the Supreme Court has decided and what it has not decided.' The Court said:
 
 
 63
 'It has not decided that the federal courts are to take over or regulate the public schools of the states. It has not decided that the states must mix persons of different races in the schools or must require them to attend schools or must deprive them of the right of choosing the schools they attend. What it has decided, and all that it has decided, is that a state may not deny to any person on account of race the right to attend any school that it maintains. * * * The Constitution, in other words, does not require integration. It merely forbids (segregation).' 132 F.Supp. at 777.
 
 
 64
 Ten years later Clarendon County schools were still totally segregated.[56]
 
 
 65
 This Court and other courts, gratuitously for the most part, have often paraphrased or quoted with approval the Briggs dictum.[57] It is not surprising, therefore, that Briggs prompted Pupil Placement Laws, the most effective technique for perpetuating school segregation. And it is not surprising that school officials-- the Briggs dictum dinned into their ears for a decade-- have not now faced up to faculty integration. However, as this Court's experience in handling school cases increased, the Court became aware of the frustrating effects of Briggs. In Singleton I we referred to the dictum as 'inconsistent with Brown (II) and the later development of decisional and statutory law in the area of civil rights.' 348 F.2d at 730 n. 5. In Singleton II we called it an 'oversimplified' construction of Brown I. We added: 'The Constitution forbids unconstitutional state action in the form of segregated facilities, including segregated public schools. School authorities, therefore, are under the constitutional compulsion of furnishing a single, integrated school system.' 355 F.2d at 869. Other federal courts have disapproved of the Briggs dictum.[58]
 
 
 66
 The Briggs dictum may be explained as a facet of the Fourth Circuit's now abandoned view that Fourteenth Amendment rights are exclusively individual rights and in school cases are to be asserted individually after each plaintiff has exhausted state administrative remedies.[59] The Court disallowed class suits because Negro students who had not asked for transfers to white schools had not individually exhausted their remedies and were therefore not similarly situated with the plaintiffs. Thus in Carson v. Warlick, 4 Cir. 1956, 238 F.2d 724, Judge John Parker, for the Court, stated:
 
 
 67
 'There is no question as to the right of these (Negro) school children * * *. They (are to be) admitted, however, as individuals, not as a class or group; and it is as individuals that their rights under the Constitution are asserted. * * * (The) school board must pass upon individual applications made individually to the board. * * *' 238 F.2d at 729.
 
 
 68
 In Covington v. Edwards, 4 Cir. 1959, 264 F.2d 780, 783, the court commented that 'the County board has taken no steps to put an end to the planned segregation', but still held for the board for failure of the plaintiffs to exhaust their remedies and for filing the suit as a class action. As late as 1961, a district court observed:
 
 
 69
 'It can fairly be said that what the children and their parents are still seeking is only a desegregation of the Caswell County School System rather than a protection of their own rights . . ..' Jeffers v. Whitley, M.D.N.C. Dec. 29, 1961, 7 Race Rel.L.Rep. 22, 24.
 
 
 70
 The Fourth Circuit moved away from this view, holding that administrative remedies need not be exhausted where the School Board's past discriminatory practices made clear that exhaustion would be futile, or where there was no time to seek redress through proper administrative channels. Jeffers v. Whitley, 4 Cir. 1962, 309 F.2d 621; Green v. School Board of the City of Roanoke, 4 Cir. 1965, 304 F.2d 119. Green is particularly significant in its approval of a class suit to abolish discriminatory practices:
 
 
 71
 'Even if limited to its narrowest interpretation, it holds that after one Negro child exhausted his administrative remedies, he may bring suit on behalf of all children segregated in the school system. The other children do not have to follow individually the labyrinth of administrative steps in the pupil placement act.' Emerson, Haber & Dorsen 1668 (2d ed. 1967).
 
 
 72
 '(It) would be almost a cruel joke to say that admministrative remedies must be exhausted when it is known that such exhaustion of remedies will not terminate the pattern of a racial assignment.' Jackson v. School Board of City of Lynchburg, W.D.Va.1962, 201 F.Supp. 620. McNeese v. Board of Education for School District 187, 1963, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622, put beyond debate the need to exhaust remedies and the right of Negro students to file a class action. See also Armstrong v. Board of Education of the City of Birmingham, 5 Cir. 1963, 323 F.2d 333, cert denied sub. nom. Gibson v. Harris, 376 U.S. 908, 84 S.Ct. 661, 11 L.Ed.2d 606 (1964).
 
 
 73
 In the sense that an individual pupil's right under the equal protection clause is a 'personal and present' right not to be discriminated against by being segregated,[60] the dictum is a cliche. The Fourteenth Amendment provides, 'nor shall any State * * * deny to any person within its jurisdiction the equal protection of the laws'. The dictum would also be defensible, if the Briggs court had used the term 'integration' to mean an absolute command at all costs that each and every Negro child attend a racially balanced school.[61] But what is wrong about the dictum is more important than what is right about it. What is wrong about Briggs is that it drains out of Brown that decision's significance as a class action to secure equal educational opportunities for Negroes by compelling the states to reorganize their public school systems.[62] All four of the original School Segregation cases were class actions and described as such in the opinions. 347 U.S. at 455, 74 S.Ct. 686.
 
 
 74
 We do not minimize the importance of the Fourteenth Amendment rights of an individual, but there was more at issue in Brown than the controversy between certain schools and certain children. Briggs overlooks the fact that Negroes collectively are harmed when the state, by law or custom, operates segregated schools or a school system with uncorrected effect of segregation.
 
 
 75
 Denial of access to the dominant culture, lack of opportunity in any meaningful way to participate in political and other public activities, the stigma of apartheid condemned in the Thirteenth Amendment are concomitants of the dual educational system. The unmalleable fact transcending in importance the harm to individual Negro children is that the separate school system was an integral element in the Southern State's general program to restrict Negroes as a class from participation in the life of the community, the affairs of the State, and the mainstream of American life: Negroes must keep their place.[63]
 
 
 76
 "Segregation is a group phenomenon. Although the effects of discrimination are felt by each member of the group, and discriminatory practice is directed against the group as a unit and against individuals only as their connection with the group involves the antigroup sanction. * * * (As) a group-wrong * * * the mode of redress must be group-wide to be adequate.'[64] Adequate redress therefore calls for much more than allowing a few Negro children to attend formerly white schools; it calls for liquidation of the state's system of de jure school segregation and the organized undoing of the effects of past segregation. 'Beyond (a child's) personal right (under the Fourteenth Amendment) however, or perhaps as an aspect of it, the lower federal courts seem to be recognizing a right in Negro school children, enforceable at least by a class action, to have the school system administered free of an enforced policy of segregation irrespective of whether any colored pupil has been denied admission to any particular school on the ground of his race.'[65]
 
 
 77
 It is undoubtedly true that the intangible inadequacies of a segregated education harm the individual, but the Supreme Court treated these inadequacies as inherent attributes which prevail universally.[66] For example, the Court said:(Education) is the very foundation of good citizenship. Today it is a principle instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms 347 U.S. at 493, 74 S.Ct. at 691.
 
 Again, in a critical passage:
 
 78
 To separate (children) from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone. 347 U.S. at 494, 74 S.Ct. at 691.
 
 
 79
 With this predicate it is not surprising that Brown II, a year after Brown I was decided, going beyond recognition of the 'personal' right in the individual plaintiffs, fashioned a remedy appropriate for the class. The Court imposed on the states the duty of furnishing an integrated school system, that is, the duty of 'effectuat(ing) a transition to a racially nondiscriminatory school system.'[67] In addition, Brown II subordinated the 'present' right in the individual plaintiffs to the right of Negroes as a class to a unitary, nonracial system-- some time in the future.[68]
 
 
 80
 The central vice in a formerly de jure segregated public school system is apartheid by dual zoning: in the past by law, the use of one set of attendance zones for white children and another for Negro children, and the compulsory initial assignment of a Negro to the Negro school in his zone. Dual zoning persists in the continuing operation of Negro schools identified as Negro, historically and because the faculty and students are Negroes. Acceptance of an individual's application for transfer, therefore, may satisfy that particular individual; it will not satisfy the class. The class is all Negro children in a school district attending, by definition, inherently unequal schools and wearing the badge of slavery separation displays. Relief to the class requires school boards to desegregate the school from which a transferee comes as well as the school to which he goes. It requires conversion of the dual zones into a single system. Faculties, facilities, and activities as well as student bodies must be integrated. No matter what view is taken of the rationale in Brown I, Brown II envisaged the remedy following the wrong, the state's correcting its discrimination against Negroes as a class, through separate schools, by initiating and operating a unitary integrated school system. The gradual transition the Supreme Court authorized was to allow the states time to solve the administrative problems inherent in that change-over. No delay would have been necessary if the right at issue in Brown had been only the right of individual Negro plaintiffs to admission to a white school. Moreover, the delay of one year in deciding Brown II and the gradual remedy Brown II fashioned can be justified only on the ground that the 'personal and present' right of the individual plaintiffs must yield to the overriding right of Negroes as a class to a completely integrated public education.68a
 
 
 81
 Although psychological harm and lack of educational opportunities to Negroes may exist whether caused by de facto or de jure segregation, a state policy of apartheid aggravates the harm. Thus, Chief Justice Warren quoted with approval the finding of the district court in the Kansas case: 'The impact (of the detrimental effect of segregation upon Negro children) is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the negro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendency to (retard) the educational and mental development of Negro children and to deprive them of some of the benefits they would receive in a racial(ly) integrated school system.' Brown I, 347 U.S. at 494, 74 S.Ct. at 691. The State, therefore, should be under a duty to take whatever corrective action is necessary to undo the harm it created and fostered.[69] 'State authorities were thus duty bound to devote every effort toward initiating desegregation and bringing about the elimination of racial discrimination in the public school system.' Cooper v. Aaron, 358 U.S. at 7, 78 S.Ct. at 1404. Some may doubt whether tolerance of de facto segregation is an unsubtle form of state action. There can be no doubt as to the nature and effect of segregation that came into being and persists because of state action as part of the longstanding pattern to narrow the access of Negroes to political power and to the life of the community.
 
 
 82
 In a school system the persons capable of giving class relief are of course its administrators. It is they who are under the affirmative duty to take corrective action toward the goal of one integrated system. As Judges Sobeloff and Bell said in their concurring opinion in Bradley v. School Board of the City of Richmond, 4 Cir. 1965, 345 F.2d 310, 322:
 
 
 83
 '* * * the initiative in achieving desegregation of the public schools must come from the school authorities. * * * Affirmative action means more than telling those who have long been deprived of freedom of educational opportunity. 'You now have a choice.' * * * It is now 1965 and high time for the court to insist that good faith compliance requires administrators of schools to proceed actively with their nontransferable duty to undo the segregation which both by action and inaction has been persistently perpetuated.
 
 
 84
 In Northcross v. Board of Education of the City of Memphis, 6 Cir. 1962, 302 F.2d 818, the defendants asserted, as the defendants assert here, that continued segregation is 'voluntary on the part of Negro pupils and parents because they do not avail themselves of the transfer provisions.' The Court held: 'The Pupil Assignment Law * * * will not serve as a plan to convert a biracial system into a nonracial one * * * Negro children cannot be required to apply for that to which they are entitled as a matter of right. * * * The burden rests with the school authorities to initiate desegregation * * * (The Board should submit) some realistic plan for the organization of their schools on a nonracial basis'. In Dowell v. School Board of Oklahoma City Public Schools, W.D.Okla.1965, 244 F.Supp. 971, 976, 978-979, aff'd, 10 Cir. Jan. 23, 1967, 375 F.2d 158, the School Board in Oklahoma City had 'superimposed' a geographic zone plan on 'already existing residential segregation initiated by law.' The court held: A school board must 'adopt policies that would increase the percentage of pupils who are obtaining a desegregated education. * * * (The) failure to adopt an affirmative policy is itself a policy, adherence to which, at least in this case, has slowed up * * * the desegregation process. * * * Where the cessation of assignment and transfer policies based solely on race is insufficient to bring about more than token change in the segregated system, the Board must devise affirmative action reasonably purposed to effectuate the desegregation goal. This conclusion makes no new law.'
 
 
 85
 The position we take in these consolidated cases is that the only adequate redress for a previously overt system-wide policy of segregation directed against Negroes as a collective entity is a system-wide policy of integration. In Singleton I the Court touched on the state's duty to integrate:
 
 
 86
 'In retrospect, the second Brown opinion clearly imposes on public school authorities the duty to provide an integrated school system. Judge Parker's well-known dictum * * * should be laid to rest. It is inconsistent with Brown and the later development of decisional and statutory law in the area of civil rights.' 348 F.2d at 730 n. 5.
 
 
 87
 Three years before Singleton I this Court analyzed the problem in Potts v. Flax, 5 Cir. 1963, 313 F.2d 284. In that case the Court rejected a school board's contention that a suit brought by two Negro parents was not a class action even though the record contained testimony that one parent was bringing the action only for his own children and not for other Negro children. The Board contended that a court order was not needed because it was willing to admit any Negro child to a white school on demand of any Negro child. Judge Brown, speaking for the Court, said:
 
 
 88
 'Properly construed the purpose of the suit was not to achieve specific assignment of specific children to any specific grade or school. The peculiar rights of specific individuals were not in controversy. It was directed at the system-wide policy of racial segregation. It sought obliteration of that policy of system-wide racial discrimination. * * *'[70]
 
 
 89
 Even before Potts v. Flax, in Bush v. Orleans Parish School Board, 5 Cir. 1962, 308 F.2d 492, 499, the Court said:
 
 
 90
 'In this aspect of (initial) pupil assignment (to segregated schools) the facts present a clear case where there is not only deprivation of the rights of the individuals directly concerned but deprivation of the rights of Negro school children as a class. As a class, and irrespective of any individual's right to be admitted on a non-racial basis to a particular school, Negro children in the public schools have a constitutional right to have the public school system administered free from an administrative policy of segregation.'[71]
 
 
 91
 See also Ross v. Dyer, 5 Cir. 1963, 312 F.2d 191, 194-95; Augustus v. Board of Public Instruction of Escambia County, 5 Cir. 1963, 306 F.2d 862, 869; Holland v. Board of Public Instruction of Palm Beach County, 5 Cir. 1958, 258 F.2d 730; Orleans Parish School Board v. Bush, 5 Cir. 1957, 242 F.2d 156.
 
 
 92
 Brown was an inevitable, predictable extension of Sweatt v. Painter, 1950, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114, and McLaurin v. Oklahoma State Regents, 1950, 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149.[72] Those cases involved separate but equal or identical graduate facilities. Factors 'incapable of objective measurement' but crucial to a good graduate education were not available to segregated Negroes. These were the intangible factors that prevented the Negro graduate students from having normal contacts and association with white students. Apartheid made the two groups unequal. In Brown I these same intangibles were found '(to) apply with added force to children in grade and high schools'; educational opportunity in public schools must be made available to all on equal terms.
 
 
 93
 The Brown I finding that segregated schooling causes psychological harm and denies equal educational opportunities should not be construed as the sole basis for the decision.[73] So construed, the way would be open for proponents of the status quo to attempt to show, on the facts, that integration may be harmful or the greater of two evils. Indeed that narrow view of Brown I has led several district courts into error.[74] We think that the judgment 'must have rested on the view that racial segregation is, in principle, a denial of equality to the minority against whom it is directed.'[75] The relief Brown II requires rests on recognition of the principle that state-imposed separation by race is an invidious classification and for that reason alone is unconstitutional.[76] Classifications based upon race are especially suspect, since they are 'odius to a free people'.[77] In short, compulsory separation, apartheid, is per se discriminatory against Negroes.
 
 
 94
 A number of post-Brown per curiam decisions not involving education make it clear that the broad dimensions of the rationale are not circumscribed by the necessity of showing harmful inequality to the individual. In these cases Negroes were separated from whites but were afforded equal or identical facilities. Relying on Brown, the Court ordered integration of the facility or activity.[78] See also Anderson v. Martin, 1964, 375 U.S. 399, 402, 84 S.Ct. 454, 11 L.Ed.2d 430, 433, holding that compulsory designation of a candidate's race on the ballot is unlawful. The designation placed 'the power of the State behind a racial classification that induces racial prejudice at the polls.'
 
 
 95
 Bolling v. Sharpe, 1954, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884, provides further evidence of the breadth of the right recognized in Brown. There, because the case concerned the District of Columbia, the Court had to rely on the due process clause of the Fifth Amendment instead of the equal protection clause of the Fourteenth Amendment. Going beyond any question of psychological harm or of the denial of equal educational opportunities to the individual, the Court concluded that racial classifications in public education are so unreasonable and arbitrary as to violate due process:[79]
 
 
 96
 'Liberty under law extends to the full range of conduct which the individual is free to pursue, and it cannot be restricted except for a proper governmental objective. Segregation in public education is not reasonably related to any proper governmental objective, and thus it imposes on Negro children * * * a burden that constitutes an arbitrary deprivation of their liberty.' 347 U.S. at 498, 74 S.Ct. at 694.
 
 
 97
 As in the jury exclusion cases, when the classification is not 'reasonably related to any proper governmental objective' equal protection and due process merge.
 
 
 98
 If Brown has only the narrow meaning Briggs gives it the system of state sanctioned segregated schools will continue indefinitely with only a little token desegregation. White school boards, almost universal in this circuit, will be able to continue to say that their constitutional duty ends when they provide relief to the particular Negro children who, as individuals, claim their personal right to be admitted to white schools. If the Briggs thinking should prevail, the dual system will, for all practical purposes, be maintained: white school officials in most key positions at the state and county levels; Negro faculties in Negro schools, white faculties in white schools; no white children or only a few white children of way-out parents in Negro schools; a few Negroes in some white schools; at best, tokenism in certain school districts.
 
 
 99
 Brown's broad meaning, its important meaning, is its revitalization of the national constitutional right the Thirteenth, Fourteenth, and Fifteenth Amendments created in favor of Negroes. This is the right of Negroes to national citizenship, their right as a class to share the privileges and immunities only white citizens had enjoyed as a class. Brown erased Dred Scott, used the Fourteenth Amendment to breathe life into the Thirteenth, and wrote the Declaration of Independence into the Constitution. Freedmen are free men. They are created as equal as are all other American citizens and with the same unalienable rights to life, liberty, and the pursuit of happiness. No longer 'beings of an inferior race'-- the Dred Scott article of faith-- Negroes too are part of 'the people of the United States'.
 
 
 100
 A primary responsibility of federal courts is to protect nationally created constitutional rights. A duty of the States is to give effect to such rights-- here, by providing equal educational opportunities free of any compulsion that Negroes wear a badge of slavery. The States owe this duty to Negroes not just because every citizen is entitled to be free from arbitrary discrimination as a heritage of the common law or because every citizen may look to his state for equal protection of the rights a state grants its citizens. As Justice Harlan clearly saw in the Civil Rights Cases (1883),109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835, the Wartime Amendments created an affirmative duty that the States eradicate all relics, 'badges and indicia of slavery' lest Negroes as a race sink back into 'second-class' citizenship.
 
 
 101
 B. The factual situation dealt with in Bell v. School City of Gary, N.D.Ind. 1963, 213 F.Supp. 819, aff'd 7 Cir. 1963, 324 F.2d 209, cert. den'd 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964) is not the situation the Supreme Court had before it in Brown or that we deal with in this circuit. Brown dealt with state-imposed segregation based on dual attendance zones. Bell envolved nonracially motivated de facto segregation in a school system based on the neighborhood single zone system. In Bell the plaintiffs alleged that the Gary School Board had deliberately gerrymandered school attendance zones to achieve a segregated school system in violation of its 'duty to provide and maintain a racially integrated school system'. On the showing that the students were assigned and boundary lines drawn based upon reasonable nonracial criteria, the court held that the school board did not deliberately segregate the races; the racial balance was attributable to geographic and housing patterns. The court analyzed the problem in terms of state action rather than in terms of the Negroes' right to equal educational opportunities. Finding no state action the court concluded that Brown did not apply. In effect, the court held that de facto segregated neighborhood schools must be accepted. At any rate, the court said, 'States do not have an affirmative, constitutional duty to provide an integrated education'. The Seventh Circuit affirmed.
 
 
 102
 We must assume that Congress was well aware of the fact that Bell was concerned with de facto segregated neighborhood schools-- only. Notwithstanding the broad language of the opinion relating to the lack of a duty to integrate, language later frequently quoted by Senator Humphrey and others in the debates on the Civil Rights Act of 1964, Congress went only so far as to prohibit cross-district bussing and cross-district assignment of students.
 
 
 103
 The facts, as found by the Court in Bell, favored the Gary School Board. Other courts, on very similar facts, have decided that there are alternatives to acceptance of the status quo.[80] A commentator on the subject has fairly summed up the cases: 'Using Brown as a governing principle, racial imbalance caused by racially motivated conduct is clearly invalid. When racial imbalance results fortuitously, there is a split of authority.'[81]
 
 
 104
 Barksdale v. Springfield School Committee, D.Mass.1965, 237 F.Supp. 543, similar on the facts to Bell, holds squarely contrary to Bell:
 
 
 105
 'The defendants argue, nevertheless, that there is no constitutional mandate to remedy racial imbalance. Bell v. School City of Gary, Indiana, 324 f,2d 209 (7th Cir. 1963). But that is not the question. The question is whether there is a constitutional duty to provide equal educational opportunities for all children within the system. While Brown answered that question affirmatively in the context of coerced segregation, the constitutional fact-- the inadequacy of segregated education-- is the same in this case, and I so find. * * * This is not to imply that the neighborhood school policy per se is unconstitutional, but that it must be abandoned or modified when it results in segregation in fact. * * * I cannot accept the view in Bell that only forced segregation is incompatible with the requirements of the Fourteenth Amendment, nor do I find meaningful the statement that 'the Constitution * * * does not require integration. It merely forbids discrimination.' 324 F.2d at 213. * * * P This court recognizes and reiterates that the problem of racial concentration is an educational, as well as constitutional, problem and, therefore, orders the defendants to present a plan no later than April 30, 1965, to eliminate to the fullest extent possible racial concentration in its elementary and junior high schools within the framework of effective educational procedures, as guaranteed by the equal protection clause of the Fourteenth Amendment to the Constitution of the United States.'
 
 
 106
 'In short, Barksdale (does not analyze Brown) in terms of propriety of school board action, but proceeds in terms of a right on the part of Negro students to an equal educational opportunity, which in light of the ruling in Brown that separate schools are inherently unequal, must perforce be a right to an integrated educational setting.'[82] On appeal, the First Circuit accepted the district court's findings of fact but vacated the order with directions to dismiss without prejudice because the school board, on its own initiative, had taken action identical with the court ordered action. 348 F.2d 261. The Court noted a difference between 'the seeming absolutism' of the opinion and the less sweeping order '(to) eliminate (segregation) to the fullest extent possible * * * within the framework of effective educational procedures'.[83] Taking both opinions together, they recognize that 'the state would not be permitted to ignore the problem of de facto segregation. The holding in Brown, unexplained by its underlying reasoning, requires no more than the decision in Bell, but when illuminated by the reasoning, it permits the result in Barksdale and may require that result.'[84] At the very least, as the Barksdale court saw it, there is a duty to integrate in the sense that integration is an educational goal to be given a high, high priority among the various considerations involved in the proper administration of a system beset with de facto segregated schools.
 
 
 107
 Although Brown points toward the existence of a duty to integrate de facto segregated schools,[85] the holding in Brown, unlike the holding in Bell but like the holding in this, circuit, occurred within the context of state-coerced Segregation. The similarity of pseudo de facto segregation in the South to actual de facto segregation in the North is more apparent than real. Here school boards, utilizing the dual zoning system, assigned Negro teachers to Negro schools and selected Negro neighborhoods as suitable areas in which to locate Negro schools. Of course the concentration of Negroes increased in the neighborhood of the school. Cause and effect came together. In this circuit, therefore, the location of Negro schools with Negro faculties in Negro neighborhoods and white schools in white neighborhoods cannot be described as an unfortunate fortuity: It came into existence as state action and continues to exist as racial gerrymandering, made possible by the dual system.[86] Segregation resulting from racially motivated gerrymandering is properly characterized as 'de jure' segregation. See Taylor v. Board of Education of City School Dist. of the City of New Rochelle, S.D.N.Y.1961, 191 F.Supp. 181.[87] The courts have had the power to deal with this situation since Brown I. In Holland v. Board of Public Instruction of Palm Beach County, 5 Cir. 1958, 258 F.2d 730, although there was no evidence of gerrymandering as such, the court found that the board 'maintained and enforced' a completely segregated system by using the neighborhood plan to take advantage of racial residential patterns. See also Evans v. Buchanan, D.Del.1962, 207 F.Supp. 820, where, in spite of a genuflexion in the direction of Briggs, the Court found that there was gerrymandering of school districts superimposed on a pre-Brown policy of segregation.
 
 
 108
 C. The defendants err in their contention that the HEW and the courts cannot take race into consideration in establishing standards for desegregation. 'The Constitution is not this colorblind.'[88]
 
 
 109
 The Constitution is both color blind and color conscious. To avoid conflict with the equal protection clause, a classification that denies a benefit, causes harm, or imposes a burden must not be based on race. In that sense, the Constitution is color blind. But the Constitution is color conscious to prevent discrimination being perpetuated and to undo the effects of past discrimination. The criterion is the relevancy of color to a legitimate governmental purpose. For example, jury venires must represent a cross-section of the community. Strauder v. State of West Virginia, 1880, 100 U.S. 303, 25 L.Ed. 664. The jury commissioners therefore must have a 'conscious awareness of race in extinguishing racial discrimination in jury service'. Brooks v. Beto, 5 Cir. 1966, 366 F.2d 1. Similarly, in voter registration cases we have used the 'freezing principle' to justify enjoining the use of a constitutional statute where, in effect, the statute would perpetuate past racial discrimination against Negroes. United States v. State of Louisiana, E.D.La.1963, 225 F.Supp. 353, aff'd 1965, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709. 'It is unrealistic to suppose that the evils of decades of flagrant racial discrimination can be overcome by purging registration rolls of white voters. * * * Unless there is some appropriate way to equalize the present with the past, the injunctive prohibitions even in the most stringent, emphatic, mandatory terms prohibiting discrimination in the future, continues for many years a structure, committing effectual political power to the already registered whites while excluding Negroes from this vital activity of citizenship.' United States v. Ward, 5 Cir. 1965, 349 F.2d 795, 802. 'An appropriate remedy * * * should undo the results of past discrimination as well as prevent future inequality of treatment.' United States v. Duke, 5 Cir. 1965, 332 F.2d 759, 768. If the Constitution were absolutely colorblind, consideration of race in the census and in adoption proceedings would be unconstitutional.
 
 
 110
 Here race is revelant,[89] because the governmental purpose is to offer Negroes equal educational opportunities. The means to that end, such as disestablishing segregation among students, distributing the better teachers equitably, equalizing facilities, selecting appropriate locations for schools, and avoiding resegregation must necessarily be based on race. School officials have to know the racial composition of their school populations and the racial distribution within the school district. The Courts and HEW cannot measure good faith or progress without taking race into account. 'When racial imbalance infects a public school system, there is simply no way to alleviate it without consideration of race. * * * There is not constitutional right to have an inequality perpetuated.'[90] Judge Sobeloff's answer in Wanner v. County School Board of Arlington County, 4 Cir. 1966, 357 F.2d 452, 454-455, is our answer in this case:
 
 
 111
 'If a school board is constitutionally forbidden to institute a system of racial segregation by the use of artificial boundary lines, it is likewise forbidden to perpetuate a system that has been so instituted. It would be stultifying to hold that a board may not move to undo arrangements artificially contrived to effect or maintain segregation, on the ground that this interference with the status quo would involve 'consideration of race.' When school authorities, recognizing the historic fact that existing conditions are based on a design to segregate the races, act to undo these illegal conditions-- especially conditions that have been judicially condemned-- their effort is not to be frustrated on the ground that race is not a permissible consideration. This is not the 'consideration of race' which the Constitution discountenances. * * * There is no legally protected vested interest in segregation. If there were, then Brown v. Board of Education and the numerous decisions based on that case would be pointless. Courts will not say in one breath that public school systems may not practice segregation, and in the next that they may do nothing to eliminate it.'
 
 
 112
 D. Under Briggs's blessing, school boards throughout this circuit first declined to take any affirmative action that might be considered a move toward integration. Later, they embraced the Pupil Placement Laws as likely to lead to no more than a little token desegregation. Now they turn to freedom of choice plans supervised by the district courts. As the defendants construe and administer these plans, without the aid of HEW standards there is little prospect of the plans ever undoing past discrimination or of coming close to the goal of equal educational opportunities. Moreover, freedom of choice, as now administered, necessarily promotes resegregation. The only relief approaching adequacy is the conversion of the still-functioning dual system to a unitary, non-racial system-- lock, stock, and barrel.
 
 
 113
 If this process be 'integration' according to the 1955 Briggs court, so be it. In 1966 this remedy is the relief commanded by Brown, the Constitution, the Past, the Present, and the wavy foreimage of the Future.
 
 IV.
 
 114
 We turn now to the specific provisions of the Civil Rights Act on which the defendants rely to show that HEW violates the Congressional intent. These provisions are the amendments to Title IV and VI added in the Senate. The legislative history of these amendments is sparse and less authoritative than usual because of the lack of committee reports on the amended version of the bill.
 
 A. Section 401(b) defines desegregation:
 
 115
 "Desegregation' means the assignment of students to public schools and within such schools without regard to their race, color, religion, or national origin, but 'desegregation' shall not mean the assignment of students to public schools in order to overcome racial imbalance.'
 
 
 116
 The affirmative portion of this definition, down to the 'but' clause, describes the assignment provision necessary in a plan for conversion of a de jure dual system to a unitary, integrated system. The negative portion, starting with 'but', excludes assignment to overcome racial imbalance, that is acts to overcome de facto segregation. As used in the Act, therefore, 'desegregation' refers only to the disestablishment of segregation in de jure segregated schools. Even if a broader meaning should be given to 'assignment * * * to overcome racial imbalance', Section 401 would not mean that such assignments are unlawful:
 
 
 117
 'The intent of the statute is that no funds and no technical assistance will be given by the United States Commissioner of Education with respect to plans for the assignment of students to public schools in order to overcome racial imbalance. The statute may not be interpreted to mean that such assignment is illegal or that reasonable integration efforts are arbitrary or unlawful.[91]
 
 
 118
 The prohibition against assignment of students to overcome racial imbalance was added as an amendment during the debates in the House to achieve the same result as the anti-bussing provision in section 407. Some of the difficulty in understanding the Act and its legislative history arises from the statutory use of the undefined term 'racial imbalance'. It is clear however from the hearings and debates that Congress equated the term, as do the commentators, with 'de facto segregation' that is, non-racially motivated segregation in a school system based on a single neighborhood school for all children in a definable area.[92] Thus, Congressman William Cramer who offered the amendment, was concerned that the bill as originally proposed might authorize the government to require bussing to overcome de facto segregation. In explaining the amendment, he said:
 
 
 119
 'In the hearings before the committee I raised questions on 'racial imbalance' and in the sub-committee we had lengthy discussions in reference to having these words stricken in the title, as it then consisted, and to strike out the words 'racial imbalance' proposed by the administration. P The purpose is to prevent any semblance of congressional acceptance or approval of the concept of 'de facto' segregation or to include in the definition of 'desegregation' any balancing of school attendance by moving students across school district lines to level off percentages where one race outweighs another.'
 
 
 120
 The neighborhood school system is rooted deeply in American culture.[93] Whether its continued use is constitutional when it leads to grossly imbalanced schools is a question some day to be answered by the Supreme Court, but that question is not present in any of the cases before this Court. As noted in the previous section of this opinion, we have many instances of a heavy concentration of Negroes or whites in certain areas, but always that type of imbalance has been superimposed on total school separation. And always the separation originally was racially motivated and sanctioned by law in a system based on two schools within a neighborhood or overlapping neighborhoods, each school serving a different race. The situations have some similarity but they have different origins, create different problems, and require different corrective action.[94]
 
 
 121
 In the 1964 Act (and again in 1966 during consideration of amendments to the Elementary and Secondary Education Act of 1965) Congress, within the context of debates on aid to de facto segregated schools declined to decide just what should be done about imbalanced neighborhood schools.94a The legislative solution, if there is one to this problem, will require a carefully conceived and thoroughly debated comprehensive statute. In the 1964 Act Congress simply directed that the federal assistance provided in Title IV, 403-405 was not to be used for developing plans to assign pupils to overcome racial imbalance.[95] Similarly, Congress withheld authorizing the Attorney General, in school desegregation actions, to ask for a court order calling for bussing pupils from one school to another to 'achieve a racial balance.'[96]
 
 
 122
 B. Section 407(a)(2) of Title IV authorizing the Attorney General to file suit to desegregate, contains the 'antibussing' proviso:
 
 
 123
 '* * * nothing herein shall empower any official or court of the United States to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another or one school district to another in order to achieve such racial balance, or otherwise enlarge the existing power of the court to insure compliance with constitutional standards.'
 
 
 124
 First, it should be noted that the prohibition applies only to transportation; and only to transportation across school lines to achieve racial balance. The furnishing of transportation as part of a freedom of choice plan is not prohibited. Second, the equitable powers of the courts exist independently of the Civil Rights Act of 1964. It is not contended in the instant cases that the Act conferred new authority on the courts. and thIs court has not looked to tHe act as a grant of new judicial authority.
 
 
 125
 Section 407(a)(2) might be read as applying only to orders issued in suits filed by the Attorney General under Title IV. However, Senator, now Vice President Humphrey, Floor Manager in the Senate, said it was his understanding that the provision applied to the entire bill. In particular, he said that it applies to any refusal or termination of federal assistance under Title VI since the procedure for doing so requires an order approved by the President. Senator Humphrey explained:
 
 
 126
 'This addition seeks simply to preclude an inference that the title confers new authority to deal with 'racial imbalance' in schools, and should serve to soothe fears that Title IV might be read to empower the Federal Government to order the bussing of children around a city in order to achieve a certain racial balance or mix in schools. P Furthermore, a new section 410 would explicitly declare that 'nothing in this title shall prohibit classification and assignment for reasons other than race, color, religion, or national origin.' P Thus, classification along bona fide neighborhood school lines, or for any other legitimate reason which local school boards might see fit to adopt, would not be affected by Title IV, so long as such classification was bona fide. Furthermore, this amendment makes clear that the only Federal intervention in local schools will be for the purpose of preventing denial of equal protection of the laws.'
 
 
 127
 Senator Humphrey spoke several times in the language of Briggs but his references to Bell indicate that the restrictions in the Act were pointed at the Gary, Indiana de facto type of segregation. Senator Byrd (west Virginia) asked Senator Humphrey would he give assurance 'that under Title VI school children may not be bussed from one end of the community to another end of the community at taxpayers' expense to relieve so-called racial imbalance in the schools'. Senator Humphrey replied:
 
 
 128
 'I do * * *. That language is to be found in Title IV. The provision (407(a) (2)) merely quotes the substance of a recent court decision which I have with me, and which I desire to include in the Record today, the socalled Gary case.'
 
 Senator Humphrey explained:
 
 129
 'Judge Beamer's opinion in the Gary case is significant in this connection. In discussing this case, as we did many times, it was decided to write the thrust of the court's opinion into the proposed substitute.'
 
 
 130
 The thrust of the Gary case (Bell) was that if school districts were drawn without regard to race, but rather on the basis of such factors as density of population, travel distances, safety of the children, costs of operating the school system, and convenience to parents and children, those districts are valid even if there is a racial imbalance caused by discriminatory practices in housing. Thus, continuing his explanation, Senator Humphrey said:
 
 
 131
 'The bill does not attempt to integrate the schools, but it does attempt to eliminate segregation in the schools. The natural factors, such as density of population, and the distance that students would have to travel are considered legitimate means to determine the validity of a school district, if the school districts are not gerrymandered, and in effect deliberately segregated. The fact that there is a racial imbalance per se is not something which is unconstitutional. That is why we have attempted to clarify it with the language of Section 4.:
 
 
 132
 C. Section 601 states the general purpose of Title VI of the Act:
 
 
 133
 'No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.'This is a clear congressional statement that racial discrimination against the beneficiaries of federal assistance is unlawful. Children attending schools which receive federal assistance are of course among the beneficiaries. In the House, Congressman Celler explained:
 
 
 134
 'The legality is based on the general power of Congress to apply reasonable conditions. * * * P In general, it seems rather anomalous that the Federal Government should aid and abet discrimination on the basis of race, color or national origin by granting money and other kinds of financial aid. It seems rather shocking, moreover, that while we have on the one hand the 14th amendment, which is supposed to do away with discrimination since it provides for equal protection of the laws, on the other hand, we have the Federal Government aiding and abetting those who persist in practicing racial discrimination.'
 
 
 135
 In the Senate, Senator Javits, an assistant floor-manager, expressed concern as to the clarity of the statement of policy:
 
 
 136
 'I ask the Senator whether we now have a clear understanding that if title VI shall be enacted as it is now proposed, the express and clear policy of Congress against aiding discrimination will prevail * * *.'
 
 Senator Humphrey answered:
 
 137
 'Some Federal agencies appear to have been reluctant to act in this area. Title VI will require them to act. Its enactment will thus serve to insure uniformity and permanence to the nondiscrimination policy.'
 
 
 138
 d. Section 604 of the Act, 42 U.S.C. 2000d-3 is the section the defendants principally rely upon and the section most misunderstood.[97] It provides:
 
 
 139
 'Nothing contained in this title shall be construed to authorize action under this title by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment.'
 
 
 140
 The defendants contend that this section bars any action requiring desegregation of faculties and school personnel.
 
 
 141
 Section 604 was not a part of the original House bill. Senator Humphrey, while introducing the Act explained: '(The) Commissioner might also be justified in requiring elimination of racial discrimination in employment or assignment of teachers, at least where such discrimination affected the educational opportunities of students. See Braxton v. Board of Public Instruction of Duval County, 5 Cir. 1964, 326 F.2d 616.' 110 Cong.Rec. p. 6345. That was in March 1964. In June 1964, in explaining the amendments, Senator Humphrey said, 'This provision is in line with the provisions of section 602[98] and serves to spell out more precisely the declared scope of coverage of the title.' In the same speech he stated (110 C.R. 12714): 'We have made no changes of substance in Title VI.' This explanation plainly indicates that the amendment was not intended as a statutory bar to faculty integration in schools receiving federal aid.
 
 
 142
 However, in the interval between these two explanations the Attorney General, in response to a letter from Senator Cooper, stated that Section 602 would not apply to federally aided employers who discriminated in employment practices: 'Title VI is limited * * * to discrimination against the beneficiaries of federal assistance programs. * * * Where, however, employees are the intended beneficiaries of a program, Title VI would apply.'[99] He gave as an example accelerated public works programs. It was after the receipt of the Attorney General's letter that the amended Senate bill was passed. The school boards argue therefore that Section 604 was enacted, because of the Attorney General's interpretation, to exclude interference with employment practices of schools.
 
 
 143
 In its broadest application this argument would allow racial discrimination in the hiring, discharge, and assignment of teachers. In its narrowest application this argument would allow discrimination in hiring and discharging but not in assigning teachers, an inexplicable anomaly.[100] There is no merit to this argument. Section 604 and the Attorney General's letter are not inconsistent, since under Section 601 it is the school children, not the teachers (employees), who are the primary beneficiaries of federal assistance to public schools. Faculty integration is essential to student desegregation. To the extent that teacher discrimination jeopardizes the success of desegregation, it is unlawful wholly aside from its effect upon individual teachers.
 
 
 144
 After Section 601 was proposed, additional clarifying language was suggested to make it clear that discrimination in certain employer-employee relationships, not affecting the intended beneficiaries of the program, would be excluded from the reach of the statute. See Hearings, H.R.Comm. on Rules, H.R. 7152, 88th Cong., 2d Sess. (1964), pp. 94, 226; 110 C.R. 6544-46 (Senator Humphrey). For example, there was a serious question as to whether the bill would forbid a farmer who was receiving benefits under the Agricultural Adjustment Act from discriminating upon the basis of race in the selection of his employees. Hearings, H.R.Comm. on Rules, H.R. 7152, 88 Cong., 2d Sess., 1964, p. 94, 110 C.R. 6545 (Senator Humphrey). The addition of Section 604 to the bill as originally proposed clearly excluded the application of the Act to this type of situation. Congress did not, of course, intend to provide a forum for the relief of individual teachers who might be discriminatorily discharged; Congress was interested in a general requirement essential to success of the program as a whole.[101]
 
 
 145
 Collaterally to their argument on Section 604, the defendants cite Section 701(b) of Title VII, covering Equal Employment Opportunities, which specifically excepts a 'state or political subdivision thereof'. This section has no application to schools. Section 701(b), defines 'employer' as 'a person engaged in an industry affecting commerce who has twenty-five or more employees * * *.'
 
 
 146
 Section 604 was never intended as a limitation on desegregation of schools. If the defendants' view of Section 604 were correct the purposes of the statute would be frustrated, for one of the keys to desegregation is integration of faculty. As long as a school has a Negro faculty it will always have a Negro student body. As the District Court for the Western District of Virginia put it is Brown v. County School Board of Frederick County, 1965,245 F.Supp. 549, 560:
 
 
 147
 'The presence of all Negro teachers in a school attended solely by Negro pupils in the past denotes that school a 'colored school' just as certainly as if the words were printed across its entrance in six-inch letters.'
 
 
 148
 As far as possible federal courts must carry out congressional policy. But we must not overlook the fact that 'we deal here with constitutional rights and not with those established by statute'.[102] The right of Negro students to be free from racial discrimination in the form of a segregated faculty is part of their broader right to equal educational opportunities. The 'mandate of Brown * * * forbids the discriminatory consideration of race in faculty selection just as it forbids it in pupil placement.' Chambers v. Hendersonville City Board of Education, 4 Cir. 1966, 364 F.2d 189.
 
 
 149
 In Brown II the Supreme Court specifically referred to the reallocation of staff as one of the reasons permitting desegregation 'with all deliberate speed'. In determining the additional time necessary '* * * courts may consider problems related to administration, arising from * * * personnel * * *.' 349 U.S. at 300, 75 S.Ct. at 756. For ten years, however, this Court and other circuit courts[103] had approved district courts' postponing hearings on faculty desegregation. Bradley v. School Board of the City of Richmon, 1965, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 put an end to this practice. In Bradley the Supreme Court held that faculty segregation had a direct impact on desegregation plans. The court summarily remanded the case to the district court holding that it was improper for that court to approve a desegregation plan without considering, at a full evidentiary hearing, the impact of faculty allocation on a racial basis. The Court said, '(There is) no merit to the suggestion that relation between faculty allocation on an alleged racial basis and the adequacy of the desegregation plans are entirely speculative.' Moreover, 'Delays in desegregating school systems are no longer tolerable.' 382 U.S. at 105, 86 S.Ct. at 226. In Rogers v. Paul, 1965, 382 U.S. 198, 200, 86 S.Ct. 358, 360, 15 L.Ed.2d 265, the Supreme Court held that Negro students in grades not yet desegregated were entitled to an immediate transfer to a white high school. They 'plainly had standing' to sue on two theories: (1) 'that racial allocation of faculty denies them equality of educational opportunity without regard to segregation of pupils; and (2) that it renders inadequate an otherwise constitutional pupil desegregation plan soon to be applied to their grades.' In Singleton II this Court, relying on Bradley, held that it was 'essential' for the Jackson schools to make an 'adequate start toward elimination of race as a basis for the employment and allocation of teachers, administrators, and other personnel.' 355 F.2d at 870.
 
 
 150
 In a recent decision of the Eighth Circuit, Clark v. Board of Education of Little Rock School District, 369 F.2d 661, December 15, 1966, the Court required a 'positive program aimed at ending in the near future the segregation of the teaching and operating staff'. The Court stated: 'We agree that faculty segregation encourages pupil segregation and is detrimental to achieving a constitutionally required non-racially operated school system. It is clear that the Board may not continue to operate a segregated teaching staff. * * * It is also clear that the time for delay is past. The desegregation of the teaching staff should have begun many years ago. At this point the Board is going to have to take accelerated and positive action to end discriminatory practices in staff assignment and recruitment.'
 
 
 151
 In Braxton v. Board of Public Instruction of Duval County, 1964, 326 F.2d 616, 620, cert. denied 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216, the case cited by Senator Humphrey, this Court affirmed an order of the district court prohibiting assignment of 'teachers and other personnel * * * on a racially segregated basis.' In Smith v. Board of Education of Morrilton, 8 Cir. 1966, 365 F.2d 770, 778, the Court said:
 
 
 152
 'It is our firm conclusion that the reach of the Brown decisions, although they specifically concerned only pupil discrimination, clearly extends to the proscription of the employment and assignment of public school teachers on a racial basis. Cf. United Public Workers (of America (CIO)) v. Mitchell, 330 U.S. 75, 100, 67 S.Ct. 556, 91 L.Ed. 754 (1947); Wieman v. Updegraff, 344 U.S. 183, 191-192, 73 S.Ct. 215, 97 L.Ed. 216 (1952). See Colorado Anti-Discrimination Comm'n v. Continental Air Lines, Inc., 372 U.S. 714, 721, 83 S.Ct. 1022, 10 L.Ed.2d 84 (1963). This is particularly evident from the Supreme Court's positive indications that nondiscriminatory allocation of faculty is indispensable to the validity of a desegregation plan. Bradley v. School Board of the City of Richmond, supra; Rogers v. Paul, supra. This court has already said, 'Such discrimination (failure to integrate the teaching staff) is proscribed by Brown and also the Civil Rights Act of 1964 and the regulations promulgated thereunder'. Kemp v. Beasley, supra, p. 22 of 352 F.2d.'
 
 
 153
 In Wheeler v. Durham City Board of Education, 4 Cir. 1966, 363 F.2d 738, 740 the Court stated: 'We read (Bradley) as authority for the proposition that removal of race considerations from faculty selection and allocation is, as a matter of law, an inseparable and indispensable command within the abolition of pupil segregation in public schools as pronounced in Brown v. Board of Education, supra, 347 U.S. 483, 74 S.Ct. 686. Since no proof of the relationship of faculty allocation and pupil assignment was required here. The only factual issue is whether race was a factor entering into the employment and placement of teachers.' In Wright v. County School Board of Greensville County, E.D.Va.1966, 252 F.Supp. 378, 384, holding that a faculty desegregation provision approved by the Commissioner of Education was not sufficient, the court said:
 
 
 154
 'The primary responsibility for the selection of means to achieve employment and assignment of staff on a nonracial basis rests with the school board. * * * Several principles must be observed by the board. Token assignments will not suffice. The elimination of a racial basis for the employment and assignment of staff must be achieved at the earliest practicable date. The plan must contain well defined procedures which will be put into effect on definite dates. The board will be allowed ninety days to submit amendments to its plan dealing with staff employment and assignments practices.'
 
 
 155
 In Kier v. County School Board of Augusta County, W.D.Va.1966, 249 F.Supp. 239, 246, the court held that free choice plans require faculty integration:
 
 
 156
 'Freedom of choice, in other words, does not mean a choice between a clearly delineated 'Negro school' (having an all-Negro faculty and staff) and a 'white school' (with all-white faculty and staff). School authorities who have heretofore operated dual school systems for Negroes and whites must assume the duty of eliminating the effects of dualism before a freedom of choice plan can be superimposed upon the pre-existing situation and approved as a final plan of desegregation. It is not enough to open the previously all white schools to Negro students who desire to go there while all-Negro schools continue to be maintained as such. * * * The duty rests with the School Board to overcome the discrimination of the past, and the long-established image of the 'Negro school' can be overcome under freedom of choice only by the presence of an integrated faculty.'
 
 
 157
 See also Dowell v. School Board of Oklahoma City Public Schools, W.D.Okla.1965, 244 F.Supp. 971, 977, aff'd, 10 Cir. Jan. 23, 1967, 375 F.2d 158, and Franklin v. County School Board of Giles County, 4 Cir. 1966, 360 F.2d 325.
 
 
 158
 We cannot impute to Congress an intention to repudiate Senator Humphrey's explanation of Section 604 and to change the substance of Title VI, tearing the vitals from the statutory objective. Integration of faculty is indispensable to the success of desegregation plan. Nor can we impute to Congress the intention to license, unconstitutionally, discrimination in the employment and assignment of teachers, a conspicuous badge of de jure segregated schools.[104]
 
 
 159
 E. As we construe the Act and its legislative history, especially the sponsors' reliance on Bell, Congress, because of its hands-off attitude on bona fide neighborhood school systems, qualified its broad polity of nondiscrimination by precluding HEW's requiring the bussing of children across district line or requiring compulsory placement of children in schools to strike a balance when the imbalance results from de facto, that is, non-racially motivated segregation. As Congressman Cramer said, 'De facto segregration is racial imbalance'. But there is nothing in the language of the Act or in the legislative history that equates corrective acts to desegregate or to integrate a dual school system initially based on de jure segregation with acts to bring about a racial balance in a system based on bona fide neighborhood schools.
 
 
 160
 Congress recognized that HEW's requirements for qualifying for financial assistance are one thing and the courts' constitutional and judicial responsibilities are something else again. The Act states, therefore, that it did not enlarge the court's existing powers to ensure compliance with constitutional standards. But neither did it reduce the courts' power.
 
 V.
 
 161
 The HEW Guideline agree with decisions of this circuit and of the similarly situated Fourth and Eight Circuits. And they stay within the Congressional mandate. There is no cross-district or cross-town bussing requirement. There is no provision requiring school authorities to place white children in Negro schools or Negro children in white schools for the purpose of striking a racial balance in a school or school district proportionate to the racial population of the community or school district.[105] The provision referring to percentages is a general rule of thumb or objective administrative guide for measuring progress in desegregation rather than a firm requirement that must be met.[106] See footnotes 105 and 106. Good faith in compliance should be measured by performance, not promises.
 
 
 162
 In reviewing the effectiveness of an approved plan it seems reasonable to use some sort of yardstick or objective percentage guide. The percentage requirements in the Guidelines are modest, suggesting only that systems using free choice plans for at least two years should expect 15 to 18 per cent of the pupil population to have selected desegregated schools. This Court has frequently relied on percentages in jury exclusion cases. Where the percentage of Negroes on the jury and jury venires is disproportionately low compared with the Negro population of a county, a prima facie case is made for deliberate discrimination against Negroes.[107] Percentages have been used in other civil rights cases.[108] A similar inference may by drawn in school desegregation cases, when the number of Negroes attending school with white children is manifestly out of line with the ratio of Negro school children to white school children in public schools. Common sense suggests that a gross discrepancy between the ratio of Negroes to white children in a school and the HEW percentage guides raises an inference that the school plan is not working as it should in providing a unitary, integrated system. Thus Evans v. Buchanan, D.C. Del.1962, 207 F.Supp. 820[109] held that this natural inference coupled with the board's possessing but failing to come forth with the probative facts that might rebut the inference created a presumption that the proposed desegregation plan was unconstitutional.
 
 
 163
 The Guidelines were adopted for the entire country. However, they have been formulated in a context sympathetic with local problems. Sections 403-405 of the 1964 Civil Rights Act provide that, upon request, the Commissioner of Education may render technical assistance to public school systems engaged in desegregation. The Commissioner may also establish training institutes to counsel school personnel having educational problems occasioned by desegregation; and the Commissioner may make grants to school boards to defray the costs of providing in-service training on desegregation. In short, the Commissioner may assist those school boards who allege that they will have difficulty complying with the guidelines. When desegregation plans do not meet minimum standards, the school authorities should ask HEW for assistance. And district courts should invite HEW to assist by giving advice an raising the levels of the plans and by helping to coordinate a school's promises with the school's performance. In view of the competent assistance HEW may furnish schools, there is a heavy burden on proponents of the argument that their schools cannot meet HEW standards.
 
 VI.
 
 164
 School authorities in this circuit, with few exceptions, have turned to the 'freedom of choice' method for desegregating public schools. The method has serious shortcomings. Indeed, the 'slow pace of integration in the Southern and border States is in large measure attributable to the manner in which free choice plans * * * have operated.'[110] When such plans leave school officials with a broad area of uncontrolled discretion, this method of desegregation is better suited than any other to preserve the essentials of the dual school system while giving paper compliance with the duty to desegregate.
 
 
 165
 A free choice plan does not abandon geographical criteria, but requires no rigid adherence to attendance zones. Theoretically every child may choose his school, but its effectiveness depends on the availability of open places in balanced schools. Moreover, unless there is some provision to prevent white children transferring out of an imbalanced school this plan will promote resegregation.[111]
 
 
 166
 'Under freedom of choice plans, schools tend to retain their racial identification.'[112] Such plans require affirmative action by parents and pupils to disestablish the existing system of public schools. In this circuit white students rarely choose to attend schools identified as Negro schools. Negro students who choose white schools are, as we know from many cases, only Negroes of exceptional initiative and fortitude. New construction and improvements to the Negro school plant attract no white students and diminish Negro motivation to ask for transfer. Nevertheless, the Eighth Circuit has approved freedom of choice plans 'as a permissible method at this stage', although recognizing that such a plan 'is still only in the experimental stage and it has not yet been demonstrated that such a method will fully implement the decision of Brown and subsequent cases and the legislative declaration of 2000(d) of the Civil Rights Act of 1964.'[113] We have said: 'At this stage in the history of desegregation in the deep South a 'freedom of choice plan' is an acceptable method for a school board to use in fulfilling its duty to integrate the school system. In the long run, it is hardly possible that schools will be administered on any such haphazard basis'. Singleton II, 355 F.2d at 871. HEW recognizes freedom of choice as a permissible means of desegregation. See Revised Guidelines, Subpart B, 181.11, and all of Subpart D.
 
 
 167
 Courts should scrutinize all such plans. Freedom of choice plans 'may * * * be invalid because the 'freedom of choice' is illusory. The plan must be tested not only by its provisions, but by the manner in which it operates to provide opportunities for a desegregated education.' Wright v. County School Board of Greenville County, E.D.Va.1966, 252 F.Supp. 378, 383. In that case the court was concerned that 'operation under the plan may show that the transportation policy or the capacity of the schools severely limits freedom of choice, although provisions concerning these phases are valid on their face'. In Lockett v. Board of Education of Muskogee County, Ga., 5 Cir. 1965, 342 F.2d 225, we were concerned that 'proper notice' be given so that 'Negro students are afforded a reasonable and conscious opportunity to apply for admission to any school which they are otherwise eligible to attend without regard to race'. Also, as Judge Bell, for the Court, pointed out, 'a necessary part of any plan is a provision that the dual or biracial school attendance system * * * be abolished.' See also Dowell v. School Board of Oklahoma City Public Schools, W.D.Okla.1965, 244 F.Supp. 971, aff'd, 10 Cir. Jan. 23, 1967, 375 F.2d 158; Bell v. School Board of City of Staunton, W.D.Va.1966, 249 F.Supp. 249; Kier v. County School Board of Augusta County, W.D.Va.1966, 249 F.Supp. 239.
 
 
 168
 There is much that school authorities should do to meet their responsibilities:
 
 
 169
 '(Brown) called for responsible public officials throughout the country to reappraise their thinking and policies, and to make every effort to afford Negroes the more meaningful equality guaranteed them by the Constitution. The Brown decision, in short, was a lesson in democracy, directed to the public at large and more particularly to those responsible for the operation of the schools. It imposed a legal and moral obligation upon officials who had created or maintained segregated schools to undo the damage which they had fostered.' Taylor v. Board of Education of City School Dist. of the City of New Rochelle, S.D.N.Y.1961, 191 F.Supp. 181, 187, aff'd 294 F.2d 36, cert. den'd 368 U.S. 940, 82 S.Ct. 382 (1961).
 
 
 170
 School officials should consult with Negro and white school authorities before plans are put in final form. They should see that notices of plans and procedures are clear and timely. They should avoid the discriminatory use of tests and the use of birth and health certificates to make transfers difficult. They should eliminate inconvenient or burdensome arrangements for transfer, such as requiring the personal appearance of parents, notarized forms, signatures of both parents, or making forms available at inconvenient times to working people. They should employ forms which do not designate the name of a Negro school as the choice or contain a 'waiver' of the 'right to attend white schools. Certainly school officials should not discourage Negro children from enrolling in white schools, directly or indirectly, as for example, by advising them that they would not be permitted to engage or would not want to engage in school activities, athletics, the band, clubs, school plays. If transportation is provided for white children, the schedules should be re-routed to provide for Negro children. Overcrowding should not be used as an excuse to avoid transfers of Negro children. In Bradley v. School Board of the City of Richmond, 4 Cir. 1965, 345 F.2d 310, 323, Judges Sobeloff and Bell, concurring, said:
 
 
 171
 'A plan of desegregation is more than a matter of words. The attitude and purpose of public officials, school administrators and faculties are an integral part of any plan and determine its effectiveness more than the words employed. If these public agents translate their duty into affirmative and sympathetic action the plan will work; if their spirit is obstructive, or at best negative, little progress will be made, no matter what form of words may be used:
 
 
 172
 Freedom of choice means the maximum amount of freedom and clearly understood choice in a bona fide unitary system where schools are not white schools or Negro schools-- just schools.
 
 
 173
 We turn now to a discussion of the specific elements of a freedom of choice plan that make it more than a mere word of promise to the ear.
 
 
 174
 A. Speed of Desegregation. The announced speed of desegregation no longer seems to be a critical issue. The school boards generally concede that by the school year 1967-68 all grades should be desegregatec.
 
 
 175
 B. Mandatory Annual Free Choice. Underlying and tending to counteract the effectiveness of all the freedom of choice plans before the Court is the initial unconstitutional assignment of all students by race. When the freedom of choice plan is 'permissive' or 'voluntary' the effect is to superimpose the same old transfer plan on racial assignments and dual zones. We hold that any freedom of choice plan is inadequate if based upon a preliminary system of assignment by race or dual geographic zones. See Singleton II, and Lockett v. Board of Education of Muscogee County, Ga., 5 Cir. 1965, 342 F.2d 225, restating the requirement of Stell v. Savannah-Chatham County Board of Education, 5 Cir. 1964, 333 F.2d 55 and Gaines v. Dougherty County Board of Education, 5 Cir. 1964, 334 F.2d 983. It is essential that dual or biracial school attendance systems be abolished contemporaneously with the application of a plan to the respective grades reached by it.
 
 
 176
 In place of permissive freedom of choice there must be a mandatory annual free choice of schools by all students, both white and Negro. 'If a child or his parent is to be given a meaningful choice, this choice must be afforded annually.' Kemp v. Beasley, 8 Cir. 1965, 352 F.2d 14, 22. The initial choice of assignment, within space limitations, should be made by a parent or by a child over fifteen without regard to race. This mandatory free choice system would govern even the initial assignment of students to the first grade and to kindergarten. At the minimum, a freedom of choice plan should provide that: (1) all students in desegregated grades shall have an opportunity to exercise a choice of schools. Bardley v. School Board of the City of Richmond, 4 Cir. 1965, 345 F.2d 310, vacated and remanded, 1965, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187; (2) where the number of applicants applying to a school exceeds available space, preferences will be determined by a uniform non-racial standard, Stell v. Savannah-Chatham County Board of Education, 5 Cir. 1964, 33 F.2d 55, 65; and (3) when a student fails to exercise his choice, he will be assigned to a school under a uniform non-racial standard, Kemp v. Beasley, 8 Cir. 1965, 352 F.2d 14, 22.
 
 
 177
 C. Notice. The notice provisions of the HEW Guidelines are reasonable and should be followed. Where public notice by publication in a newspaper will assure adequate notice, individual notice will not be necessary. Individual notice should be required if notice by publication is likely to be inadequate.
 
 
 178
 D. Transfers for Students in Non-desegregated Grades and with Special Needs. In Singleton II we held that children in still-segregated grades in Negro schools 'have an absolute right, as individuals, to transfer to schools from which they were excluded because of their race.'[114] 355 F.2d at 869. See also Rogers v. Paul, 1965, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265. A transfer provision should be included in the plan. The right to transfer under a state Pupil Placement Law should be regarded as an additional right that takes into consideration criteria irrelevant to the absolute right referred to in Rogers v. Paul.
 
 
 179
 E. Services, Facilities, Activities, and Programs. In Singleton II we held that there should be no segregation or discrimination in services, facilities, activities, and programs that may be conducted or sponsored by, or affiliated with, the school in which a student is enrolled. We have in mind school athletics and inter-scholastic associations of course, but also parents-teachers associations. In order to eliminate any uncertainty on this point, we hold that the plan should contain a statement that there will be no such segregation or discrimination.
 
 
 180
 F. School Equalization. In recent years, as we are all well aware, Southern states have exerted great effort to improve Negro school plants. There are however many old and inferior schools readily identifiable as Negro schools; there are also many superior white schools, in terms of the quality of instruction. A freedom of choice plan will be ineffective if the students cannot choose among schools that are substantially equal. A school plan therefore should provide for closing inferior schools and should also include a provision for remedial programs to overcome past inadequacies of all-Negro schools. This will, of course, require the local school authorities and the trial courts to examine carefully local situations and perhaps seek advice from qualified, unbiased authorities in the field.
 
 
 181
 G. Scheduled Compliance Reports. Scheduled compliance reports to the court on the progress of freedom of choice plans are a necessity and of benefit to all the parties. These should be required following the choice period and again after the opening of school. None of the school boards expressly objected to this provision, or one similar to it, and it does not appear onerous.
 
 
 182
 H. Desegregation of Faculty and Staff. The most difficult problem in the desegregation process is the integration of faculties. See Section IV D of this opinion. A recent survey shows that until the 1966-67 session not a single Negro teacher in Alabama, Louisiana, or Mississippi has been assigned to a school where there are white teachers.[115] As evidenced in numerous records, this long continued policy has resulted in inferior Negro teaching and in inferior education of Negroes as a class. Everyone agrees, on principle, that the selection and assignment of teachers on merit should not be sacrificed just for the sake of integrating faculties; teaching is an art. Yet until school authorities recognize and carry out their affirmative duty to integrate faculties as well as facilities, there is not the slightest possibility of their ever establishing an operative nondiscriminatory school system.[116] The transfer of a few Negro children to a white school does not do away with the dual system. A Negro faculty makes a Negro school' the Negro school continues to offer inferior educational opportunities; and the school system continues its psychological harm to Negroes as a class by not putting them on an equal level with white children as a class.[117] To prevent such harm or to undo the harm, or to prevent resegregation, the school authorities, even in the administration of an otherwise rational, nondiscriminatory policy, should take corrective action involving racial criteria. As we pointed out (see Section III C), in fashioning an appropriate remedy tending to undo past discrimination this Court has often taken race into account.
 
 
 183
 In the past year, district courts have struggled with the problem of framing effective orders for the desegregation of faculty. (1) Some courts have focused upon the specific results to be reached by reassignment of teachers previously assigned solely upon the basis of their race. Dowell v. School Board of Oklahoma City Public Schools, W.D.Okla. 1965, 244 F.Supp. 971, aff'd, 10 Cir. Jan. 23, 1967, 375 F.2d 158; Kier v. County School Board of Augusta County, W.D. Va.1966, 249 F.Supp. 239.[118] The orders entered in these cases require the defendant school boards to assign any newly employed teachers and reassign already-employed faculty so that the proportion of each race assigned to teach in each school will be the same as the proportion of teachers of that race in the total teaching staff in the system, or at least, of the particular school level in which they are employed. (2) Other courts have not bee specific as to the number of teachers of each race that should be assigned to each school in order to remove the effects of past discriminatory assignments. These courts have focused upon the mechanics to be followed in removing the effect of past discrimination rather than upon the result as such. Thus, in Beckett v. School Board of the City of Norfolk, Civil Action No. 2214 (E.D.Va., 1966); Gilliam v. School Board of the City of Hopewell, Civil Action No. 3554 (E.D.V.a.1966); and Bradley v. School Board of the City of Richmond, Civil Action No. 3353 (E.D.Va.1966), the courts approved consent decrees setting forth in detail the considerations that would control the school administrators in filling faculty vacancies and in transferring already employed faculty members in order to facilitate faculty integration. (3) In a third group of cases, the district court, while emphasizing the necessity of affirmative steps to undo the effects of past racial assignments of faculty and while requiring some tangible results, has not been specific regarding the mechanics or the specific results to be achieved. See Harris v. Bullock County Board of Education, M.D.Ala.1966, 253 F.Supp. 276; United States v. Lowndes Board of Education, Civil Action No. 2328-N (M.D.Ala.1966); Carr v. Montgomery County Board of Education, M.D.Ala.1966, 253 F.Supp. 306.
 
 
 184
 We agree with the Eighth Circuit's statement: 'The lack of a definite program will only result in further delay of long overdue action. We are not content at this late date to approve a desegregation plan that contains only a statement of general good intention. We deem a positive commitment to a reasonable program aimed at ending segregation of the teaching staff to be necessary for the final approval of a constitutionally adequate desegregation plan.' Clark v. Board of Education of the Little Rock School District, 369 F.2d 661, December 15, 1966. In that case the Court did not impose 'a set time with fixed mathematical requirements'. However the Court was firm in its position: 'First, as the Board has already positively pledged, future employment, assignment, transfer, and discharge of teachers must be free from racial consideration. Two, should the desegregation process cause the closing of schools employing individuals predominately of one race, the displaced personnel should, at the very minimum, be absorbed into vacancies appearing in the system. Smith v. Board of Education of Morrilton School District, No. 32,supra. Third, whenever possible, requests of individual staff members to transfer into minority situations should be honored by the Board. Finally, we believe the Board should make all additional positive commitments necessary to bring about some measure of racial balance in the staffs of the individual schools in the very near future. The age old distinction of 'white schools' and 'Negro school's must be erased. The continuation of such distinctions only perpetrates inequality of educational opportunity and places in jeopardy the effective future operation of the entire 'freedom of choice' type plan.'
 
 
 185
 In Singleton I we agreed with the original HEW Guidelines in requiring that an 'adequate start' toward faculty desegregation should be made in 1966-67. The requirement that all grades be desegregated in 1967-68 increases the need for substantial progress beyond an 'adequate start'. It is essential that school officials (1) cease practicing racial discrimination in the hiring and assignment of new faculty members and (2) take affirmative programmatic steps to correct existing effects of past racial assignment. If these two requirements are prescribed, the district court should be able to add specifics to meet the particular situation the case presents. The goal should be an equitable distribution of the better teachers.[119] We anticipate that when district courts and this Court have gained more experience with faculty integration, the Court will be able to set forth standards more specifically than they are set forth in the decrees in the instant cases.
 
 VII.
 
 186
 We attach a decree to be entered by the district courts in these cases consolidated on appeal. See Appendix A.
 
 
 187
 $104, 105$ We have carefully examined each of the records in these cases. In each instance the record supports the decree. However, the provisions of the decree are intended, as far as possible, to apply uniformly throughout this circuit in cases involving plans based on free choice of schools. School boards, private plaintiffs, and the United States may, of course, come into court to prove that exceptional circumstances compel modification of the decree. For example, school systems in areas which let school out during planting and harvesting seasons may find that the period for exercise of choice of schools, March 1-31, should be changed to a different month.
 
 
 188
 As Brown dictates, the decree places responsibility on the school authorities to take affirmative action to bring about a unitary, non-racial system. As the Constitution dictates, the proof of the pudding is in the eating: the proof of a school board's compliance with constitutional standards is the result-- the performance. Has the operation of the promised plan actually eliminated segregated and token-desegregated schools and achieved substantial integration?
 
 
 189
 The substantive requirements of the decree derive from the Fourteenth Amendment as interpreted by decisions of the Supreme Court and of this Court, in Many instances before the HEW Guidelines were published. For administrative details, we have looked to the Office of Education. For example, those familiar with the HEW Guidelines will note that the decree follows the Guidelines exactly as to the form letters which go to parents announcing the need to exercise a choice of schools, and the forms for exercising that choice are the same. Indeed a close parallel will be noted between much in Parts II through V of the decree and the Guideline provisions.
 
 
 190
 The great bulk of the school districts in this circuit have applied for federal financial assistance and therefore operate under voluntary desegregation plans.[120] Approval of these plans by the Office of Education qualifies the schools for federal aid. In this opinion we have held that the HEW Guidelines now in effect are constitutional and are within the statutory authority created in the Civil Rights Act of 1964. Schools therefore, in compliance with the Guildelines can in general be regarded as discharging constitutional obligations.
 
 
 191
 Some schools have made no move to desegregate or have had plans rejected as unsatisfactory by district courts or the HEW. We expect the provisions of the decree to be applied in proceedings involving such schools. Other schools have earlier court-approved plans which fall short of the terms of the decree. On motion by proper parties to re-open these cases, we expect these plans to be modified to conform with our decree. In some cases the parties may challenge various aspects of HEW-approved plans. Our approval of the existing Guidelines and the deference owed to any future Guidelines is not intended to deny a day in court to any person asserting individual rights or to any school board contesting HEW action.[121] In any school desegregation case the issue concerns the constitutional rights of Negroes, individually and as a class, and the constitutional rights of the State-- not the issue whether federal financial assistance should be withheld under Title VI of the Civil Rights Act of 1964.
 
 
 192
 When school systems are under court-ordered desegregation, the courts are responsible for determining the sufficiency of the system's compliance with the decree. The courts' task, therefore, is a continuing process, especially in major areas readily susceptible of observation and measurement, such as faculty integregation and student desegregation. (1) As to faculty, we have found that school authorities have an affirmative duty to break up the historical pattern of segregated faculties, the hall-mark of the dual system. To aid the courts in its task, the decree requires the school authorities to report to the district courts the progress made toward faculty integration. The school authorities bear the burden of justifying an apparent lack of progress.[122] (2) As to students the decree requires school authorities to make reports to the court showing by race, by school, by grade, the choices made in each 'choice period'. A similar report is required after schools open to show what actually happened when schools opened.
 
 
 193
 What the decree contemplates, then, is continuing judicial evaluation of compliance by measuring the performance-- not merely the promised performance-- of school boards in carrying out their constitutional obligation 'to disestablish dual, racially segregated school systems and to achieve substantial integration within such systems.'[123] District courts may call upon HEW for assistance in determining whether a school board's performance measures up to its obligation to desegregate. If school officials in any district should find that their district still has segregated faculties and schools or only token integration, their affirmative duty to take corrective action requires them to try an alternative to a freedom of choice plan, such as a geographic attendance plan, a combination of the two, the Princeton plan,[124] or some other acceptable substitute, perhaps aided by an educational park. Freedom of choice is not a key that opens all doors to equal educational opportunities.
 
 
 194
 Given the knowledge of the educators and administrators in the Office of Education and their day to day experience with thousands of school systems, judges and school officials can ill afford to turn their backs on the proffer of advice from HEW. Or from any responsible government agency or independent group competent to work toward solution of the complex problem of de jure discrimination bequeathed this generation by ten preceding generations.
 
 
 195
 Now after twelve years of snail's pace progress toward school desegregation, courts are entering a new era. The question Parish School Board July 19, 1965, the far have formerly de jure segregated schools progressed in performing their affirmative constitutional duty to furnish equal educational opportunities to all public school children? The clock has ticked the last tick for tokenism and delay in the name of 'deliberate speed'.
 
 
 196
 In the suit against the Caddo Parish School Board July 19, 1965The United States moved to intervene under 902 of the Civil Rights Act of 1964 (42 U.S.C. 2000h-2). The motion was filed twelve days after the Board submitted its plan in compliance with the district court's decree of June 14, 1965, but two days before the original plaintiffs filed their objections and before the court issued its order approving the plan. The district court denied the motion on the ground that it came too late. In these circumstances we consider that thr motion was timely filed and should have been granted.
 
 
 197
 This Court denied the motion of certain appellants to consolidate their cases, but allowed consolidation of briefs and, in effect, treated the cases as consolidated for purposes of appeal. The Court, however, in each case has separately considered the particular contentions of all the parties in the light of the record.
 
 
 198
 The Court reverses the judgments below and remands each case to the district court for further proceedings in accordance with this opinion.
 
 
 199
 Negroes
 Admitted
 Total To Formerly
 Enrollment White Schools
 W N
 Bessemer, Ala. 2,920 5,284 13
 Fairfield, Ala. 1,779 2,159 31
 Jefferson County, Ala. 45,000 18,000 24
 Caddo Parish, La. 30,680 24,467 1
 Bossier Parish, La. 11,100 4,400 31
(Affidavit of St. John Barrett, Attorney, Department of Justice, attached to
 Jackson Parish, La. 2,548 1,609 5
 Claiborne Parish, La. 2,394 3,442 5
Motion to Consolidate and Expedite Appeals.)
 1. Case Load
 -----------------------------------
 District Court of Supreme
 Court Appeals Court
 ---------- -------- -------
Number of 128 42 5
Cases
Number of 513 76 10
Orders entered
 2. Frequency of Appeals
 --------------------
 to this Court
 -------------
Number of Cases With One or More Appeals 42
Number of Cases With Two or More Appeals 21
Number of Cases With Three or More Appeals 8
Number of Cases With Four or More Appeals 4
Number of Cases With Five or More Appeals 2
 
 
 200
 COX, District Judge.
 
 
 201
 I reserve the right to dissent in whole or in part at a later date.
 
 APPENDIX A:
 PROPOSED DECREE
 
 202
 It is ORDERED, ADJUDGED and DECREED that the defendants, their agents, officers, employees and successors and all those in active concert and participation with them, be and they are permanently enjoined from discriminating on the basis of race or color in the operation of the school system. As set out more particularly in the body of the decree, they shall take affirmative action to disestablish all school segregation and to eliminate the effects of past racial discrimination in the operation of the school system:
 
 I.
 SPEED OF DESEGREGATION
 
 203
 Commencing with the 1967-68 school year, in accordance with this decree, all grades, including kindergarten grades, shall be desegregated and pupils assigned to schools in these grades without regard to race or color.
 
 II.
 EXERCISE OF CHOICE
 
 204
 The following provisions shall apply to all grades:
 
 
 205
 (a) Who May Exercise Choice. A choice of schools may be exercised by a parent or other adult person serving as the student's parent. A student may exercise his own choice if he (1) is exercising a choice for the ninth or a higher grade, or (2) has reached the age of fifteen at the time of the exercise of choice. Such a choice by a student is controlling unless a different choice is exercised for him by his parent or other adult person serving as his parent during the choice period or at such later time as the student exercises a choice. Each reference in this decree to a student's exercising a choice means the exercise of the choice, as appropriate, by a parent or such other adult, or by the student himself.
 
 
 206
 (b) Annual Exercise of Choice. All students, both white and Negro, shall be required to exercise a free choice of schools annually.
 
 
 207
 (c) Choice Period. The period for exercising choice shall commence May 1, 1967 and end June 1, 1967, and in subsequent years shall commence March 1 and end March 31 preceding the school year for which the choice is to be exercised. No student or prospective student who exercises his choice within the choice period shall be given any preference because of the time within the period when such choice was exercised.
 
 
 208
 (d) Mandatory Exercise of Choice. A failure to exercise a choice within the choice period shall not preclude any student from exercising a choice at any time before he commences school for the year with respect to which the choice applies, but such choice may be subordinated to the choices of students who exercised choice before the expiration of the choice period. Any student who has not exercised his choice of school within a week after school opens shall be assigned to the school nearest his home where space is available under standards for determining available space which shall be applied uniformly throughout the system.
 
 
 209
 (e) Public Notice. On or within a week before the date the choice period opens, the defendants shall arrange for the conspicuous publication of a notice describing the provisions of this decree in the newspaper most generally circulated in the community. The text of the notice shall be substantially similar to the text of the explanatory letter sent home to parents. (See paragraph II(e).) Publication as a legal notice will not be sufficient. Copies of this notice must also be given at that time to all radio and television stations serving the community. Copies of this decree shall be posted in each school in the school system and at the office of the Superintendent of Education.
 
 
 210
 (f) Mailing of Explanatory Letters and Choice Forms. On the first day of the choice period there shall be distributed by first-class mail an explanatory letter and a choice form to the parent (or other adult person acting as parent, if known to the defendants) of each student, together with a return envelope addressed to the Superintendent. Should the defendants satisfactorily demonstrate to the court that they are unable to comply with the requirement of distributing the explanatory letter and choice form by first-class mail, they shall propose an alternative method which will maximize individual notice, i.e., personal notice to parents by delivery to the pupil with adequate procedures to insure the delivery of the notice. The text for the explanatory letter and choice form shall essentially conform to the sample letter and choice form appended to this decree.
 
 
 211
 (g) Extra Copies of the Explanatory Letter and Choice Form. Extra copies of the explanatory letter and choice form shall be freely available to parents, students, prospective students, and the general public at each school in the system and at the office of the Superintendent of Education during the times of the year when such schools are usually open.
 
 
 212
 (h) Content of Choice Form. Each choice form shall set forth the name and location of the grades offered at each school and may require of the person exercising the choice the name, address, age of student, school and grade currently or most recently attended by the student, the school chosen, the signature of one parent or other adult person serving as parent, or where appropriate the signature of the student, and the identity of the person signing. No statement of reasons for a particular choice, or any other information, or any witness or other authentication, may be required or requested, without approval of the court.
 
 
 213
 (i) Return of Choice Form. At the option of the person completing the choice form, the choice may be returned by mail, in person, or by messenger to any school in the school system or to the office of the Superintendent.
 
 
 214
 (j) Choices not on Official Form. The exercise of choice may also be made by the submission in like manner of any other writing which contains information sufficient to identify the student and indicates that he has made a choice of school.
 
 
 215
 (k) Choice Forms Binding. When a choice form has once been submitted and the choice period has expired, the choice is binding for the entire school year and may not be changed except in cases of parents making different choices from their children under the conditions set forth in paragraph II(a) of this decree and in exceptional cases where, absent the consideration of race, a change is educationally called for or where compelling hardship is shown by the student.
 
 
 216
 (l) Preference in Assignment. In assigning students to schools, no preferences shall be given to any student for prior attendance at a school and, except with the approval of court in extraordinary circumstances, no choice shall be denied for any reason other than overcrowding. In case of overcrowding at any school, preference shall be given on the basis of the proximity of the school to the homes of the students choosing it, without regard to race or color. Standards for determining overcrowding shall be applied uniformly throughout the system.
 
 
 217
 (m) Second Choice where First Choice is Denied. Any student whose choice is denied must be promptly notified in writing and given his choice of any school in the school system serving his grade level where space is available. The student shall have seven days from the receipt of notice of a denial of first choice in which to exercise a second choice.
 
 
 218
 (n) Transportation. Where transportation is generally provided, buses must be routed to the maximum extent feasible in light of the geographic distribution of students, so as to serve each student choosing any school in the system. Every student choosing either the formerly white or the formerly Negro school nearest his residence must be transported to the school to which he is assigned under these provisions, whether or not it is his first choice, if that school is sufficiently distant from his home to make him eligible for transportation under generally applicable transportation rules.
 
 
 219
 (o) Officials not to Influence Choice. At no time shall any official, teacher, or employee of the school system influence any parent, or other adult person serving as a parent, or any student, in the exercise of a choice or favor or penalize any person because of a choice made. If the defendant school board employs professional guidance counselors, such persons shall base their guidance and counselling on the individual student's particular personal, academic, and vocational needs. Such guidance and counselling by teachers as well as professional guidance counsellors shall be available to all students without regard to race or color.
 
 
 220
 (p) Protection of Persons Exercising Choice. Within their authority school officials are responsible for the protection of persons exercising rights under or otherwise affected by this decree. They shall, without delay, take appropriate action with regard to any student or staff member who interferes with the successful operation of the plan. Such interference shall include harassment, intimidation, threats, hostile words or acts, and similar behavior. The school board shall not publish, allow, or cause to be published, the names or addresses of pupils exercising rights or otherwise affected by this decree. If officials of the school system are not able to provide sufficient protection, they shall seek whatever assistance is necessary from other appropriate officials.
 
 III.
 PROSPECTIVE STUDENTS
 
 221
 Each prospective new student shall be required to exercise a choice of schools before or at the time of enrollment. All such students known to defendants shall be furnished a copy of the prescribed letter to parents, and choice form, by mail or in person, on the date the choice period opens or as soon thereafter as the school system learns that he plans to enroll. Where there is no pre-registration procedure for newly entering students, copies of the choice forms shall be available at the Office of the Superintendent and at each school during the time the school is usually open.
 
 IV.
 TRANSFERS
 
 222
 (a) Transfers for Students. Any student shall have the right at the beginning of a new term, to transfer to any school from which he was excluded or would otherwise be excluded on account of his race or color.
 
 
 223
 (b) Transfers for Special Needs. Any student who requires a course of study not offered at the school to which he has been assigned may be permitted, upon his written application, at the beginning of any school term or semester, to transfer to another school which offers courses for his special needs.
 
 
 224
 (c) Transfers to Special Classes or Schools. If the defendants operate and maintain special classes or schools for physically handicapped, mentally retarded, or gifted children, the defendants may assign children to such schools or classes on a basis related to the function of the special class or school that is other than freedom of choice. In no event shall such assignments be made on the basis of race or color or in a manner which tends to perpetuate a dual school system based on race or color.
 
 V.
 SERVICES, FACILITIES, ACTIVITIES AND PROGRAMS
 
 225
 No student shall be segregated or discriminated against on account of race or color in any service, facility, activity, or program (including transportation, athletics, or other extracurricular activity) that may be conducted or sponsored by or affiliated with the school in which he is enrolled. A student attending school for the first time on a desegregated basis may not be subject to any disqualification or waiting period for participation in activities and programs, including athletics, which might otherwise apply because he is a transfer or newly assigned student except that such transferees shall be subject to long-standing, non-racially based rules of city, county, or state athletic associations dealing with the eligibility of transfer students for athletic contests. All school use or school-sponsored use of athletic fields, meeting rooms, and all other school related services, facilities, activities, and programs such as Commencement exercises and parent-teacher meetings which are open to persons other than enrolled students, shall be open to all persons without regard to race or color. All special educational programs conducted by the defendants shall be conducted without regard to race or color.
 
 VI.
 SCHOOL EQUALIZATION
 
 226
 (a) Inferior Schools. In schools heretofore maintained for Negro students, the defendants shall take prompt steps necessary to provide physical facilities, equipment, courses of instruction, and instructional materials of quality equal to that provided in schools previously maintained for white students. Conditions of overcrowding, as determined by pupil-teacher ratios and pupil-classroom ratios shall, to the extent feasible, be distributed evenly between schools formerly maintained for Negro students and those formerly maintained for white students. If for any reason it is not feasible to improve sufficiently any school formerly maintained for Negro students, where such improvement would otherwise be required by this subparagraph, such school shall be closed as soon as possible, and students enrolled in the school shall be reassigned on the basis of freedom of choice. By October of each year, defendants shall report to the Clerk of the Court pupil-teacher ratios, pupil-classroom ratios, and per-pupil expenditures both as to operating and capital improvement costs, and shall outline the steps to be taken and the time within which they shall accomplish the equalization of such schools.
 
 
 227
 (b) Remedial Programs. The defendants shall provide remedial education programs which permit students attending or who have previously attended all-Negro schools to overcome past inadequacies in their education.
 
 VII.
 NEW CONSTRUCTION
 
 228
 The defendants, to the extent consistent with the proper operation of the school system as a whole, shall locate any new school and substantially expand any existing schools with the objective of eradicating the vestiges of the dual system and of eliminating the effects of segregation.
 
 VIII.
 FACULTY AND STAFF
 
 229
 (a) Faculty Employment. Race or color shall not be a factor in the hiring, assignment, reassignment, promotion, demotion, or dismissal of teachers and other professional staff members, including student teachers, except that race may be taken into account for the purpose of counteracting or correcting the effect of the segregated assignment of teachers in the dual system. Teachers, principals, and staff members shall be assigned to schools so that the faculty and staff is not composed exclusively of members of one race. Wherever possible, teachers shall be assigned so that more than one teacher of the minority race (white or Negro) shall be on a desegregated faculty. Defendants shall take positive and affirmative steps to accomplish the desegregation of their school faculties and to achieve substantial desegregation of faculties in as many of the schools as possible for the 1967-68 school year notwithstanding that teacher contracts for the 1966-67 or 1967-68 school years may have already been signed and approved. The tenure of teachers in the system shall not be used as an excuse for failure to comply with this provision. The defendants shall establish as an objective that the pattern of teacher assignment to any particular school not be identifiable as tailored for a heavy concentration of either Negro or white pupils in the school.
 
 
 230
 (b) Dismissals. Teachers and other professional staff members may not be discriminatorily assigned, dismissed, demoted, or passed over for retention, promotion, or rehiring, on the ground of race or color. In any instance where one or more teachers or other professional staff members are to be displaced as a result of desegregation, no staff vacancy in the school system shall be filled through recruitment from outside the system unless no such displaced staff member is qualified to fill the vacancy. If, as a result of desegregation, there is to be a reduction in the total professional staff of the school system, the qualifications of all staff members in the system shall be evaluated in selecting the staff member to be released without consideration of race or color. A report containing any ants shall take steps to assign and reasons therefor, shall be filed with the Clerk of the Court, serving copies upon opposing counsel, within five (5) days after such dismissal, demotion, etc., as proposed.
 
 
 231
 (c) Past Assignments. The defendants shall take steps to assign and reassign teachers and other professional staff members to eliminate past discriminatory patterns.
 
 IX.
 REPORTS TO THE COURT
 
 232
 (1) Report on Choice Period. The defendants shall serve upon the opposing parties and file with the Clerk of the Court on or before April 15, 1967, and on or before June 15, 1967, and in each subsequent year on or before June 1, a report tabulating by race the number of choice applications and transfer applications received for enrollment in each grade in each school in the system, and the number of choices and transfers granted and the number of denials in each grade of each school. The report shall also state any reasons relied upon in denying choice and shall tabulate, by school and by race of student, the number of choices and transfers denied for each such reason.
 
 
 233
 In addition, the report shall show the percentage of pupils actually transferred or assigned from segregated grades or to schools attended predominantly by pupils of a race other than the race of the applicant, for attendance during the 1966-67 school year, with comparable data for the 1965-66 school year. Such additional information shall be included in the report served upon opposing counsel and filed with the Clerk of the Court.
 
 
 234
 (2) Report After School Opening. The defendants shall, in addition to reports elsewhere described, serve upon opposing counsel and file with the Clerk of the Court within 15 days after the opening of schools for the fall semester of each year, a report setting forth the following information:
 
 
 235
 (i) The name, address, grade, school of choice and school of present attendance of each student who has withdrawn or requested withdrawal of his choice of school or who has transferred after the start of the school year, together with a description of any action taken by the defendants on his request and the reasons therefor.
 
 
 236
 (ii) The number of faculty vacancies, by school, that have occurred or been filled by the defendants since the order of this Court or the latest report submitted pursuant to his subparagraph. This report shall state the race of the teacher employed to fill each such vacancy and indicate whether such teacher is newly employed or was transferred from within the system. The tabulation of the number of transfers within the system shall indicate the schools from which and to which the transfers were made. The report shall also set forth the number of faculty members of each race assigned to each school for the current year. (iii) The number of students by race, in each grade of each school.
 
 EXPLANATORY LETTER
 
 237
 (School System Name and Office Address)
 
 
 238
 (Date Sent)
 
 Dear Parent:
 
 239
 All grades in our school system will be desegregated next year. Any student who will be entering one of these grades next year may choose to attend any school in our system, regardless of whether that school was formerly all-white or all-Negro. It does not matter which school your child is attending this year. You and your child may select any school you wish.
 
 
 240
 Every student, white and Negro, must make a choice of schools. If a child is entering the ninth or higher grade, or if the child is fifteen years old or older, he may make the choice himself. Otherwise a parent or other adult serving as parent must sign the choice form. A child enrolling in the school system for the first time must make a choice of schools before or at the time of his enrollment.
 
 
 241
 The form on which the choice should be made is attached to this letter. It should be completed and returned by June 1, 1967. You may mail it in the enclosed envelope, or deliver it by messenger or by hand to any school principal or to the Office of the Superintendent at any time between May 1 and June 1. No one may require you to return your choice form before June 1 and no preference is given for returning the choice form early.
 
 
 242
 No principal, teacher or other school official is permitted to influence anyone in making a choice or to require early return of the choice form. No one is permitted to favor or penalize any student or other person because of a choice made. A choice once made cannot be changed except for serious hardship.
 
 
 243
 No child will be denied his choice unless for reasons of overcrowding at the school chosen, in which case children living nearest the school will have preference.
 
 
 244
 Transportation will be provided, if reasonably possible, no matter what school is chosen. (Delete if the school system does not provide transportation.)
 
 
 245
 Your School Board and the school staff will do everything we can to see to it that the rights of all students are protected and that desegregation of our schools is carried out successfully.
 
 
 246
 Sincerely yours, Superintendent.
 
 CHOICE FORM
 
 247
 This form is provided for you to choose a school for your child to attend next year. You have 30 days to make your choice. It does not matter which school your child attended last year, and does not matter whether the school you choose was formerly a white or Negro school. This form must be mailed or brought to the principal of any school in the system or to the office of the Superintendent, (address), by June 1, 1967. A choice is required for each child.
 
 
 248
 Name of child ............................................................
 
 
 249
 (Last) (First) (Middle)
 
 
 250
 Address ............................................................
 
 Name of Parent or other
 
 251
 adult serving as parent .............................................
 
 
 252
 If child is entering first grade, date of birth:
 
 
 253
 (Month) (Day) (Year)
 
 
 254
 Grade child is entering ............................................................
 
 
 255
 School attended last year ............................................................
 
 
 256
 Choose one of the following schools by marking an X beside the name.
 
 Name of School Grade Location
 
 257
 Signature .................... Date ....................
 
 To be filled in by Superintendent:
 School Assigned ....................[1]
 
 258
 APPENDIX B.
 
 Rate of Change and Status of Desegregation
 
 259
 (Leeson, Faster Pace, Scarcer Records, Southern Education Report 28-32 (Jan.-Feb. 1966), quoted in Emerson, Haber and Dorsen, Political and Civil Rights in the United States (3d ed. 1967), 695-99 (1967))
 
 
 260
 '* * * Both the 11-state Southern area and the border area, the latter consisting of six states and the District of Columbia, experienced a sharper increase in the percentage of Negroes in desegregated schools for 1965-66 than in previous years. But only the Southern states showed a changed attitude toward reporting records by race; in only three Southern states could nearly complete statistics be obtained district by district. As in other years, three of the border states plus the District of Columbia continued to keep records by race, and three states did not.
 
 
 261
 Correspondents for Southern Education Reporting Service * * * found that 15.89 per cent of the Negroes enrolled in the public schools of the region attended classes with whites, mostly in formerly all-white schools but sometimes also in formerly all-Negro schools. This numbered 567.789 Negro students out of the region's Negro enrollment of 3,572,810.
 
 
 262
 In the first 10 years after the Supreme Court decisions on segregated schools, in 1954 and 1955, the Southern and border region increased the number of Negroes in schools with whites at an average of about one per cent a year. Although the impetus of the Supreme Court's rulings and the possibility of direct involvement in legal action were factors, most districts desegregating through last year acted 'voluntarily' and only about 10 per cent required a specific court order. By the end of the 1964-65 school year, the region had enrolled 10.9 per cent of its Negro students in biracial classrooms.
 
 
 263
 The 1964 Civil Rights Act brought pressure on every district in the nation but the compliance effort admittedly was concentrated on the South. * * * Beginning in the spring of 1965 and continuing even through the first months of the 1965-66 school year, HEW's Office of Education negotiated with officials in each district to obtain compliance by the school officials either signing a statement, submitting a court-ordered desegregation plan or adopting a voluntary plan.
 
 
 264
 With the new school year, the region had increased the number of Negroes in desegregated schools by five percentage points to reach 15.9 per cent, while in the previous two school years the rate of increase in this figure had only been between one and two percentage points. For 1964-65, the region had 10.9 per cent of the Negro enrollment in desegregated schools, an increase of 1.7 percentage points over 1963-64, and for that year the 9.2 per cent figure was an increase of 1.2 percentage points over 1962-63. (See Table I.) * * *
 
 
 265
 TABLE I
 The Rate of Change
 Percentage of Negroes in Schools with Whites
 % % %
School Year South Change Border Change Region Change
1959-60* . 160 45.4 6.4
1960-61 .162 .002 49.0 3.6 7.0 .6
1961-62 .241 .079 52.5 3.5 7.6 .6
1962-63 .453 .212 51.8 0.7 8.0 .4
1963-64 1.17 .717 54.8 3.0 9.2 1.2
1964-65 2.25 1.08 58.3 3.5 10.9 1.7
1965-66 6.01 3.76 68.9 10.6 15.9 5.0
* First school year in which SERS began recording number of Negroes in
 schools with whites.
 
 
 266
 Up through the 1962-63 school year, the 11 Southern states together had fewer than one per cent of their Negro students in schools with whites. In 1963-64, the figure passed the one per cent mark and it almost doubled for 1964-65 to become 2.25 per cent of the Negroes in biracial schools, an increase of more than one percentage point. For the 1965-66 school year, the percentage more than doubled and reached 6.01 per cent.[2]
 
 
 267
 The six border states and the District of Columbia desegregated at a faster rate than did the South, and by the 1961-62 school year that area had more than half of its Negro enrollment attending desegregated schools. The annual change in the number of Negroes in desegregated border schools averaged about three per cent a year, and by 1964-65, the border area had desegregated 58.3 per cent of its Negro enrollment. In the current school year, the border area has 68.9 per cent of its Negro students attending the same schools with whites, a jump of over 10 percentage points from the previous year's figure.
 
 
 268
 This year, as in previous years, a disparity exists between what might be called 'technical' desegregation and 'actual' desegregation. Last year, for example 56 per cent of the region's Negro students were enrolled in districts having desegregation policies, but about 11 per cent of the total Negro enrollment attended desegregated schools. This year, the region has 97 per cent of its districts in official compliance with federal desegregation regulations, and 93 per cent of the region's combined Negro and white enrollment comes from these districts. However, the actual attendance of Negroes in desegregated schools amounts to almost 16 per cent. The difference in these figures was accentuated this year by the fact that almost 2,000 school districts having either all-white or all-Negro enrollments are included in the 'in compliance' statistics. * * *
 
 
 269
 Among the Southern states, Texas leads in the number and percentage of Negroes in schools with whites-- an estimated 60,000 Negroes or 17 per cent of the state's Negro enrollment. Tennessee ranks second in the area with 16 per cent and Virginia third with 11 per cent. Three states-- Alabama, Louisiana, and Mississippi-- continue to have less than one per cent of their Negro enrollment attending schools with whites. The other Southern states-- Arkansas, Florida, Georgia, North Carolina and South Carolina-- vary between 1 and 10 per cent of their Negro students in biracial classrooms.
 
 
 270
 All but one of the border states have more than half of their Negro enrollments in desegregated schools. Oklahoma has 38 per cent of its Negroes in biracial schools, Maryland has 56 per cent, and Delaware, the District of Columbia, Kentucky, * * * Missouri and West Virginia have desegregated more than three-fourths of their Negro student population. * * *
 
 
 271
 The desegregation statistic showing the sharpest increase this year was the number of districts with desegregation policies. The region now has 4,804 public school districts that have received approval from the U.S. Office of Education for their desegregation proposals. When the last school year ended, SERS reported that 1,476 districts had desegregated in practice or in policy.
 
 
 272
 TABLE III
 Status of Desegregation
 (17 Southern and Border States and D.C.)
 School Districts
 With
 Negroes In Not In
 and Compliance Compliance
 Total Whites
Alabama 118 119 105 14
Arkansas 410 217 400 10
Florida 67 67 0
Georgia 196 180 192 5
Louisiana 67 67 33 34
Mississippi 149 149 118 31
North Carolina 170 170 165 4
South Carolina 108 108 86 21
Tennessee 152 129 149 2
Texas 1,325 850 1,303 7
Virginia 130 127 124 12
SOUTH 2,892 2,183 2,742 140
Delaware 58 47 59 0
Dist. of Columbia 1 1 1 0
Kentucky 200 167 204 0
Maryland 24 23 24 0
Missouri 1,096 212 * 675 0
Oklahoma 1,046 323 1,044 4
West Virginia 55 44 55 0
BORDER 2,480 817 2,062 4
REGION 5,372 3,000 4,804 144
 TABLE - CONTINUED
 Negroes
 in Schools
 Enrollment with Whites
 White Negro No. %
 559,123 ** 295,848 ** 1,250 * . 43
 337,652 ** 111,952 ** 4,900 * 4.38
 1,056,805 * 256,063 * 25,000 * 9.76
 784,917 * 355,950 * 9,465 * 2.66
 483,941 318,651 2,187 .69
 309,413 296,834 1,750 * . 59
 828,638 ** 349,282 ** 18,000 * 5.15
 374,007 263,983 3,864 1.46
 714,241 * 176,541 * 28,801 16.31
 2,136,150 * 349,192 * 60,000 *
 757,037 ** 239,729 ** 27,550 * 11.49
 8,341,924 3,014,025 182,767 6.01
 86,041 20,785 17,069 83.32
 15,173 128,843 109,270 84.81
 713,451 ** 59,835 ** 46,891 78.37
 583,796 178,851 99,442 55.60
 843,167 105,171 79,000 * 75.12
 564,250 * 45,750 * 17,500 * 38.25
 425,087 * 19,850 * 15,850 * 79.85
 3,230,965 558,785 385,022 68.90
11,572,889 3,572,810 567,789 15.89
* Estimated.
** 1964-65.
The sum of adding the districts "In Compliance" will not always equal the
Total number of districts because the Office of Education reports a different
number of districts from that of some of the state departments of education.
The number of Negroes in schools with whites, compared to the total Negro
enrollmeent.
 
 
 273
 WILLIAM HAROLD COX, District Judge (dissenting).
 
 
 274
 The majority opinion herein impels my dissent, with deference, to its general theme, that precedent required the public schools to mix the races rather than desegregate such schools by removing all effects of state action which may have heretofore compelled segregation, so as to permit these schools to be operated upon a proper free choice plan. This Court has heretofore firmly and soundly (as decision and not gratuitously) committed itself to the views expressed by the distinguished jurists in Briggs v. Elliott, 132 F.Supp. 776. The majority now seeks to criticize the Briggs case and disparage it as dictum, although this Court in several reported decisions had embraced and adopted Briggs with extensive quotations from it as the decisional law of this Circuit. Surely, only two of the judges of this Court may not now single handedly reverse those decisions and change such law of this Circuit.
 
 
 275
 These school cases all stem from the decision of the Supreme Court of the United States in the familiar Brown cases.[1] Nothing was said in those cases or has since been said by the Supreme Court to justify or support the extremely harsh plan of enforced integration devised by the majority decision. Significantly, there is nothing in the Civil Rights Act of 1964 to suggest the propriety of this Court adopting and following any guidelines of the Health, Education and Welfare Commissioner in these school desegregation cases in such respect. The policy statement of Congress as contained in the act itself expressly disclaims any intention or purpose to do that which these guidelines, and the majority opinion approving them, do in complete disregard thereof.
 
 
 276
 No informed person at this late date would now argue with the soundness of the philosophy of the Brown decision. That case simply declared the constitutional right of negro children to attend public schools of their own free choice without any kind of restraint by state action. That Court has made it clear that the time for 'deliberate' speed in desegregating these public schools has now expired, but the majority opinion herein is the first to say that the Brown case, together with the Civil Rights Act of 1964, makes it necessary that these public schools must now integrate and mix these schools and their facilities, 'lock, stock and barrel.' That view comes as a strange construction of the Fourteenth Amendment rights of colored children. The passage of time since the rendition of the Brown case; and of natural disparities which are found in so many school plans before the Court; and the difficult problems posed before the Court by such plans certainly can provide no legal justification or basis for this extreme view and harsh and mailed fist decision at this time. These questions involving principles of common sense and law are readily resolved by a court of equity without being properly accused of giving an advisory opinion. The decision in such case is not overtaxing on a court of equity and its articulated conclusions can be implemented by an enforceable decree even at the expenditure of some well spent time, patience and energy of the Court. If a Court is to write a decree, it should be the decree of that Court and not the by-product of some administrative agency without knowledge or sworn obligation to resolve sacred constitutional rights and principles. Unilaterally prepared guidelines allegedly devised by the Commissioner may or not accord with his own views, but such an anomalously prepared document could not justify this Court in adopting it 'lock, stock and barrel' under any pretext and even with repeated disavowals of such intention or purpose.
 
 
 277
 The Constitution of the United States is not the dead hand of the past strangling the liberties of a free people; it is a living document designed for all time to perpetuate liberty, freedom and justice for every person, young or old, who is born under or who comes within its protecting shield. As was said many years ago, 'in moving water there is life, in still waters there is stagnation and death.' The Constitution was framed not for one era, but for all time. But when the Courts transform viability into elasticity, constitutional rights are illusory. The rope of liberty may be twisted and become a garrote which strangles those who seek its protection. It the majority opinion in these cases is permitted to stand, it will, in the name of protecting civil rights of some, destroy civil rights and constitutional liberties of all our citizens, their children and their children's children.
 
 
 278
 The Supreme Court, in Brown II, said that 'school authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles.' It thereupon became the duty of the Court, acting as a Court of Equity, under such principles to see that public schools, still operating under the dual system by state action, were desegregated (not integrated) in accordance with the vested constitutional right of colored children. Judicial haste and impatience cannot justify this Court in equating integration with desegregation. No Court up to this time has been heard to say that this Court now has the power and the authority to force integration of both races upon these public schools without regard to any equitable considerations, or the will or wish of either race. The decisions of this Court deserve and must have stability and integrity. It was the 1965 guidelines of HEW that were approved by this Court in Jerome Derek Singleton v. Jackson Municipal Separate School District, 355 F.2d 865. Judge Wisdom wrote for the Court and Judge Thornberry concurred in that case on January 26, 1966; and there was not a word in that case to the effect that this Court then thought that any decision or statute or guidelines under any statute required or justified forced integration. Almost before that slip opinion reached the bound volume, this Court has now written on December 29, 1966, a vastly different opinion with no change intervening in the law.
 
 
 279
 The last reported school case from this Circuit, decided August 16, 1966 by Judge Tuttle and Judge Thornberry in Birdie Mae Davis, et al. v. Board of School Commissioners of Mobile County, et al., 364 F.2d 896, this Court still wrote of accelerating a plan of desegregation. As if to foreshadow the point of Judge Wisdom's 'nettle' in the majority opinion in this case, Judge Tuttle wrote in his Note 1 an explanation of his changing requirements in these school cases for the delayed enjoyment of constitutional rights by accelerating desegregation. Davis said that negro children, as individuals, had the right to transfer to schools from which they were excluded because of their race, and said that this had been the law since the Brown decision; but that misunderstanding of that principle was perhaps due to the popularity 'of an oversimplified dictum that the constitution 'does not require integration' (Briggs v. Elliott, E.D.S.C.1955, 132 F.Supp. 776, 777).' That is the first and only expressed criticism of Briggs found among the decisions of this Circuit, but the Court did not comment upon the viability and soundness of the many decisions of this Circuit which wholeheartedly embraced and repeatedly reaffirmed the so-called dicta in Briggs. Davis dealt with an urban area in Mobile, Alabama, while these cases deal with small communities or rural schools but that could have no possible bearing on desegregation versus or as distinguished from immediate forced integration or mixing of these schools.
 
 
 280
 In Alfred Avery, Jr., a Minor by his Mother and Next Friend, Mrs. Alfred Avery, et al. v. Wichita Independent School District, et al., 241 F.2d 230 (1957), this Court said:
 
 
 281
 'The Constitution as construed in the School Segregation Cases, Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; Id., 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, and Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884, forbids any state action requiring segregation of children in public schools solely on account of race; it does not, however, require actual integration of the races. As was well said in Briggs v. Elliott, D.C.E.D.S.C., 132 F.Supp. 776, 777:
 
 
 282
 '* * * it is important that we point out exactly what the Supreme Court has decided and what it has not decided in this case. It has not decided that the federal courts are to take over or regulate the public schools of the states. It has not decided that the states must mix persons of different races in the schools or must require them to attend schools or must deprive them of the right of choosing the schools they attend. What it has decided, and all that it has decided, is that a state may not deny to any person on account of race the right to attend any school that it maintains. This, under the decision of the Supreme Court, the state may not do directly or indirectly; but if the schools which it maintains are open to children of all races, no violation of the Constitution is involved even though the children of different races voluntarily attend different schools, as they attend different churches. Nothing in the Constitution or in the decision of the Supreme Court takes away from the people freedom to choose the schools they attend. The Constitution, in other words, does not require integration. It merely forbids discrimination. It does not forbid such segregation as occurs as the result of voluntary action. It merely forbids the use of governmental power to enforce segregation. The Fourteenth Amendment is a limitation upon the exercise of power by the state or state agencies, not a limitation upon the freedom of individuals.'
 
 
 283
 Again, this Court in Hilda Ruth Borders, a Minor, et at. v. Dr. edwin L. Rippy, et al., 247 F.2d 268 (1957) said: 'The equal protection and due process clauses of the fourteenth amendment do not affirmatively command integration, but they do forbid any state action requiring segregation on account of their race or color of children in the public schools. Avery v. Wichita Falls Independent School District, 5 Cir., 1957, 241 F.2d 230, 233. Pupils may, of course, be separated according to their degree of advancement or retardation, their ability to learn, on account of their health or for any other legitimate reason, but each child is entitled to be treated as an individual without regard to his race or color.'
 
 
 284
 In a public housing case, participated in by Judge Wisdom, Queen Cohen v. Public Housing Administration, 5 Cir., 257 F.2d 73, it is said: 'Neither the Fifth nor the Fourteenth Amendment operates positively to command integration of the races, but only negatively to forbid governmentally enforced segregation.'
 
 
 285
 This Court in Sandra Craig Boson, et al. v. Dr. Edwin L. Rippy, et al., 285 F.2d 43, said: 'Indeed, this Court has adopted the reasoning in Briggs v. Elliott, D.C. E.D.S.C.1955, 132 F.Supp. 776, relied on by the Sixth Circuit, and has further said: 'The equal protection and due process clauses of the fourteenth amendment do not affirmatively command integration, but they do forbid any state action requiring segregation on account of their race or color of children in the public schools. Avery v. Wichita Falls Independent School District, 5 Cir., 1957, 241 F.2d 230, 233. Pupils may, of course, be separated according to their degree of advancement or retardation, their ability to learn, on account of their health, or for any other legitimate reason, but each child is entitled to be treated as an individual without regard to his race or color.' Borders v. Rippy, 5 Cir., 1957, 247 F.2d 268, 271.
 
 
 286
 'Nevertheless, with deference to the views of the Sixth Circuit, it seems to us that classification according to race for purposes of transfer is hardly less unconstitutional than such classification for purposes of original assignment to a public school.' It is that decision in Briggs v. Elliott, supra, which the majority here now seek to criticize and repudiate.
 
 
 287
 In Ralph Stell, et al. v. Savannah-Chatham County Board of Education, et al. (5 CA) 333 F.2d 55, 59, in footnote 2 it is said: 'No court has required a 'compulsory racially integrated school system' to meet the constitutional mandate that there be no discrimination on the basis of race in the operation of public schools. See Evers v. Jackson Municipal Separate School District, 5 Cir., 1964, 328 F.2d 408, and cases there cited. The interdiction is against enforced racial segregation. Incidental integration, of course, occurs through the process of desegregation. Cf. Stone v. Board of Education of Atlanta, 5 Cir., 1962, 309 F.2d 638.'
 
 
 288
 This Court in Darrell Kenyatta Evers, et al. v. Jackson Municipal Separate School District, 328 F.2d 408 (1964) said: 'This is not to say that the Fourteenth Amendment commands integration of the races in the schools, or that voluntary segregation is not legally permissible. See Avery v. Wichita Falls Ind. School Dist., 5 Cir., 1957, 241 F.2d 230; Rippy v. Borders, 5 Cir., 1957, 250 F.2d 690; Cohen v. Public Housing Administration, 5 Cir., 1958, 257 F.2d 73, cert. den., 358 U.S. 928, 79 S.Ct. 315, 3 L.Ed.2d 302; Holland v. Board of Public Instruction, supra; and Shuttlesworth v. Birmingham Board of Education, supra. The Supreme Court did not hold otherwise in Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873.' The same teaching is expressed in a park case from this Court, styled City of Montgomery, Alabama v. Georgia Theresa Gilmore, 277 F.2d 364. In the many cases from this Court involving the race issue in public schools (there being some forty-one of them according to the majority opinion), not one of them speaks of any requirement or duty of the school to forcefully integrate the races, or to compel the races to mix with each other in public schools; but every one of them speak of desegregating such schools. The word desegregate does not appear in Webster's New International Dictionary, Second Edition, Edited in 1950. But Webster's New Collegiate Dictionary (a Merriam-Webster) defines desegregation as: 'To free itself of any law, provision or practice requiring isolation of the members of a particular race in separate units, especially in military service or in education.'
 
 
 289
 In sum, there is no law to require one of these public schools to integrate or force mix these races in public schools. But these public schools, which have been heretofore segregated by state action, and operate under a dual system, should be required to remove every vestige of state influence toward segregation of the races in these schools; and these colored children should be fully advised of their constitutional right to attend public schools of their choice, completely without regard to race. Many problems exist and are created by the proper enforcement of desegregation plans that will assure a full sweep of real freedom of choice to these negro children, and this Court cannot by only two of its members become impatient as trail-blazers and rewrite the decisional law of this Circuit as my good friends have undertaken to do in this case.
 
 
 290
 Such a course would do violence to the ancient rule of Stare Decisis. In Donnelly Garment Co. v. National Labor Relations Board, (8 CCA) 123 F.2d 215: 'It is a long-established rule that judges of the same court will not knowingly review, reverse or overrule each other's decisions. Shreve v. Cheesman, 8 Cir., 69 F. 785, 790, 791; Plattner Implement Co. v. International Harvester Co., 8 Cir., 133 F. 376, 378, 379. The necessity of such a rule in the interest of an orderly administration of justice is clear.' In Sanford Napoleon Powell v. United States, (7 CA) 338 F.2d 556 (1964), it is said: 'Our decision in Lauer has been criticized. However, this decision is the law of this Circuit unless and until this Court (presumably sitting en banc) would determine otherwise or unless higher authority might so determine.'
 
 
 291
 Rule 25a of the Fifth Circuit provides for a rehearing in any case upon vote of a majority of the circuit judges in active service for any reason which appears to them to be sufficient in the particular case. Ordinarily, a hearing or rehearing en banc is not ordered except 'when necessary to secure or maintain uniformity or continuity in the decisions of the Court, (etc.)' The majority opinion simply does not reflect the well considered and firmly stated composite decision of this Circuit; and in that view, is not an accurate or proper statement of the law in this case as it now exists in the Fifth Circuit.
 
 
 292
 The Civil Rights Act of 1964 (42 U.S.C., 1958 ed., 2000c-6) refers to 'desegregation in public education' and not to forced mixing or integration of the races. That same section states 'provided that nothing herein shall empower any official or court of the United States to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another or one school district to another in order to achieve such racial balance, or otherwise enlarge the existing power of the court to insure compliance with constitutional standards.' The English language simply could not be summoned to state any more clearly than does that very positive enactment of Congress, that these so-called 'guidelines' of this administrative agency are not sacrosanct expositions of school law (if so intended), but are actually promulgated and being used in opposition to and in violation of this positive statute. Contrary to the majority opinion, it was never the intention or purpose of the Congress to constitute the Commissioner of Health, Education and Welfare as the sidewalk superintendent of this Court in these school cases. On the contrary, 42 U.S.C., 1958 ed., 2000c-2 provides that the Commissioner, only upon application of a school board, state, municipality, school district or other governmental unit, can render any technical assistance to such an applicant. Nowhere in that act is it contemplated that this court should abdicate its power and authority to act upon and decide a case on appeal to it as a court of equity, and simply decide it by rubber stamping one of the annual guideline bulletins of an administrative bureau of the United States in Washington. The attitude and position of this Court in doing exactly that in this case is not improved by disavowing any intention or purpose to do so.
 
 
 293
 There were seven consolidated cases before the Court which are embraced in this decision. Most, if not all, of the plans in those cases were defective and needed updating for a more realistic and effective application of the free choice principle under the former decisions of this Court; but they did not need or deserve the harsh and unprecedented treatment accorded these schools by the majority decision in these cases. The colored children are not befriended and their lot is not improved by this unprecedented majority opinion and the entire school system will suffer under the impact of this improvident administrative directive as thus adopted by this Court.
 
 
 294
 Mu duty impels me to file this dissent to the majority view in these cases with great deference to both of my distinguished associates.
 
 
 
 *
 William Harold Cox, U.S. District Judge for the Southern District of Mississippi, sitting by designation
 
 
 [1]
 Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (Brown I). See Brown v. Board of Education, 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (Brown II)
 
 
 [2]
 347 U.S. at 495, 74 S.Ct. 686
 
 
 [3]
 Shakespeare, The Tempest, Act IV. The cases consolidated for appeal involve Alabama and Louisiana public schools. In Alabama, as of December 1965, there were 1250 Negro pupils, out of a statewide total of 295,848, actually enrolled in schools with 559,123 white students, 0.43% of the eligible Negro enrollment. In Louisiana there were 2187 Negro children, out of a total of 318,651, enrolled in school with 483,941 white children, 0.69% of the total eligible. Southern Education Reporting Service, Statistical Summary of Segregation-Desegregation in the Southern and Border Area from 1954 to the present, 15th Rev. p. 2, Dec. 1965. See Appendix B, Rate of Change and Status of Desegregation. In each of the seven cases before this Court, no start was made toward desegregation of the schools until 1965, eleven years after Brown. In all these cases, the start was a consequence of a court order obtained only after vigorous opposition by school officials
 
 
 [4]
 Braxton v. Board of Public Instruction of Duval County, S.D.Fla.1962, 7 Race Rel.L.Rep. 675, aff'd, 5 Cir. 1964, 326 F.2d 616, cert. den'd 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964). Senator Humphrey cited this case in explaining Section 604 of The Civil Rights Act of 1964. See Section IV D of this opinion
 
 
 [5]
 The mystique that has developed over the supposed difference between 'desegregation' and 'integration' originated in Briggs v. Elliott, E.D.S.C.1955, 132 F.Supp. 776: 'The Constitution * * * does not require integration. It merely forbids (segregation)'. 132 F.Supp. at 777. This dictum is a product of the narrow view that Fourteenth Amendment rights are only individual rights; that therefore Negro school children individually must exhaust their administrative remedies and will not be allowed to bring class action suits to desegregate a school system. See Section III A of this opinion
 The Supreme Court did not use either term, 'desegregation' or 'integration', in Brown. But the Court did quote with approval a statement of the district court in which 'integrated' was used as we use it here. For ten years after Brown the Court refrained from using the terms 'integration' or 'integrated'. Then in 1964 in Griffin v. County School Board of Prince Edward County, 375 U.S. 391, 84 S.Ct. 400, 11 L.Ed.2d 409, the Court noted that 'the Board of Supervisors decided not to levy taxes or appropriate funds for integrated public schools', i.e. schools schools under a desegregtaion order. There is not one Supreme Court decision which can be fairly construed to show that the Court distinguished 'desegregation' from 'integration', in terms or by even the most gossamer implication.
 Counsel for the Alabama defendants assert that 'desegregation' and 'integration' are terms of art. They struggle valiantly to define these words:
 By 'desegregation' we mean the duty imposed by Brown upon schools which previously compelled segregation to take affirmative steps to eliminate such compulsory segregation so as to allow the admission of students to schools on a non-racial admission basis. By 'integration' we mean the actual placing of or attendance by Negro students in schools with whites.
 They can do so only by narrowing the definitions to the point of inadequacy. Manifestly, the duty to desegregate schools extends beyond the mere 'admission' of Negro students on a non-racial basis. As for 'integration', manifestly a desegregation plan must include some arrangement for the attendance of Negroes in formerly white schools.
 In this opinion we use the words 'integration' and 'desegregation' interchangeably. That is the way they are used in the vernacular. That is the way they are defined in Webster's Third New International Dictionary: "integrate' to 'desegregate". The Civil Rights Commission follows this usage: for example, 'The Office of Education * * * standards * * * should * * * ensure that free choice plans are adequate to disestablish dual, racially segregated school systems * * * to achieve substantial integration in such systems.' U.S. Comm. on Civil Rights, Survey of School Desegregation 1965-66, p. 54.
 The Eighth Circuit used 'integration' interchangeably with 'desegregation' in Smith v. Board of Education of Morrilton, 8 Cir. 1966, 365 F.2d 770. So did the Third Circuit in Evans v. Ennis, 3 Cir. 1960, 281 F.2d 385. See also Brown v. County School Board of Frederick County, Va., W.D.Va.1965, 245 F.Supp. 549. The courts in Dowell v. School Board of Oklahoma City Public Schools, W.D.Okl. 1965, 244 F.Supp. 971, aff'd, 10 Cir. Jan. 23, 1967, 375 F.2d 158 and Dove v. Parham, 8 Cir. 1960, 282 F.2d 256 (and the Civil Rights Commission), speak of a school board's duty to 'disestablish segregation'. This term accurately 'implies that existing racial imbalance is a consequence of past segregation policies, and, because of this, school boards have an affirmative duty to remedy racial imbalance'. Note, Discrimination in the Hiring and Assignment of Teachers in Public School Systems, 64 Mich.L.Rev. 692, 698 n. 44 (1966).
 We use the terms 'integregation' and 'desegregation' of formerly segregated public schools to mean the conversion of a de jure segregated dual system to a unitary, nonracial (nondiscriminatory) system-- lock, stock, and barrel: students, faculty, staff, facilities, programs, and activities. The proper governmental objective of the conversion is to offer educational opportunities on equal terms to all.
 As we see it, the law imposes an absolute duty to desegregate, that is, disestablish segregation. And an absolute duty to integrate, in the sense that a disproportionate concentration of Negroes in certain schools cannot be ignored; racial mixing of students is a high priority educational goal. The law does not require a maximum of racial mixing or striking a racial balance accurately reflecting the racial composition of the community or the school population. It does not require that each and every child shall attend a racially balanced school. This, we take it, is the sense in which the Civil Rights Commission used the phrase 'substantialintegration'.
 As long as school boards understand the objective of desegregation and the necessity for complete disestablishment of segregation by converting the dual system to a nonracial unitary system, the nomenclature is unimportant. The criterion for determining the validity of a provision in a desegregation plan is whether it is reasonably related to the objective. We emphasize, therefore, the governmental objective and the specifics of the conversion process, rather than the imagery evoked by the pejorative 'integration'. Decision-making in this important area of the law cannot be made to turn upon a quibble devised over ten years ago by a court that misread Brown, misapplied the class action doctrine in the school desegregation cases, and did not foresee the development of the law of equal opportunities.
 
 
 [6]
 Brown v. Board of Education, 1955, 349 U.S. 294, 301, 75 S.Ct. 753, 756
 
 
 [7]
 Especially Cooper v. Aaron, 1958, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 3; Bradley v. School Board of the City of Richmond, 1965, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187; Rogers v. Paul, 1965, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265
 
 
 [8]
 Singleton v. Jackson Municipal Separate School District, 5 Cir. 1965, 348 F.2d 729 (Singleton I)
 
 
 [9]
 45 C.F.R. 80.4(c) (1964). The guidelines are, of course, subject to this regulation
 
 
 [10]
 In Singleton I, to avoid any such inference, we said: 'The judiciary has of course functions and duties distinct from those of the executive department * * *. Absent legal questions, the United States Office of Education is better qualified * * *' 348 F.2d at 731
 
 
 [11]
 'The rule has become: the later the start, the shorter the time allowed for transition.' Lockett v. Board of Education of Muscogee County, 5 Cir. 1965, 342 F.2d 225, 228
 
 
 [12]
 See Section III A and footnote 5
 
 
 [13]
 The Court asked counsel in these consolidated cases and in five other cases for briefs on the following questions:
 (a) To what extent, consistent with judicial prerogatives and obligations, statutory and constitutional, is it permissible and desirable for a federal court (trial or appellate) to give weight to or to rely on H.E.W. guidelines and policies in cases before the court?
 (b) If permissible and desirable, what practical means and methods do you suggest that federal courts (trial and appellate) should follow in making H.E.W. guidelines and policies judicially effective?
 
 
 [14]
 Alabama provides tuition grants of $185 a year and Louisiana $360 a year to students attending private schools. 'Only Florida and Texas report no obvious cases of private schools formed to avoid desegregation in public schools.' Up to the school year 1965-66, Louisiana had 'some 11,000 pupils already receiving state tuition grants to attend private schools.' This number will be significantly increased as a result of new private schools in Plaquemines Parish. Leeson, Private Schools Continue to Increase in the South, Southern Education Report, November 1966, p. 23. In Louisiana, students attending parochial schools do not receive tuition grants
 
 
 [15]
 In a press meeting May 19, 1964, to discuss the Civil Rights bill, Senator Everett Dirksen so paraphrased, 'On resiste a l'invasion des armees; on ne resiste pas a l'invasion des idees.' Victor Hugo, Histoire d'un Crime: Conclusion: La Chute, Ch. 10 (1877). Senator Dirksen then said, 'Let editors rave at will and let states fulminate at will, but the time has come, and it can't be stopped.' Cong. Quarterly Service, Revolution in Civil Rights 63 (1965)
 
 
 [16]
 HR. 7152, Pub.L. 88-352, 78 Stat. 243; approved July 2, 1964
 
 
 [17]
 'In the last decade it has become increasingly clear that progress has been too slow and that national legislation is required to meet a national need which becomes ever more obvious. That need is evidenced, on the one hand, by a growing impatience by the victims of discrimination with its continuance and, on the other hand, by a growing recognition on the part of all of our people of the incompatibility of such discrimination with our ideals and the principles to which this country is dedicated. A number of provisions of the Constitution of the United States clearly supply the means 'to secure these rights,' and H.R. 7152, as amended, resting upon this authority, is designed as a step toward eradicating significant areas of discrimination on a nationwide basis. It is general in application and national in scope.' House Judiciary Committee Report No. 914, to Accompany H.R. 7152. 2 U.S. Code Congressional and Administrative News, 88th Cong. 2nd Sess.1964, p. 2393. 'The transition from all-Negro to integrated schools is at best a difficult problem of adjustment for teachers and students alike. * * * We have tried to point out that the progress in school desegregation so well commenced in the period 1954-57 has been grinding to a halt. The trend observed in 1957-59 toward desegregation by court order rather than by voluntary action has continued. It is not healthy nor right in this country to require the local residents of a community to carry the sole burden and face alone the hazards of commencing costly litigation to compel school desegregation. After all, it is the responsibility of the Federal Government to protect constitutional rights. * * *' Additional Views on H.R. 7152 of Hon. William M. McCulloch, Hon. John V. Lindsay, Hon. William T. Cahill, Hon. Garner E. Shriver, Hon. Clark MacGregor, Hon. Charles McC. Mathias, Hon. James E. Bromwell.' Ibid., 2487
 
 
 [18]
 78 Stat. 246-99, 42 U.S.C. 2000c (1964)
 
 
 [19]
 78 Stat. 252-53, 42 U.S.C. 2000d (1964). Section 601 states: 'No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.' Section 602 states: 'Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity * * * is authorized and directed to effectuate the provisions of section 601 with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. * * *'
 
 
 [20]
 78 Stat. 246-49, 42 U.S.C. 2000c (1964). In addition, Title IX authorizes the Attorney General to intervene in private suits where persons have alleged denial of equal protection of the laws under the 14th Amendment where he certifies that the case is of 'general public importance.' 78 Stat. 266, Title IX 902, 42 U.S.C. 2000 h-2 (1964)
 
 
 [21]
 N.Y. Times, July 3, 1964, p. 1
 
 
 [22]
 Executive Order 11197, Feb. 9, 1965, 30 F.R. 1721
 
 
 [23]
 Executive Order No. 11247, Sept. 28, 1965, 30 F.R. 12327
 
 
 [24]
 The Elementary and Secondary Education Act of 1965, 79 Stat. 27
 
 
 [25]
 'The Elementary and Secondary Education Act of 1965 greatly increased the amount of federal money available for public schools, and did so in accordance with a formula that pumps the lion's share of the money to low-income areas such as the Deep South. Consequently, Title VI of the Civil Rights Act of 1964 has become the main instrument for accelerating and completing the desegregation of Southern public schools.' The New Republic, April 9, 1966 (Professor Alexander M. Bickel)
 
 
 [26]
 45 C.F.R. Part 80, Dec. 4, 1964, 64 F.R. 12539
 
 
 [27]
 'Every application for Federal financial assistance to carry out a program to which this part applies * * * shall, as a condition to its approval * * *, contain or be accompanied by an assurance that the program will be conducted or the facility operated in compliance with all requirements imposed by or pursuant to this part. * * *' 45 C.F.R. 80.4(a) (1964)
 28 U.S. Department of Health, Education and Welfare, Office of Education, General Statement of Policies under Title VI of the Civil Rights Act of 1964 Respecting Desegregation of Elementary and Secondary Schools, April, 1965. It is quoted in full in Price v. Denison Independent School District, 5 Cir., 1965, 348 F.2d at 1010.
 
 
 [29]
 Revised Statement of Policies for School Desegregation Plans Under Title VI of the Civil Rights Act of 1964. March, 1966
 
 
 [30]
 In Davis v. Board of School Commissioners of Mobile County, 5 Cir. 1966, 364 F.2d 896, Judge Tuttle, for the Court, noted that 'for many a year, it has been apparent to all concerned that the requirements of Singleton and Denison were the minimum standards to apply.'
 
 
 [31]
 Title IV, 407, 42 U.S.C. 2000c-6 authorizing the Attorney General to bring suit, on receipt of a written complaint, would seem to imply this conclusion. Section 409 preserves the right of individual citizens 'to sue for or obtain relief' against discrimination in public education. HEW Regulations provide: 'In any case in which a final order of a court of the United States for the desegregation of such school or school system is entered after submission of such a plan, such a plan shall be revised to conform to such final order, including any future modification of such order.' 45 C.F.R. 80.4(c) (1964)
 
 
 [32]
 See footnote 17
 
 
 [33]
 'The Federal courts have been responsible for great qualitative advances in civil rights; the lack has been in quantitative implementation-- in enabling the individual to avail himself of these great decisions.' Bernhard and Natalie, Between Rights and Remedies, 53 Georgetown L. Jour. 915, 916 (1965). 'It is the consensus of the judges on the firing line, so to speak, that one phase in the administration of the law-- the establishment phase, characterized by permissive tokenism, by a sort of minimal judicial holding of the line while the political process did, as it must, the main job of establishing-- this phase has been closed out.' Bickel, The Decade of School Desegregation, 64 Colum.L.Rev. 193, 209 (1964). 'The changes of the past decade have disappointed the most optimistic hopes, but they have been dramatically sweeping nonetheless.' Gellhorn, A Decade of Desegregation-- Retrospect and Prospect, 9 Utah L.Rev. 3 (1964). 'What makes one uneasy, of course is the truly awesome magnitude of what has yet to be done.' Thurgood Marshall, The Courts, in Center for the Study of Democratic Institutions, The Maze of Modern Government 36 (1964), quoted in Pollak, Ten Years After the Decision, 24 Fed. Bar Jour. 123 (1964). On the first decade of desegregation, see generally, Sarratt, The Ordeal of Desegregation (1966); Legal Aspects of the Civil Rights Movement (D. B. King ed. 1965)
 
 
 [34]
 
 35 U.S. Dept. of Health, Education and Welfare, Office of Education, Release, Table 3, September 27, 1965. In the 11 states of the Confederacy there are 1800 Negro teachers, 1.8 per cent of all the Negro teachers in Southern schools, assigned to schools with biracial faculties. By contrast, in the border states (Delaware, Kentucky, Maryland, Missouri, Oklahoma, and West Virginia) 51 per cent of the Negro teachers now teach white students. Ibid.
 
 
 [36]
 Southern Education Reporting Service, Statistical Summary, Dec.1965, cited in U.S. Comm. on Civil Rights, Survey of School Desegregation in the Southern and Border States 1965-66, p. 1
 
 
 [37]
 Ibid.; see footnote 3; Appendix B, Rate of Change and Status of Desegregation
 
 
 [38]
 See Section III A and footnote 5 of this opinion
 
 
 [39]
 In Davis v. Board of School Commissioners of Mobile County, 5 Cir. 1966, 364 F.2d 896, 898, Judge Tuttle, for the Court, said: 'This is the fourth appearance of this case before this court. This present appeal, coming as it does from an order of the trial court entered nearly eighteen months ago, on March 31, 1965, points up, among other things, the utter impracticability of a continued exercise by the courts of the responsibility for supervising the manner in which segregated school systems break out of the policy of complete segregation into gradual steps of compliance and towards complete compliance with the constitutional requirements of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686. One of the reasons for the impracticability of this method of overseeing the transitional stages of operations of the school boards involved is that, under the Supreme Court's 'deliberate speed' provisions, it has been the duty of the appellate courts to interpret and reinterpret this language as time has grown apace, it now being the twelfth school year since the Supreme Court's decision.'
 
 
 [40]
 'The pupil assignment acts have been the principal obstacle to desegregation in the South.' U.S. Comm. on Civil Rights, Civil Rights U.S.A.-- Public Schools, Southern States 15, 1962. See Note, The Federal Courts and Integration of Southern Schools: Troubled Status of the Pupil Placement Acts, 62 Colum.L.Rev. 1448, 1471-73 (1962); Bush v. Orleans Parish School Board, 5 Cir. 1962, 308 F.2d 490. Such laws allow carefully screened Negro children, on their application, to transfer to white schools from the segregated schools to which the Negroes were initially unconstitutionally assigned. Often, even after six to eight years of no desegregation, these transfers were limited to a grade a year. When this law first came before us, we held it to be unconstitutional. Bush v. Orleans Parish School Board, E.D.La.1956, 138 F.Supp. 337, aff'd 242 F.2d 156, cert. den'd 354 U.S. 921, 77 S.Ct. 1380, 1 L.Ed.2d 1436 (1957). Later, in a narrowly focused opinion, we held that the Alabama version was constitutional on its face. Shuttlesworth v. Birmingham Board of Education, N.D.Ala.1958, 162 F.Supp. 372, aff'd per curiam, 358 U.S. 101, 79 S.Ct. 221, 3 L.Ed.2d 145 (1958). As long ago as 1959 and 1960 this Court disapproved of such acts as a reasonable start toward full compliance. Gibson v. Board of Public Instruction of Dade County, 5 Cir., 272 F.2d 763; Mannings v. Board of Public Instruction of Hillsborough County, 5 Cir., 277 F.2d 370. See also Bush v. Orleans Parish School Board, 5 Cir. 1961, 308 F.2d 491; Evers v. Jackson Municipal Separate School District, 5 Cir. 1964, 328 F.2d 408. 'The entire public knows that in fact (the Louisiana law) * * * is being used to maintain segregation. * * * It is not a plan for desegregation at all.' Bush v. Orleans Parish School Board, 308 F.2d at 499-500
 
 
 [41]
 Bush v. Orleans Parish School Board is an example. The board was plagued by bundles of Louisiana statutes aimed at defeating desegregation. There were five extra sessions of the Louisiana legislature in 1960. After the School Board had for three years failed to comply with an order to submit a plan, the district judge wrote one himself. The trial judge simply said: 'All children (entering New Orleans public schools) * * * may attend either the formerly all white public schools nearest their homes or the formerly all negro public schools nearest their homes, at their option. B. Children may be transferred from one school to another, provided such transfers are not based on considerations of race'. 204 F.Supp. 568, 571-572
 
 
 [42]
 For example, the order of the able district judge in Bush. See footnote 41. Judge Bohanon underscored this point in Dowell v. School Board of Oklahoma City Public Schools, W.D.Okla.1965, 244 F.Supp. 971, 976, aff'd, 10 Cir. Jan. 23, 1967, 375 F.2d 158. 'The plan submitted to this Court * * * is not a plan, but a statement of policy. School desegregation is a difficult and complicated matter, and, as the record shows, cannot be accomplished by a statement of policy. P Desegregation of public schools in a system as large as Oklahoma City requires a definite and positive plan providing definable and ascertainable goals to be achieved within a definite time according to a prepared procedure and with responsibilities clearly designated.'
 
 
 [43]
 The Civil Rights Act of 1964 had its direct genesis in President Kennedy's message to Congress of June 19, 1963, urging passage of an omnibus civil rights law. He noted: 'In the continued absence of congressional action, too many State and local officials as well as businessmen will remain unwilling to accord these rights to all citizens. Some local courts and local merchants may well claim to be uncertain of the law, while those merchants who do recognize the justice of the Negro's request (and I believe these constitute the great majority of merchants, North and South) will be fearful of being the first to move, in the face of official customer, employee, or competitive pressures. Negroes, consequently, can be expected to continue increasingly to seek the vindication of these rights through organized direct action, with all its potentially explosive consequences, such as we have seen in Birmingham, in Philadelphia, in Jackson, in Boston, in Cambridge, Md., and in many other parts of the country. P In short, the result of continued Federal legislative inaction will be continued, if not increased, racial strife-- causing the leadership on both sides to pass from the hands of reasonable and responsible men to the purveyors of hate and violence, endangering domestic tranquility, retarding our Nation's economic and social progress and weakening the respect with which the rest of the world regards us. No American, I feel sure, would prefer this course of tension, disorder, and division-- and the great majority of our citizens simply cannot accept it.' H.Doc. 124, 88th Cong. 1st Sess. June 20, 1963, Rep. Emanuel Celler, Chairman of the House Judiciary Committee, introduced H.R. 7152 embodying the President's proposals. U.S. Congressional and Administrative News, p. 1527. The same day Senator Mike Mansfield introduced a similar bill, S. 1731. H.R. 7152-S.1731, as amended, became the Civil Rights Act of 1964
 
 
 [44]
 H.Rep.No.914, 88th Cong., 1st Sess
 
 
 [45]
 'It was the Congressional purpose, in Title VI of the Civil Rights Act of 1964, to remove school desegregation efforts from the courts, where they had been bogged down for more than a decade. Unless the power of the Federal purse is more effectively utilized, resistance to national policy will continue and, in fact, will be reinforced.' Report of the White House Conference 'To Fulfill These Rights', June 1-2, 1966, p. 63
 
 
 [46]
 Rep.U.S.Comm. on Civil Rights, Survey of School Desegregation in the Southern and Border States-- 1965-66, p. 2
 
 
 [47]
 Stone, The Common Law in the United States, 50 Harv.L.Rev. 1, 18 (1936). In a similar vein, writing for the Court, Justice Stone has said: '* * * in construing a statute setting up an administrative agency and providing for judicial review of its action, court and agency are not to be regarded as wholly independent and unrelated instrumentalities of justice, each acting in the performance of its prescribed statutory duty without regard to the appropriate function of the other in securing the plainly indicated objects of the statute. Court and agency are the means adopted to attain the prescribed end, and so far as their duties are defined by the words of the statute, those words should be construed so as to attain that end through co-ordinated action. Neither body should repeat in this day the mistake made by the courts of law when equity was struggling for recognition as an ameliorating system of justice; neither can rightly be regarded by the other as an alien intruder, to be tolerated if must be, but never to be encouraged or aided by the other in the attainment of the common aim.' United States v. Morgan, 1939, 307 U.S. 183, 191, 59 S.Ct. 795, 799, 83 L.Ed. 1211
 
 
 [48]
 The Supreme Court also stated in Skidmore, 323 U.S. at 139-140, 65 S.Ct. at 164: 'The rulings of this administrator are not reached as a result of hearing adversary proceedings in which he finds facts from evidence and reaches conclusions of law from findings of fact. They are not, of course, conclusive, even in the cases with which they directly deal, much less in those to which they apply only by analogy. They do not constitute an interpretation of the Act or a standard for judging factual situations which binds a district court's processes, as an authoritative pronouncement of a higher court might do. But the Administrator's policies are made in pursuance of official duty, based upon more specialized experience and broader investigations and information than is likely to come to a judge in a particular case. They do determine the policy which will guide applications for enforcement by injunction on behalf of the Government. Good administration of the Act and good judicial administration alike require that the standards of public enforcement and those for determining private rights shall be at variance only where justified by very good reasons.'
 
 
 [49]
 The following statement appeared in the Shreveport Journal for July 1, 1965: 'The local school boards prefer a court order over the voluntary plan because HEW regulations governing the voluntary plans or compliance agreements demand complete desegregation of the entire system, including students, faculty, staff, lunch workers, bus drivers, and administrators, whereas the court-ordered plans can be more or less negotiated with the judge.' This was not news to the Court
 
 
 [50]
 We may also expect a number of school desegregation suits to be filed in Alabama. The legislature has enacted a statute declaring the Guidelines null and void in Alabama and prohibiting school officials signing any agreement to comply. The bill provides that any agreement or assurance of compliance with the guidelines already in effect 'is null and void and shall have no binding effect.' H.B. 446, approved September 2, 1966
 
 
 [51]
 The brief of the United States gives the following figures:
 In Bush v. Orleans Parish School Board the complaint was filed September 5, 1952. Bush's peregrinations through the courts are reported as follows: 138 F.Supp. 336 (3-judge 1956) motion for leave to file petition for mandamus denied, 351 U.S. 948, 76 S.Ct. 854, 100 L.Ed. 1472 (1956); 138 F.Supp. 337 (1956), aff'd 242 F.2d 156 (1957), cert. den'd, 354 U.S. 921, 77 S.Ct. 1380, 1 L.Ed.2d 1436 (1957); 252 F.2d 253, cert. den'd 356 U.S. 969, 78 S.Ct. 1008, 2 L.Ed.2d 1074 (1958); 163 F.Supp. 701 (1958), aff'd, 268 F.2d 78 (1959); 187 F.Supp. 42 (3-judge 1960), motion to stay den'd, 364 U.S. 803, 81 S.Ct. 28, 5 L.Ed.2d 36 (1960), aff'd 365 U.S. 569, 81 S.Ct. 754, 5 L.Ed.2d 806 (1961); 188 F.Supp. 916 (3-judge 1960), motion for stay denied, 364 U.S. 500, 81 S.Ct. 260, 5 L.Ed.2d 245 (1960), aff'd, 365 U.S. 569, 81 S.Ct. 754 (1961); 190 F.Supp. 861 (3-judge 1960), aff'd 366 U.S. 212, 81 S.Ct. 1091, 6 L.Ed.2d 239 (1961); 191 F.Supp. 871 (3-judge 1961), aff'd Denny v. Bush, 367 U.S. 908, 81 S.Ct. 1917, 6 L.Ed.2d 1249 (1961); 194 F.Supp. 182 (3-judge 1961), aff'd, Tugwell v. Bush, 367 U.S. 907, 81 S.Ct. 1926, 6 L.Ed.2d 1250 (1961), Gremillion v. United States, 368 U.S. 11, 82 S.Ct. 119, 7 L.Ed.2d 75 (1961); 204 F.Supp. 568 (1962); 205 F.Supp. 893 (1962), aff'd in part and rev'd in part, 308 F.2d 491 (1962); 230 F.Supp. 509 (1963).
 
 
 [52]
 Of the 99 court-approved freedom of choice plans in this circuit, 44 do not desegregate all grades by 1967; 78 fail to provide specific, non-racial criteria for denying choices; 79 fail to provide any start toward faculty desegregation; only 22 provide for transfers to take courses not otherwise available; only 4 include the Singleton transfer rule
 
 
 [53]
 See footnote 39
 
 
 [54]
 In Ward the Court said: 'Good administration suggests that the proposed decree be indicated by an Appendix, not because of any apprehension that the conscientious District Judge would not faithfully impose every condition so obviously implied, but rather because of factors bearing upon administration itself. It is not possible, or even desirable, of course to achieve absolute uniformity. But in this ever growing class of cases which have their genesis in unconstitutional lack of uniformity as between races, courts within this single circuit should achieve a relative uniformity without further delay.' 349 F.2d at 805
 
 
 [55]
 'There has been entirely too much deliberation and not enough speed in enforcing the constitutional rights which we held in Brown v. Board of Education, supra, had been denied Prince Edward County Negro children.' Grieffin v. County School Board of Prince Edward County, 1964, 377 U.S. 218, 229, 84 S.Ct. 1226, 1232, 12 L.Ed.2d 256, 164. See also Rogers v. Paul and Bradley v. School Boards of the City of Richmond, 1965, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187. 'Brown never contemplated that the concept of 'deliberate speed' would countenance indefinite delay in elimination of racial barriers in schools * * *.' (Goldberg, J.) Watson v. City of Memphis, 1963, 373 U.S. 526, 530, 83 S.Ct. 1314, 1317, 10 L.Ed.2d 529, 534
 
 
 [56]
 See Brunson v. Board of Trustees of School District No. 1, 4 Cir. 1962, 311 F.2d 107; Southern Education Reporting Service, Statistical Summary, Nov. 1964, p. 46
 
 
 [57]
 The Fifth Circuit cases are: Boarders v. Rippy, 1957, 247 F.2d 268, 271; Boson v. Rippy, 1960, 285 F.2d 43, 48; Lockett v. Board of Education of Muscogee County, 5 Cir. 1965, 342 F.2d 225; Avery v. Wichita Falls Independent School District, 1956, 241 F.2d 230, 233; Stell v. Savannah-Chatham County Board of Education, 1964, 333 F.2d 55, 59; Evers v. Jackson, 1964, 328 F.2d 408; cf. Cohen v. Public Housing Administration, 1958, 257 F.2d 73 (public housing); City of Montgomery, Ala., v. Gilmore, 1960, 277 F.2d 364 (public parks). For a list of cases in other circuits see footnotes 10 and 11 in Blocker v. Board of Education of Manhasset, E.D.N.Y.1964, 226 F.Supp. 208, 220. In Blocker Judge Zavitt notes that 'this construction draws continuing sustenance through a process in which each case relies upon the preceding one; it would appear that the ultimate and solitary source is this dictum in Briggs v. Elliott.' 226 F.Supp. at 220
 In Borders v. Rippy, 5 Cir. 1957, 247 F.2d 268, the Court reversed the judgment of the district court dismissing the complaint and directed the entry of a judgment enjoining the defendants 'from requiring segregation of the races in any school under their supervision'. On remand, the district court entered an order enjoining the defendants 'from requiring or permitting segregation of the races in any school under their supervision'. On the second appeal, in Rippy v. Borders, 5 Cir. 1957, 250 F.2d 690, 692, the Court again reversed the district court, stating: 'West have emphasized the words 'or permitting segregation of the races' in the district court's order because that expression might indicate a serious misconseption of the applicable law and of the mandate of this Court. Our mandate (footnote 1, supra) had been carefully limited so as to direct the entry of a judgment restraining and enjoining the defendants 'from requiring segregation of the races in any school under their supervision'. Likewise in our opinion, we had pointed out that it is only racially discriminatory segregation in the public schools which is forbidden by the Constitution.'
 
 
 [58]
 In Kemp v. Beasley the Eighth Circuit remarked, 'The dictum in Briggs has not been followed or adopted by this Circuit and it is logically inconsistent with Brown.' Blocker v. Board of Education of Manhasset, E.D.N.Y.1964, 226 F.Supp. 208, makes a frontal attack on Briggs. In that case, which concerned segregation characterized as de jure, Judge Zavatt observed that even where the Briggs dictum has seemingly been adopted, 'it appears to be in a state of diminishing force, if not outright erosion', citing Dillard v. School Board of the City of Charlottesville, 4 Cir. 1962, 308 F.2d 920, cert. denied, 374 U.S. 827, 83 S.Ct. 1864, 10 L.Ed.2d 1051 (1963), and McCoy v. Greensboro City Board of Education, 4 Cir. 1960, 283 F.2d 667. The Third Circuit, reversing a district court's approval of a year-by-year plan, ignored Briggs: 'if the plan as approved by the court below by not drastically modified, a large number of the Negro children of Delaware will be deprived of education in integrated schools despite the fact that the Supreme Court has unqualifiedly declared integration to be their constitutional right.' Evans v. Ennis, 3 Cir. 1960, 281 F.2d 385, 389, cert. den'd 364 U.S. 933, 81 S.Ct. 379, 5 L.Ed.2d 365. In Evans v. Ennis, only three school districts were involved. Nevertheless, the court required the district judge to order the State Board of Education and the State Superintendent of Delaware to prepare a plan 'which will provide for the integration at all grades of the public school system of Delaware.' 'Eventually,' Judge Biggs said, 'a wholly integrated school system will be effected for Delaware: 'wholly integrated' in the sense that all school children, whether white or Negro, * * * will attend public schools without regard for race or color.' Sometimes a court's action in regard to the school board's affirmative duty has spoken louder than Briggs's words. In Evans v. Buchanan, D.C.Del.1962, 207 F.Supp. 820, although the court cited Briggs and stated that the Fourteenth Amendment 'does not contemplate compelling action; rather, it is a prohibition preventing the States from applying their laws unequally', the court did compel the school boards to act. The Court found that the Negro school children who wished to attend integrated schools were attending an all-Negro school, with an all-Negro faculty, surrounded by white attendance area. On those bare facts, the Court found: 'The * * * Board as promulgator of the plan and the State Board of Education as the party having the ultimate responsibility for administering a nondiscriminatory system of public education should have the initial burden of coming forward since a presumption of unconstitutionality arises under this set of facts.' 207 F.Supp. at 825. The facts were 'highly probative' of intentional racial discrimination and the evidence of intent rested largely with the Board. The Board came forward and showed that its plan was based on such neutral factors as the safety of the children, facilities, location, and access roads. The court, however, held that the Board did not rebut the presumption by showing that the plan could be justified as rational and nondiscriminatory. The obviously sophisticated trial judge observed, 'In effect, counsel is asking the States to intentionally gerrymander districts which may be rational when viewed by acceptable, nondiscriminatory criteria'. Id. at 824
 
 
 [59]
 See U.S.Comm. on Civil Rights, Civil Rights U.S.A.-- Public Schools, Southern States (1962), p. 7
 
 
 [60]
 For example: '* * * the essence of the constitutional right is that it is a personal one. * * * It is the individual who is entitled to the equal protection of the laws, and if he is denied by a common carrier, acting in the matter under the authority of a state law, a facility or convenience in the course of his journey which under substantially the same circumstances is furnished to another traveler, he may properly complain that his constitutional privilege has been invaded'. McCabe v. Atchison, T. & S.F.Ry., 1914, 235 U.S. 151, 161-162, 35 S.Ct. 69, 71, 59 L.Ed. 169. The legislative history of the 14th Amendment provides no information on this point. See Frank and Munro, The Original Understanding of Equal Protection of the Laws, 50 Colum.L.Rev. 131 (1950); Bickel, The Original Understanding and the Segregation Decision, 69 Harv.L.Rev. 1 (1955). But 'the personal nature of the right to be free from discrimination was declared in order to make the existence of such right independent of the number of other members of the same racial group who were victimized by the discrimination. * * *' Hartman, The Right to Equal Educational Opportunities as a Personal and Present Right, 9 Wayne L.Rev. 424, 427 (1963)
 
 
 [61]
 What is meant by the statement of 'no duty to integrate' is that a school board 'does not have to completely alter boundaries and to insure that every school district is mixed, even though some students will have a great distance to travel * * *. Even though the state is not required to integrate fully every school and child, this does not mean that the state may not have certain responsibilities to children of a minority race while educating them, the failure to perform which may be unconstitutional'. Sedler, School Segregation in the North and West: Legal Aspects, 7 St. Louis U.L.J. 228, 251 (1963). See also the discussion of Barksdale v. Springfield School Comm., at 874-875, infra
 
 
 [62]
 Rule 23(a), Fed.R.Civ.P., before the recent amendments, was unclear as to whether a favorable decree applies to members of the class who do not join in the suit. Compare 3 Moore, Federal Practice 3434 (2d Ed.) with Chafee. Some Problems in Equity 199-295 (1950). 'In dealing with (segregation) cases, courts have largely disregarded Moore's classifications, and have indicated that an injunction would run to the benefit of absentees.' Developments in the Law-- Multiparty Litigation in the Federal Courts, 71 Harv.L.Rev. 874, 935 (1958). Citing Brown II, 349 U.S. at 300-301, 75 S.Ct. 753 dictum; Brown I, 347 U.S. at 495, 74 S.Ct. 686 (dictum); Orleans Parish School Board v. Buch, 5 Cir. 1957, 242 F.2d 156, 165-66 (dictum); Browder v. Gayle, M.D.Ala.1956, 142 F.Supp. 707, 711, 714, aff'd per curiam, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114 (1956); Frasier v. Board of Trustees of University of North Carolina, M.D.N.C.1955, 134 F.Supp. 589, aff'd per curiam, 350 U.S. 979, 76 S.Ct. 467, 100 L.Ed. 848 (1956)
 'Violations of the Fourteen Amendment are of course violations of individual or personal rights, but where they are committed * * * generally because of race, they are no less entitled to be made the subject of class actions and class adjudication under rule 23 * * * than are other several rights.' Kansas City v. Williams, 8 Cir. 1953, 205 F.2d 47, 52, cert. denied 346 U.S. 826, 74 S.Ct. 45, 98 L.Ed. 351 (1953). See also Holmes v. City of Atlanta, N.D.Ga.1954, 124 F.Supp. 290, aff'd 223 F.2d 93, judgment vacated and remanded for a brother decree in conformity with Mayor and City Council of Baltimore v. Dawson, 350 U.S. 877, 76 S.Ct. 133, 100 L.Ed. 774 (1955); Jeffers v. Whitley, 4 Cir. 1962, 309 F.2d 621; Brunson v. Board of Trustess of School District No. 1, 4 Cir. 1962, 311 F.2d 107, cert. denied 373 U.S. 933, 83 S.Ct. 1538, 10 L.Ed.2d 690 (1963).
 See Comment, The Class Action Device in Antisegregation Cases, 20 U.Chi.L.Rev. 577 (1953). See also Comment, Multiparty Litigation in the Federal Courts, 71 Harv.L.Rev. 874, 935; McKay, 'With All Deliberate Speed'-- A Study of School Desegregation, 31 N.Y.U.L.Rev. 991, 1084-86 (1956); Class Actions-- A Study of Group Interest Litigation, 1 Race Rel.Rep. 991 (1956); Meador, The Constitution and the Assignment of Pupils to Public Schools, 45 Va.L.Rev. 517, 523 (1959).
 
 
 [63]
 In United States v. State of Louisiana, E.D.La.1963, 225 F.Supp. 353, aff'd 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709, the court traced the history of voting in Louisiana to show that the black codes, the grandfather clause, the white primary, literacy tests, and other devices were all members of a seemingly endless series designed to bar access of Negroes to the dominant culture and to political power. The same situation exists with regard to denial of equal educational opportunities. So-called freedom of choice plans, as thus far utilized, follow pupil placement laws, which followed the 'separate but equal' dodge in the educational series of devices to limit access of Negroes to the polity
 
 
 [64]
 Note, 20 U.Chi.L.Rev. 577 (1953)
 
 
 [65]
 Meador, The Constitution and the Assignment of Pupils to Public Schools, 45 Va.L.Rev. 517, 523 (1959)
 
 
 [66]
 In Brown the unanimous court, through Chief Justice Warren, cited the Slaughter House Cases, 1872, 83 U.S. (16 Wall.) 36, 71, 21 L.Ed. 394 in which the Court stated: '* * * one pervading purpose found in (all of these amendments), lying at the foundation of each, and without which none of them would have been even suggested; we mean the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly-made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over him. It is true that only the Fifteenth Amendment, in terms, mentions the negro by speaking of his color and his slavery. But it is just as true that each of the other articles was addressed to the grievances of that race, and designed to remedy them as the fifteenth.' The Court also quoted the following passage from Strauder v. State of West Virginia, 1879, 100 U.S. 303, 307, 25 L.Ed. 664: 'The words of the amendment * * * contain a necessary implication of a positive immunity, or right, most valuable to the colored race,-- the right to exemption from unfriendly legislation against them distinctly as colored,-- exemption from legal discriminations, implying inferiority in civil society, lessening the security of their enjoyment of the rights which others enjoy, and discriminations which are steps towards reducing them to the condition of a subject race.'
 
 
 [67]
 'The courts will require that the defendants make a prompt and reasonable start toward full compliance with our May 17, 1954, ruling. Once such a start has been made, the courts may find that additional time is necessary to carry out the ruling in an effective manner. * * * To that end, the courts may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems.' Brown v. Board of Education, 349 U.S. 294, 300-301, 75 S.Ct. 753, 756
 
 
 [68]
 'If it is the Negro population as a minority group which is entitled to attend public facilities, then the objective of any corrective plan would be to bring about complete integration of all Negro children in public education.' Hartman, The Right to Equal Educational Opportunities as a Personal and Present Right, 9 Wayne L.Rev. 424, 441 (1963). Cf. Greenberg, Race Relations and Group Interests in the Law, 13 Rutgers L.Rev. 503, 506 (1959). There would be no necessary conflict between the individual's 'personal and present' right and the class right if the Brown, Cooper v. Aaron, Bradley, and Rogers v. Paul decisions were read as recognizing the immediate right of any Negro plaintiff to transfer to a white school, over and above the state's duty to reorganize its school system. Thus in Watson v. City of Memphis, 1963, 373 U.S. 526, 533, 83 S.Ct. 1314, 1318, 10 L.Ed.2d 529, the Supreme Court stated that the rights asserted in that case 'are, like all such rights, present rights * * * warrants for the here and now and, unless there is an overwhelmingly compelling reason, they are to be promptly fulfilled.'
 68a 'A year later, when the 'deliberate speed' formula was promulgated, the significance of the changed emphasis became clear. The Court had determined to deal with the problem as involving the rights of the Negro race rather than the rights of individuals.' Lusky, The Stereotype: Hard Core of Racism, 13 Buffalo Law Review, p. 450, 458 (1964).
 
 
 [69]
 'Indeed, the requirement of affirmative action lies at the very heart of Brown; seventeen states had to abandon racial criteria and affirmatively reorganized school attendance plans.' Fiss, Racial Imbalance in the Public Schools: The Constitutional Concepts, 78 Harv.L.Rev. 564, 612 (1965). See also Gillmor and Gosule, Duty to Integrate Public Schools? Some Judicial Responses and a Statute, 46 Bost.U.L.Rev. 45, 62-3 (1966). 'State support of segregated schools through any arrangement, management, funds, or property cannot be squared with the (equal protection clause).' Cooper v. Aaron, 1958, 358 U.S. 1, 19, 78 S.Ct. 1401, 1410, 3 L.Ed.2d 5. '* * * Most of the major dedisions of the Warren Court under the equal protection clause impose affirmative obligations upon the states. Earlier cases sustaining a constitutional claim were typically mandates directing the government to refrain from a particular form of regulation. Now the emphasis is upon measures the states must adopt in carrying on their activities and steps they must take (even) to offset disabilities not of their creation'. Cox, Foreword: Constitutional Adjudication and the Promotion of Human Rights, 80 Harv.L.Rev. 91, 93 (1966)
 
 
 [70]
 The Court also said: 'There is at least considerable doubt that relief confined to individual specified Negro children either could be granted or, if granted, could be so limited in its operative effect. By the nature of the controversy, the attack is on the unconstitutional practice of racial discrimination. Once that is found to exist, the Court must order that it be discontinued. Such a decree, of course, might name the successful plaintiff as the party not to be discriminated against. But that decree may not-- either expressly or impliedly-- affirmatively authorize continued discrimination by reason of race against others. Cf. Shelley v. Kraemer, 1948, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161. Moreover, to require a school system to admit the specific successful plaintiff Negro child while others, having no such protection, were required to attend schools in a racially segregated system, would be for the court to contribute actively to the class discrimination proscribed by Bush v. Orleans Parish School Board, 5 Cir. 1962, 308 F.2d 491, 499, on rehearing 308 F.2d 503; see also Ross v. Dyer, 5 Cir., 1962, 312 F.2d 191.' Potts v. Flax, 313 F.2d at 289
 
 
 [71]
 The Court also said: 'Geographical districts based on race are a parish-wide system of unconstitutional classification. Of course, it is undoubtedly true that Brown v. Board of Education dealt with only an individual child's right to be admitted to a particular school on a non-racial basis. And it is also true, as the second Brown opinion pointed out, that courts must bear in mind the 'personal interest' of the plaintiffs. In this sense, the Brown cases held that the law requires non-discrimination as to the individual, not integration. But when a statute has a state-wide discriminatory effect or when a School Board maintains a parish-wide discriminatory policy or system, the discrimination is against Negroes as a class. Here, for example, it is the Orleans Parish dual system of segregated school districts, affecting all school children in the Parish by race, that, first, was a discriminatory classification and, second, established the predicate making it possible for the Pupil Placement Act to fulfill its behind-the-face function of preserving segregation.' Bush v. Orleans Parish School Board, 308 F.2d at 499
 
 
 [72]
 See, for example, Ransmier, The Fourteenth Amendment and the 'Separate but Equal' Doctrine, 50 Mich.L.Rev. 203, 238-40 (1951); Roche, Education, Segregation and the Supreme Court-- A Political Anslysis, 99 U.Pa.L.Rev; 949 (1951); Taylor, The Demise of Race Restrictions in Graduate Education, 1 Duke B.Jour. 135 (1951); Note, 26 St. John's L.Rev. 123 (1951)
 
 
 [73]
 Professor Edmund Cahn characterized as a 'myth' the notion that the Brown decision was 'sociological' rather than 'legal'. Cahn, Jurisprudence, 31 N.Y.U.L.Rev. 182 (1956); Cahn, Jurisprudence, 30 N.Y.U.L.Rev. 150 (1955). 'I would not have the constitutional rights of Negroes-- or of other Americans-- rest on any such flimsy foundation as some of the scientific demonstrations in these records. * * * Heretofore, no government official has contended that he could deny equal protection with impunity unless the complaining parties offered competent proof that they would sustain or had sustained some permanent (psychological or other kind of) damage. The right to equal protection has not been subjected to any such proviso.' Cahn, Jurisprudence, 30 N.Y.U.L.Rev. 150, 157, 158, 168 (1955). Professor Black has said: 'The charge that it is 'sociological' is either a truism or a canard-- a truism if it means that the Court, precisely like the Plessy court, and like innumerable other courts facing innumerable other issues of law, had to resolve and did resolve a question about social fact: a canard if it means that anything like principal reliance was placed on the formally 'scientific' authorities, which are relegated to a footnote and treated as merely corroboratory of common sense.' Black, The Lawfulness of the Segregation Decision, 69 Yale L.J. 421, 430 n. 25 (1960)
 Acceptance of these views is not inconsistent with the continued vitality of the psychological findings in Brown I. Indeed, several studies have reinforced those findings. The most recent is the United States Office of Education's 'Equality of Educational Opportunity', the two-year study authorized by section 402 of the Civil Rights Act of 1964 to investigate 'the lack of availability of equal educational opportunities for individuals by reason of race, color, religion, or national origin in public educational institutions * * *.' 42 U.S.C. 2000c-- 1.
 
 
 [74]
 See Stell v. Savannah-Chatham County Board of Education, S.D.Ga.1963, 220 F.Supp. 667, rev'd 333 F.2d 55; 255 F.Supp. 84 (1965), appeal pending; 255 F.Supp. 88 (1966), appeal pending. See also Jackson Municipal Separate School District v. Evers, 5 Cir. 1966, 357 F.2d 653
 
 
 [75]
 Wechsler, Toward Neutral Principles of Constitutional Law, 73 Harv.L.Rev. 1, 33 (1959). Professor Wechsler concluded: 'for me, assuming equal facilities, the question posed by state-enforced segregation is not one of discrimination at all. Its human and constitutional dimensions lie entirely elsewhere, in the denial by the state of freedom to associate * * *.' The article started a vigorous debate. See authorities collected in Emerson, Haber and Dorsen, Political and Civil Rights 1625-1629 (3d ed. 1967). See also Kaplan, Equality in an Unequal World, 61 NW U.L.Rev. 363 (1966)
 For discussion of the inherently arbitrary classification principle against the principle of equality of educational opportunity, see Fiss, Racial Imbalance in the Public Schools: The Constitutional Concept, 78 Harv.L.Rev. 564, 590-98 (1965).
 
 
 [76]
 See Pollak, Racial Discrimination and Judicial Integrity: A Reply to Professor Wechsler, 108 U.Pa.L.Rev. 1 (1959); Kaplan, Segregation Litigation and the Schools-- Part I, The New Rochelle Experience 58 NW U.L.Rev. 1, 21 (1964)
 
 
 [77]
 Korematsu v. United States, 1944, 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194
 
 
 [78]
 E.g., Schiro v. Bynum, 375 U.S. 395, 84 S.Ct. 452, 11 L.Ed.2d 412 (1964) (municipal auditoriums); Johnson v. State of Virginia, 373 U.S. 61, 83 S.Ct. 1053, 10 L.Ed.2d 195 (1963) (court-rooms); State Athletic Comm'n v. Dorsey, 359 U.S. 533, 79 S.Ct. 1137, 3 L.Ed.2d 1028 (1959) (athletic contests); New Orleans City Park Improvement Ass'n v. Detiege, 358 U.S. 54, 79 S.Ct. 99, 3 L.Ed.2d 46 (1958) (public parks and golf courses); Gayle v. Browder, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114 (intrastate busses); Holmes v. City of Atlanta, 350 U.S. 897, 76 S.Ct. 141, 100 L.Ed. 776 (1955) (municipal golf courses); Mayor of Baltimore v. Dawson, 350 U.S. 877, 76 S.Ct. 133 (1955) (public beaches and bathhouses). Muir v. Louisville Park Theatrical Ass'n, 347 U.S. 971, 74 S.Ct. 783, 98 L.Ed. 1112 (1954) (municipal amphitheater). For lower court decisions to the same effect, see cases collected in Emerson, Haber and Dorsen, Political and Civil Rights in the United States, 1678 (3d ed. 1967)
 
 
 [79]
 See Cahn, Jurisprudence, 30 N.Y.U.L.Rev. 150, 155 (1955). Cf. Antieau, Equal Protection Outside the Clause, 40 Cal.L.Rev. 362, 364 (1954); Pollak, Racial Discrimination and Judicial Integrity, 108 U.Pa.L.Rev. 1, 27-28 (1959)
 
 
 [80]
 'The central constitutional fact is the inadequacy of segregated education. * * * The educational system that is thus compulsory and public afforded must deal with the inadequacy arising from adventitious segregation; it cannot accept and indurate segregation on the ground that it is not coerced or planned but accepted.' Branche v. Board of Education, 204 F.Supp. at 153. See Wright, Public School Desegregation: Legal Remedies for De Facot Segregation, 40 N.Y.U.L.Rev. 285, 301 (1965); Fiss, 78 Harv.L.Rev. 564, 609 (1965) (a relative approach); Sedler, School Segregation in the North and West: Legal Aspects, 7 St. Louis L.Ref. 228, 233-239, 275 (1963); Maslow, De Facto Public School Segregation, 6 Vill.L.Rev. 353 (1961)
 
 
 [81]
 King, Racial Imbalance in the Public Schools, 18 Vand.L.Rev. 1290, 1337 (1965). Webb v. Board of Education of Chicago, N.D.Ill.1963, 223 F.Supp. 466; Deal v. Cincinnati Board of Education, S.D.Ohio 1965, 244 F.Supp. 572; Lynch v. Kenston School District, N.D.Ohio 1964, 229 F.Supp. 740; Downs v. Board of Education, 10 Cir. 1965, 336 F.2d 988, cert. denied 380 U.S. 914, 85 S.Ct. 898, 13 L.Ed.2d 800; and Sealy v. Department of Public Instruction of Pennsylvania, 3 Cir. 1958, 252 F.2d 898, are more or less in agreement with Bell. These cases usually rely on the school board's good faith, lack of racial motivation, and the propriety of considering transportation, geography, safety, access roads, and other neutral criteria as rational bases school districting. Taking the contrary position are: Booker v. Board of Education of Plainfield, 1965, 45 N.J. 161, 212 A.2d 1; Branche v. Board of Ed. of Town of Hempstead, E.D.N.Y.1962, 204 F.Supp. 150; Blocker v. Board of Education of Manhasset, E.D.N.Y.1964, 226 F.Supp. 208, 229 F.Supp. 709; Barksdale v. Springfield School Committee, D.Mass. 1965, 237 F.Supp. 543, vacated for other reasons 1 Cir. 1965, 348 F.2d 261; Jackson v. Pasadena City School District, 1962, 59 Cal.2d 876, 31 Cal.Rptr. 606, 382 P.2d 878. School authorities may act to offset racial imbalance: See Addabbo v. Donovan, 22 A.D.2d 383, 256 N.Y.S.2d 178, aff'd 16 N.Y.2d 619, 261 N.Y.S.2d 68, 209 N.E.2d 112 (1965), cert. den'd 382 U.S. 905, 86 S.Ct. 241, 15 L.Ed.2d 158 (1965). See also Balaban v. Rubin, 20 A.D.2d 438, 248 N.Y.S.2d 574, aff'd 14 N.Y.2d 193, 250 N.Y.S.2d 281, 199 N.Ed.2d 375 (1964), cert. den'd 379 U.S. 881, 85 S.Ct. 148, 13 L.Ed.2d 87 (1964) (Board may 'take into consideration the ethnic composition of the children' before drawing the attendance lines for a new school); Olson v. Board of Education, E.D.N.Y.1966, 250 F.Supp. 1000 (the Princeton plan-- see note 124, infra); Offerman v. Nitkowski, W.D.N.Y.1965, 248 F.Supp. 129; Guida v. Board of Education of City of New Haven, 26 Conn.Supp. 121, 213 A.2d 843 (1965); Strippoli v. Bichal, 21 A.D.2d 365, 250 N.Y.S.2d 969, aff'd 16 N.Y.2d 652, 261 N.Y.S.2d 84, 209 N.E.2d 123 (1965) (bussing); Morean v. Board of Education, 42 N.J. 237, 200 A.2d 97 (1965); Vetere v. Allen, 15 N.Y.2d 259, 258 N.Y.S.2d 77, 206 N.E.2d 174 (1965) (redistricting of attendance zone approved because 'racial balance is essential to a sound education'); Van Blerkom v. Donovan, 1965, 15 N.Y.2d 399, 259 N.Y.S.2d 825, 207 N.Ed.2d 503
 
 
 [82]
 Gillmor and Gosule, Duty to Integrate Public Schools? Some Judicial Responses and a Statute, 46 Bost.U.L.Rev. 45, 57 (1966)
 
 
 [83]
 The First Circuit construed the court's order as not calling for 'an absolute right in the plaintiffs to have what the court found to be 'tantamount to segregation' removed at all costs.' At the same time, the Court said: 'Rather we take it to determine that * * * racial imbalance disadvantages Negro students and impairs their educational opportunities as compared with other races to such a degree that they have a right to insist that the defendants consider their special problems along with all other relevant factors when making administrative decisions.' Springfield School Committee v. Barksdale, 1965, 348 F.2d 261, 264
 
 
 [84]
 Gillmor and Gosule supra note 82, at 64. Compare the statement of policy in the Massachusetts statute, An Act Providing for the Elimination of Racial Imbalance in the Public Schools (Mass. Acts. 1965, ch. 651):
 It is hereby declared to be the policy of the commonwealth to encourage all school committees to adopt as educational objectives the promotion of racial balance and the correction of existing racial imbalance in the public schools. The prevention or elimination of racial imbalance shall be an objective in all decisions involving the drawing or altering of school attendance lines and the selection of new school sites.
 The statute was enacted a month after Barksdale was decided.
 
 
 [85]
 'Some of the Supreme Court's language in Brown can apply to this type of segregation as well as to that before the Court, since this type of imbalance may also 'generate a feeling of inferiority as to (the Negro children's) status in the community that may affect their hearts and minds in a way unlikely ever to be undone.' Thus, if one believes that the basis of the Brown decision was the Court's finding that separate schools were unconstitutional simply because they bred a feeling of inferiority in the Negro, one must also believe that the neighborhood school must also be unconstitutional if it breeds the same feeling of inferiority.' Kaplan, Segregation Litigation and the Schools-- Part 1, The New Rochelle Experience 58 NW U.L.Rev. 1, 21 (1964). 'Necessarily implied in (Brown's) * * * proscription of segregat(ed education) was the positive obligation of eliminating it.' Taylor v. Board of Education of City School Dist. of the City of New Rochelle, S.D.N.Y.1961, 191 F.Supp. 181, 193, aff'd 294 F.2d 36, cert. denied 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339
 
 
 [86]
 See Clemons v. Board of Education of Hillsboro, 6 Cir. 1956, 228 F.2d 853, cert. den'd 350 U.S. 1006, 76 S.Ct. 651, 100 L.Ed. 868 (1956). Cf. Gomillion v. Lightfoot, 1960, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110
 
 
 [87]
 Modified plan approved, 195 F.Supp. 231, aff'd 2 Cir. 1961, 294 F.2d 36, cert. den'd 368 U.S. 940, 82 S.Ct. 382 (1961). See Kaplan, Segregation Litigation and the Schools-- Part 1; The New Rochelle Experience, 58 NW U.L.Rev. 1 (1964). Jackson v. School Board of the City of Lynchburg, W.D.Va.1962, 203 F.Supp. 701; Dowell v. School Board of Oklahoma City Public Schools, W.D.Okla.1965, 244 F.Supp. 971, aff'd, 10 Cir. Jan. 23, 1967, 375 F.2d 158 and Swann v. Charlotte-Mecklenburg Board of Education, W.D.N.C.1965, 243 F.Supp. 667, followed Taylor on the unconstitutionality of racial gerrymandering. See also Jackson v. Pasadena City School District, 1963, 59 Cal.2d 876, 31 Cal.Rptr. 606, 382 P.2d 878; Clemons v. Board of Education of Hillsboro, 6 Cir. 1956, 228 F.2d 853, cert. den'd 350 U.S. 1006, 76 S.Ct. 651 (1956); Fuller v. Volk, 3 Cir. 1965, 351 F.2d 323
 
 
 [88]
 Taylor v. Board of Education of City School Dist. of the City of New Rochelle, S.D.N.Y.1961, 191 F.Supp. 181, 196, aff'd 294 F.2d 36 (Kaufman, J.)
 
 
 [89]
 'The justification for the school board's incorporation of racial distinctions in its correctional scheme is that race is a relevant characteristic, given the school board's purpose, which is to avoid psychological injury to the Negro child, break down social barriers, and mitigate the academic inadequacy of the imbalanced schools. Of course, it might be argued that many of the evils the school board attempts to eliminate when it takes correctional steps are not attributable to the race of the individuals within the imbalanced school, but instead are attributable to their social class. Yet, certain of these evils are uniquely related to the fact that the imbalance is a racial one; namely, those attributable to the personal impact of the imbalance on the Negro. Moreover, most Negroes in the ghetto, and hance attending an imbalanced school, are members of the lowest economic class, and thus the board's remedial measures will tend to cure the social imbalance as well.' Fiss, Racial Imbalance in the Public Schools: The Constitutional Concepts, 78 Harv.l.Rev. 564, 577-78 (1965)
 
 
 [90]
 Wright, Public School Desegregation: Legal Remedies for De Facto Segregation, 16 West.Res.L.Rev. 478, 489 (1965)
 
 
 [91]
 Addabbo v. Donovan, 22 A.D.2d 383, 256 N.Y.S.2d 178, 184, (2d Dept.1965), aff'd, 16 N.Y.2d 619, 261 N.Y.S.2d 68, 209 N.E.2d 112 (1965), cert. denied, 382 U.S. 905, 86 S.Ct. 241 (1965)
 
 
 [92]
 For example, 'Racial imbalance' and 'de facto segregation' are 'used synonymously * * * (to) refer to a situation where a school is predominantly composed of Negro students not as a result of state action but rather as the end product of segregated housing and adherence to the neighborhood school plan.' Gillmor and Gosule, 46 Boston U.L.Rev. 45, 46 (1966). The term 'de facto segregation' has become accepted as denoting non-racially motivated separation of the races as opposed to 'de jure segregation' denoting deliberate separation of the races by law. Since segregation is unconstitutional, each is a contradiction in terms. One student of the problem has pointed out, 'The term de facto segregation makes the racially imbalanced school appear * * * (to be) the Northern counterpart of segregated education under Jim Crow laws * * *. As such the term distorts reality and paralyzes thought. (Racial) imbalance is frequently labeled 'de facto' segregation to suggest that the requisite governmental involvement cannot be found.' Fiss, Racial Imbalance in the Public Schools: The Constitutional Concepts, 78 Harv.L.Rev. 564, 566, 584 (1965). Another has said, 'As a more accurate term, racial imbalance will be used to denote fortuitous racial separation in the public schools'. King, Racial Imbalance in the Public Schools: Constitutional Dimensions and Judicial Response, 18 Vand.L.Rev. 1290, 1291 (1965)
 'De facto segregation has become the short way of describing the existing situation in northern cities. * * * a school system which is marked by a very high proportion of Negroes in some of its schools, and few or none in others, but in which this separation has taken place without the compulsion of a state law or officially announced policy requiring that Negro and white children be placed in separate schools.' Hyman and Newhouse, Desegregation of the Schools: The Present Legal Situation, 14 Buff.L.Rev. 208, 221 (1964). See also Carter, De Facto Segregation, 16 West.Res.L.Rev. 502, 503 (1965).
 
 
 [93]
 The rationale of the neighborhood school system is that the school serves as the educational, recreational, and cultural center of the community. See Hansen, The Role of Educators, 34 Notre Dame L.Rev. 652, 654 (1959). Proponents of the view that neighborhood schools may become so racially imbalanced as to require affirmative corrective action point out: 'The modern-day neighborhood school cannot be equated with the common school of yesteryear the latter constitutes America's ideal of a democratic institution a single structure serving a heterogeneous community in which children of varied racial, cultural, religious, and socio-economic backgrounds were taught together the proverbial melting pot. Because of rigid racial and socio-economic stratification, ethnic and class similarity has become the most salient present-day neighborhood characteristic, particularly in urban areas. The neighborhood school, which encompasses a homogeneous racial and socio-economic grouping, as is true today, is the very antithesis of the common school heritage.' Carter, De Facto School Segregation: An Examination of the Legal and Constitutional Questions Presented, 16 West.Res.L.Rev. 502, 507 (1965). See also Sedler, School Segregation in the North and West: Legal Aspects, 7 St. Louis U.L.J. 228, 252-56 (1963)
 
 
 [94]
 For some idea of the number and complexity of the administrative problems school officials face in dealing with de facto segregation, see Kaplan, Segregation Litigation and the Schools-- Part II: The General Northern Problem, 58 ,NW.U.L.Rev. 157, 182-186 (1963). Professor Kaplan quotes at length excerpts from the testimony in Bell
 94a The question of providing special, earmarked federal funds for school districts that were trying to correct imbalanced neighborhood schools came up again in connection with the 1966 amendments to the Elementary and Secondary Education Act of 1965. The House Committee recommended special priority for applications under Title III of the Act from local school districts which sought help with problems of overcrowding, obsolescence, or racial imbalance. The House withdrew priority for dealing with problems of racial imbalance and added an amendment to Section 604 of the Act to the effect that nothing in the Act be construed to 'require the assignment or transportation of students or teachers in order to overcome racial imbalance.' The Senate went along with both actions. The debate makes clear that Congress was once again talking about racial imbalance in the context of de facto, not de jure, school segregation. See particularly Congressional Record, October 6, 1966, pp. 24538-9; 24541-3. See also 1966 U.S. Code Congressional and Administrative News, pp. 3865, 3866, for language in House committee report recommending the priority position of applications to deal with racial imbalance.
 
 
 [95]
 Congressman Cramer's amendment
 
 
 [96]
 This restriction appears in 407 of the Act. In its context it seems clearly to restrict the Attorney General to requesting only such relief as is constitutionally compelled. In other words, the Act is not to be construed as authorizing a statutory duty to reduce imbalance by bussing. Certainly the language of 407 does not call for a construction that prohibits a court order directing that school boards abandon racially discriminatory practices which violate the Constitution. Nor does it suggest that the Attorney General is precluded from requesting court orders to end racial imbalance resulting from unconstitutional practices
 
 
 [97]
 See Hearings Before the Committee on Rules, House of Representatives, 89 Cong. 2nd Sess., on H.Rep., 826, Sept. 29-30, 1966, 24-26, 37-40
 
 
 [98]
 See footnote 19
 
 
 [99]
 BNA Operations Manual, The Civil Rights Act of 1964, p. 359
 
 
 [100]
 See Note, Desegregation of Public School Activities, 51 Iowa L.Rev. 681, 690-96 (1966)
 
 
 [101]
 Senator Humphrey explained: The 'elimination of racial discrimination in employment or assignment of teachers * * * does not mean that Title VI would authorize a federal official to prescribe (particular) pupil assignments, or to select a (particular) faculty as opponents of the bill have suggested. The only authority conferred would be authority to adopt, with the approval of the President, a general requirement that the local school authority refrain from racial discrimination in treatment of pupils and teachers * * *.' 110 Cong.Rec. 6545
 
 
 [102]
 Smith v. Board of Education of Morrilton, 8 Cir. 1966, 365 F.2d 770, 784
 
 
 [103]
 For example, Lockett v. Board of Education of Muscogee County, 5 Cir. 1965, 345 F.2d 225, 229; Calhoun v. Latimer, 5 Cir. 1963, 321 F.2d 302, 307; Bradley v. School Board of the City of Richmond, 4 Cir. 1965, 345 F.2d 310, 320
 
 
 [104]
 Chambers v. Hendersonville City Board of Education, 4 Cir. 1966, 364 F.2d 189, 192, involved the problem of surplus Negro teachers who lost their jobs when an all Negro school was abolished. The School Board treated them as new applicants. The court held that this was discriminatory. Speaking for the majority, Judge Bell said: 'First, the mandate of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), forbids the consideration of race in faculty selection just as it forbids it in pupil placement. See Wheeler v. Durham City Board of Education, 346 F.2d 768, 773 (4 Cir. 1965). Thus the reduction in the number of Negro pupils did not justify a corresponding reduction in the number of Negro teachers. Franklin v. County Board of Giles County, 360 F.2d 325 (4 Cir. 1966). Gecond, the Negro school teachers were public employees who could not be discriminated against on account of their race with respect to their retention in the system. Johnson v. Branch, 364 F.2d 177, (4 Cir. 1966) * * *.'
 
 
 [105]
 The present Commissioner of Education, Harold Howe II, in a congressional hearing declared:
 'The guidelines do not mention and do not require 'racial balance' or the correction of racial 'imbalance.' Nor have we in the administration of our obligations under Title VI sought to establish 'racial balance.' They deal only with desegregation plans designed to eliminate the dual school systems for whites and Negroes, systems being operated in violation of the 1954 Supreme Court ruling. * * * Racial imbalance certainly means the notion of trying to establish some proportion of youngsters that must be in each and every school. We are not about such an enterprise. We are trying to give the effect of free choices to enter into, or to allow free choices in having pupils enter into whatever school they may wish to attend. I do not believe that free choice plans were ever intended by the courts or by us to be an arrangement whereby the dual school system could continue without support of law. But rather an arrangement by which over a period of time we would gradually have one school system rather than two separate school systems. I do not see that we are engaged in any way in establishing procedures for balance.' Hearing before the Committee on Rules, House of Representatives, 89th Cong. 2nd Sess., on H.Res. 26, Sept. 29-30, 1966, p. 32-34.
 See also footnote 106.
 
 
 [106]
 In a letter addressed to Members of Congress and Governors, dated April 9, 1966, and given wide publicity in the press, John W. Gardner, Secretary of Health, Education and Welfare explained the purpose of the percentages:
 'The second area of concern involves the percentages mentioned in the guidelines. Some have contended that this portion of the guidelines imposes a formula of 'racial balance.' This contention misconceives the purpose of the percentages. The prevailing method of desegregation is what is called the 'free choice' plan. Under such a plan, students select their schools instead of being assigned to them on a geographic basis. Courts have expressly conditioned their approval of such plans on affirmative action by school boards to insure that 'free choice' actually exists. It is our responsibility to review such plans to insure that the choice is, in fact, free and to indicate to school districts what procedures should be used to assure true freedom of choice.
 In seeking appropriate cirteria to guide us in review of free choice plans, we have adopted the objective criteria applied by the courts in similar situations. One such criterion is the distribution of students by race in the various schools of a system after the students have made their choices. If substantial numbers of Negro children choose and go to previously all-white schools, the choice system is clearly operating freely. If few or none choose to do so in a community where there has been a pattern of segregation, then it is appropriate that the free choice plan be reviewed and other factors considered to determine whether the system is operating freely.
 With more than 2000 separate districts to consider, such percentages are thus an administrative guide which helps us to determine those districts requiring further review. Such review in turn will determine whether or not the freedom of choice plan is in fact working fairly.' New York Times, April 12, 1966, page 1.
 Printed in Hearings before the Committee on Rules, House of Representatives, 89 Cong. 2nd Sess., on H.Res. 826, Sept. 29-30, 1966, p. 31. Commissioner Howe reaffirmed Secretary Gardner's policies as stated in the letter. See Hearings on H.Res. 826, p. 30-33.
 
 
 [107]
 'Very decided variations in proportions of Negroes and whites on jury lists from racial proportions in the population, which variations are not explained and are long continued, furnish sufficient evidence of systematic exclusion of Negroes from jury service.' United States ex rel. Seals v. Wiman, 5 Cir. 1962, 304 F.2d 53, 67
 
 
 [108]
 In United States v. Ward, supra, 349 F.2d at 803, the Court compared the number of Negroes registered with the number of Negroes eligible to vote. A similar practice is used in proving systematic exclusion of Negroes from juries. Cassell v. State of Texas, 1950, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839; Avery v. State of Georgia, 1953, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244; Smith v. State of Texas, 1940, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84. In each instance, percentage tests have been used not as an effort to affect racial balance, but as a means of determining whether a challenged procedure is operating in a way that violates constitutional rights. See Finkelstein, The Application of Statistical Decision Theory to the Jury Discrimination Cases, 80 Harv.L.Rev. 338 (1966)
 
 
 [109]
 See footnote 58
 
 
 [110]
 Rep.U.S.Comm. on Civil Rights, Survey of School Desegregation in the Southern and Border States-- 1965-66, p. 51. 'Freedom of choice plans accepted by the Office of Education have not disestablished the dual and racially segregated school systems involved, for the following reasons: a. Negro and white schools have tended to retain their racial identity; b. White students rarely elect to attend Negro schools; c. Some Negro students are reluctant to sever normal school ties, made stronger by the racial identification of their schools; d. Many Negro children and parents in Southern States, having lived for decades in positions of subservience, are reluctant to assert their rights; e. Negro children and parents in Southern States frequently will not choose a formerly all-white school because they fear retaliation and hostility from the white community; f. In some school districts in the South school officials have failed to prevent or punish harassment by white children of Negro children who have elected to attend white schools; g. In some areas in the South where Negroes have elected to attend formerly all white schools, the Negro community has been subjected to retailiatory violence, evictions, loss of jobs, and other forms of intimidation.' Ibid
 
 
 [111]
 See Goss v. Board of Education, 1963, 378 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632; Dillard v. School Board of the City of Charlottesville, 4 Cir. 1962, 308 F.2d 920, cert. den'd 374 U.S. 827, 83 S.Ct. 1864, 10 L.Ed.2d 1051 (1963); Jackson v. Board of the City of Lynchburg, 4 Cir. 1963, 321 F.2d 230. For discussion of limitations to a free choice plan, see Fiss, Racial Imbalance in the Public Schools, 78 Harv.L.Rev. 563, 572 (1965)
 
 
 [112]
 Rep.U.S.Comm. on Civ.Rights, Survey of Desegregation in the Southern and Border States, 1965-66, p. 33. The Commission also notes that racial identification of schools as Negro schools is strengthened by: (1) normal school ties; (2) the interest Negro administrators and teachers have in maintaining the dual system (from May 1965 to September 1965, 668 Negro teachers became surplus because of desegregation); (3) some Negro educators are opposed to desegregation, because past economic and cultural deprivation makes Negroes ill prepared to complete with white children in schools
 
 
 [113]
 Kemp v. Beasley, 8 Cir. 1965, 352 F.2d 14, 21
 
 
 [114]
 This was not new. In 1957 a district court in Maryland held that stair step plans do not justify excluding a qualified individual, notwithstanding a more gradual schedule applicable to the school population generally. Moore v. Board of Education of Harford County, D.Md. 1957, 146 F.Supp. 91 and 152 F.Supp. 114, aff'd sub. nom. Slade v. Board of Education, 4 Cir. 1958, 252 F.2d 191, cert. den'd 357 U.S. 906, 78 S.Ct. 1151, 2 L.Ed.2d 1157 (1958). This Court approved such an order in Augustus v. Board of Public Instruction, 5 Cir. 1962, 306 F.2d 862, 863
 
 
 [115]
 See footnote 35. However, the press has carried accounts that progress is being made toward 'desegregation of teachers, administrators and other personnel' for 1967-68 in Jackson, Mississippi. See Jackson Clarion Ledger, July 30, 1966, page 1
 
 
 [116]
 'faculty desegregation is a necessary precondition of an acceptable free choice plan. A free choice plan cannot disestablish the dual school system where faculties remain segregated on the basis of the race of the teachers or the pupils. In such circumstances a school inevitably will remain identified as 'white' and 'negro' depending on the color of the teachers.' Rep., U.S.Comm. on Civil Rights, Survey of Desegregation in the Southern and Border States-- 1965-66, p. 57
 
 
 [117]
 Faculties should be desegregated so that 'both white and Negro students would feel that their color was represented upon an equal level and that their people were sharing the responsibility of high-level teaching'. Dowell v. School Board of Oklahoma City Public Schools, W.D.Okla.1965, 219 F.Supp. 427
 
 
 [118]
 In Kier the Court said that duty to desegregate faculty must be 'immediately and squarely met'; there can be no freedom of choice for faculties and administrative staffs by the 1966-67 school year. Insofar as possible, 'the percentage of the Negro teachers in each school in the system should approximate the percentage of Negro teachers in the entire system for the 1965-66 season'. 249 F.Supp. at 22
 
 
 [119]
 Rev. Theodore M. Hesburgh, President of Notre Dame and a member of the Civil Rights Commission, makes these suggestions: 'A realistic and quite possible approach to this is, I think, through the immediate improvement of all teachers of each race, beginning with those who most need assistance in being better qualified as teachers. P At this precise time of transition, why not institute along with the whole process of desegregation in the South a positive program of upgrading all teachers in the present systems? In fact, the best teachers of either race, worthy of their profession, should be put in the schools needing the most help to improve. One might even think of rotating teachers within the schools of a given district. There is already the existing pattern of academic year and summer institutes for just this purpose of improving teachers. * * * P If this positive action could be moved along quickly, with good will from all concerned, school administrators, parents, and students, then we could eliminate the present cat-and-mouse game which is going on between the Federal Office of Education and the local Southern school districts. In fact, I have a feeling that the South could solve its problem long before the North, which has an educational desegregation problem which may be less amenable to solution because of entrenched patterns of housing segregation.' Rep., U.S. Comm. on Civil Rights, Survey of Desegregation in the Southern and Border States-- 1965-66, p. 64
 
 
 [120]
 'Although only 164 (3.4 percent) of the 4,941 school districts in the South have qualified by the court order route, these districts include most of the major cities of the South and, accordingly, a large share of the population. Court orders are a significant method of qualification, particularly in Louisiana, where official resistance to compliance with Title VI has been most widespread. In Louisiana, 32 court orders have been accepted, affecting 86.5 percent of the school districts judged qualified.' 1966-- U.S.Comm. on Civ.Rights, Survey of School Desegregration in the Southern and Border States 46. See also Table 3 in Appendix B
 
 
 [121]
 For an HEW approved desegregation plan held insufficient to protect constitutional rights of Negro students see Brown v. Board of Education of DeWitt School District, E.D.Ark.1966, 263 F.Supp. 734. See also Thompson v. County School Board of Hanover County, E.D.Va.1966, 252, F.Supp. 546; Turner v. County School Board of Goochland County, E.D.Va.1966, 252 F.Supp. 578
 
 
 [122]
 'Innumerable cases have clearly established the principle that under circumstances such as this where a history of racial discrimination exists, the burden of proof has been thrown upon the party having the power to produce the facts. * * *' Chambers v. Hendersonville City Board of Education, 4 Cir. 1966, 364 F.2d 189, 192. In Brown II, permitting desegregation with 'deliberate speed' the Supreme Court put the 'burden * * * upon the defendants to establish that (additional) time is necessary * * * to carry out the ruling in an effective manner'. 349 U.S. at 300, 75 S.Ct. at 756
 123 U.S.Comm. on Civil Rights, Survey of School Desegregation in the Southern and Border States 1965-66, p. 54.
 
 
 [124]
 The Princeton plan involves establishing attendance zones including more than one school and assigning students by grade rather than by residence location. Thus all of the zone's students in grades 1 through 3 would attend school A, while all students in grades 4 through 6 would attend school B. For a discussion of the plan see Fiss, Racial Imbalance in the Public Schools: The Constitutional Concepts, 78 Harv.L.Rev. 564, 573 (1965)
 
 
 [1]
 In subsequent years the dates in both the explanatory letter and the choice form should be changed to conform to the choice period
 
 
 [2]
 Other estimates are summarized in Report of the United States Commission on Civil Rights, Survey of School Desegregation in the Southern and Border States 1965-1966, 27-28 (Feb. 1966)
 '* * * The Office of Education based on a sampling of 590 districts through a telephone survey conducted in cooperation with State departments of education, estimates that 216,000, or 7.5 percent, of the Negro students in the 11 Deep South States are enrolled in school this year with white pupils. (Office of Education, telephone survey, Table I. Sept. 27, 1965.) Civil rights organizations, relying upon figures obtained from a variety of sources, including field workers, advance a lower figure. The Southern Regional Council's estimate is 151,416 Negro pupils, or 5.23 percent of the total. (Southern Regional Council, 'School Desegregation: Old Problems Under a New Law' 9, Sept. 1965.) The American Friends Service Committee and NAACP Legal Defense and Educational Fund agree that the actual figure is less than 6 percent (American Friends Service Committee and NAACP Legal Defense and Educational Fund, 'Report on the Implementation of Title VI of the Civil Rights Act of 1964 in Regard to School Desegregation' 4, Nov. 15, 1965).'
 
 
 [1]
 Brown I Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873
 Brown II Brown v. Board of Education of Topeka, Kansas, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083.
 On December 6, 1965 in Patricia Rogers, et al. v. Edgar F. Paul, et al., 382 U.S. 198, 86 S.Ct. 358, the Court decried delays in desegregation of public schools and called for an acceleration of the process, but neither said nor intimated the existence of any power or the justification for any authority to forcefully mix or integrate these schools.